**FRANCHISE DISCLOSURE DOCUMENT**

**PAINT Nail Bar Franchise Company, LLC**
**A Florida limited liability company**
**1432 First Street**
**Sarasota, Florida 34236**
**(301) 807-2971**
**www.paintnailbar.com**
**https://www.facebook.com/paintnailbar;**
**https://www.instagram.com/paintnailbar;**
**https://www.pinterest.com/paintnailbar; and**
**https://twitter.com/paintnailbar/**

The franchises offered are for the operation of PAINT Nail Bar® Salons which are retail businesses that bring to fruition beautiful, hygienic nail salons where guests are welcomed with affordable luxury services, exceptional sterilization and safety standards, and impeccable customer service.

The total investment necessary to begin operation of a PAINT Nail Bar® Salon ranges from $184,350 to $714,700. This includes between $70,650 to $295,400 that must be paid to the franchisor, or our designee. The estimated initial investment for an area development program ranges from $264,350 to $884,700 (based on a Development Fee for 2 to 5 Salons). Under the Area Development Program, the Development Fee equals $45,000 for the first Salon plus: (a) $35,000 for the second Salon, and (b) $30,000 each for the remaining Salons to be developed. In addition to the Development Fee, you will also incur the total initial investment for each Salon except the Initial Franchise Fee is waived.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in a different format contact: PAINT Nail Bar Franchise Company, LLC, Attn: Mark Schlossberg, 1432 First Street, Sarasota, Florida 34236, (301) 807-2971, Mark@paintnailbar.com.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "*A Consumer's Guide to Buying a Franchise,*" which can help you understand how to use this disclosure document, is available from the Federal Trade Commission (the "**FTC**"). You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, DC 20580. You can also visit the FTC's home page at *www.ftc.gov* for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on Franchising in your state. Ask your state agencies about them.

The issuance date of this disclosure document is: September 29, 2021

1

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

# How to Use This Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits and losses.  You should also try to obtain this information from others, like current and former franchisees.  You can find their names and contact information in Item 20. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction.  Item 7 lists the initial investment to open.  Item 8 describes the supplies you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21, or Exhibit "D" includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only PAINT Nail Bar® Salons business in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a PAINT Nail Bar® Salons franchisee?** | Item 20 lists current and former franchisees.  You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for.  Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity.  See the table of contents. |

## What You Need to Know About Franchising *Generally*

**Continuing responsibility to pay fees**.  You may have to pay royalties and other fees even if you are losing money.

**Business model can change**.  The franchise agreement may allow the franchisor to change its manuals and business model without your consent.  These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**Supplier restrictions**.  You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates.  These items may be more expensive than similar items you could buy on your own.

**Operating restrictions**.  The franchise agreement may prohibit you from operating a similar business during the term of the franchise.  There are usually other restrictions.  Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**Competition from franchisor**.  Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**Renewal**.  Your franchise agreement may not permit you to renew.  Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**When your franchise ends**.  The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

### Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state.  Registration does not mean that the state recommends the franchise or has verified the information in this document.  To find out if your state has registration requirements, or to contact your state, use the agency information in Exhibit "A."

Your state also may have laws and require special disclosures or amendments be made to your franchise agreement.  If so, you should check the State Specific Addenda.  See the Table of Contents for the location of the State Specific Addenda.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

## Special Risks to Consider About *This* Franchise

Certain states require the following risk(s) be highlighted:

1.  **<u>Out-of-State Dispute Resolution</u>**.  The franchise agreement requires you to resolve disputes with the franchisor by mediation, arbitration and/or litigation only in Florida.  Out-of-state mediation, arbitration, or litigation may force you to accept a less favorable settlement for disputes.  It may also cost more to mediate, arbitrate, or litigate with the franchisor in Florida than in your own state.

2.  **<u>Financial Condition</u>**.  The franchisor's financial condition, as reflected in its financial statement (see Item 21), calls into question the franchisor's financial ability to provide services and support to you.

Certain states may require other risks to be highlighted.  Check the "State Specific Addenda" (if any) to see whether your state require other risks to be highlighted.

QB\40549416.55

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**THE FOLLOWING PROVISIONS APPLY ONLY TO**
**TRANSACTIONS GOVERNED BY**
**THE MICHIGAN FRANCHISE INVESTMENT LAW**

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.**

Each of the following provisions is void and unenforceable if contained in any documents relating to a franchise:

(a)     A prohibition on the right of a franchisee to join an association of franchisees.

(b)     A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c)     A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

(d)     A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 10 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(e)     A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(f)     A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g)     A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

      (i)     The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.

      (ii)     The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

1

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

(iii)    The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)    The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)    A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor.  This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)    A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000.00, the franchisee may request the franchisor to arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations, if any, of the franchisor to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled.  At the option of the franchisor, a surety bond may be provided in place of escrow.

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.

Any questions regarding this notice should be directed to:

State of Michigan
Department of Attorney General
CONSUMER PROTECTION DIVISION
Attention:  Antitrust & Franchise
G. Mennen Williams Building, 1st Floor
525 West Ottawa
Lansing, Michigan  48909
Telephone Number:  (517) 373-7117

QB\40549416.55

# TABLE OF CONTENTS

**ITEM**                                                          **PAGE**

ITEM 1 THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES ................................................................................................... 1

ITEM 2 BUSINESS EXPERIENCE ............................................................................ 2

ITEM 3 LITIGATION .................................................................................................. 3

ITEM 4 BANKRUPTCY ............................................................................................. 3

ITEM 5 INITIAL FEES ............................................................................................... 3

ITEM 6 OTHER FEES ................................................................................................ 5

ITEM 7 ESTIMATED INITIAL INVESTMENT ....................................................... 7

ITEM 8 RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES ............. 12

ITEM 9 FRANCHISEE'S OBLIGATIONS ............................................................... 16

ITEM 10 FINANCING ............................................................................................... 17

ITEM 11 FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING .................................................................................. 17

ITEM 12 TERRITORY .............................................................................................. 25

ITEM 13 TRADEMARKS .......................................................................................... 27

ITEM 14 PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ............ 28

ITEM 15 OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS ............................................................................... 29

ITEM 16 RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL ..................... 30

ITEM 17 RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION ............... 30

ITEM 18 PUBLIC FIGURES ..................................................................................... 33

ITEM 19 FINANCIAL PERFORMANCE REPRESENTATIONS ................................. 34

ITEM 20 OUTLETS AND FRANCHISEE INFORMATION ........................................ 43

ITEM 21 FINANCIAL STATEMENTS ...................................................................... 49

ITEM 22 CONTRACTS .............................................................................................. 49

ITEM 23 RECEIPT .................................................................................................... 50

Exhibits:

Exhibit "A"      List of State Agencies/Agents for Service of Process
Exhibit "B"      Franchise Agreement
Exhibit "C"      Area Development Addendum
Exhibit "D"      Financial Statements
Exhibit "E"      Form of Release
Exhibit "F"      State Specific Addenda and Riders
Exhibit "G"      Table of Contents of Manuals
Exhibit "H"      Principal Owner's Guaranty
Exhibit "I"      Principal Owner's Statement

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

Exhibit "J"      Form of Conditional Assignment of Telephone Numbers and Listings and Internet Addresses
Exhibit "K"      Confidentiality, Nonsolicitation and Noncompetition Agreement
Exhibit "L"      Lease Addendum
Exhibit "M"      Lender Consent
Exhibit "N"      Franchise Compliance Certificate
Exhibit "O"      State Effective Dates
Exhibit "P"      Receipts

APPLICABLE STATE LAW MAY REQUIRE ADDITIONAL DISCLOSURES RELATED TO THE INFORMATION CONTAINED IN THIS DISCLOSURE DOCUMENT. THESE ADDITIONAL DISCLOSURES, IF ANY, APPEAR IN AN ADDENDUM OR RIDER IN EXHIBIT "F."

QB\40549416.55

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

## ITEM 1
## THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES

To simplify the language in this disclosure document, "**we**" or "**us**" or "**our**" mean PAINT Nail Bar Franchise Company, LLC – the franchisor. "**You**" or "**your**" means the person or entity who buys a PAINT Nail Bar® franchise – the franchisee, and includes your partners if you are a partnership, your shareholders if you are a corporation, and your members if you are a limited liability company.

### Us and Our Parents, Predecessors and Affiliates

We are a limited liability company formed effective August 13, 2015 in Delaware and converted to a Florida limited liability company on November 3, 2017. Our principal business address is 1432 First Street, Sarasota, Florida 34236 ("**Corporate Headquarters**"), and our phone number is (301) 807-2971. Our registered agent for service of process is HBK CPAs & Consultants, 1777 Main Street, Suite 301, Sarasota, Florida 34236. Our agents for service of process in the states that require franchise registration are listed in Exhibit "A" to this disclosure document. We have no parent and no predecessors whose information is required to be disclosed in this Item. Our founders, Mark J. Schlossberg and Michele C. Schlossberg, own the Marks (defined below).

Our affiliate is PAINT Nail Bar, LLC, f/k/a Lusso Nail Bar, LLC, a Florida limited liability company ("**PNB**"). PNB was formed on April 2, 2014, and its principal business address is the same as our address. PNB has operated a PAINT Nail Bar® Salon since 2014. PNB has no obligations, and does not provide any services or products to franchisees. We do not currently have any affiliates that offer franchises in any lines of business. Our affiliate, Primers By Paint, LLC ("**PbP**") was formed effective July 1, 2020. PbP's principal business address is 1417 First Street, Suite 1010, Sarasota, Florida 34236. PbP has developed private label branded nail care products to be sold to franchised and affiliated PAINT Nail Bar® Salons both for resale and application at the Salons. Marketing and sales of the products are scheduled to begin on September 15, 2021. Our affiliate, PAINT Purpose LLC ("**PP**") was formed effective October 1, 2021. PP's principal business address is 1432 First Street, PAINT Nail Bar, Sarasota, Florida 34236. PP began selling a jewelry line to franchised and affiliate PAINT Nail Bar® Salons for resale at the Salon at its inception.

### Our Unit Franchise Program

We offer franchises for salons that provide affordable and luxury services for nails, self-care, and personal grooming, in addition to selling related products and services which use the Marks (defined below) and our franchise system. We call these salons "**PAINT Nail Bar® Salons**" and we call the PAINT Nail Bar® Salon that you operate under the Franchise Agreement your "**Salon**." You must operate the Salon from a site we approve (the "**Site**"). PAINT Nail Bar® Salons feature manicure, pedicure, waxing and massage services, along with the retail products we specify and operate under the mandatory and suggested specifications, standards, operating procedures and rules that we periodically specify for developing and/or operating a PAINT Nail Bar® Salon ("**System Standards**"). PAINT Nail Bar® Salons use certain trademarks, service marks and other commercial symbols that we periodically specify, as we periodically modify them (the "**Marks**").

### Area Development Program

We also grant, to persons who meet our qualifications and who are willing to undertake the investment and effort, the right to develop and operate Salons at multiple locations within specific

QB\40549416.55

geographical areas and within a predetermined time frame. Our standard form of Area Development Addendum (the "**ADA**") is attached as Exhibit "C." Each Salon is operated under a separate Franchise Agreement. An Area Developer is required to sign our then-current form of Franchise Agreement for each Salon, which may contain different terms than the current Franchise Agreement attached as Exhibit "B" to this disclosure document.

## Our Business.

We do not operate a business of the type being offered that you will operate. We have been offering franchises for PAINT Nail Bar® Salons since October 27, 2016. We do not engage in other business activities, and have not offered, and do not currently offer, franchises in any other lines of business.

## Market and Regulations

We strategically position PAINT Nail Bar® Salons between high-end spas and low-cost salons. Your Salon will compete with nail salons and businesses that offer services for nails, self-care, and personal grooming, including spas, nail salons, hair salons, and cosmetic businesses. Depending upon your Salon's location and demographics, certain high/low seasons exist. You will offer your products and services to the general public throughout the year.

Certain states and local governments have passed laws relating specifically to nail salons, including laws requiring licensure and education of nail technicians, laws regulating sanitation and sterilization, and laws regulating worker health and pay. You also must comply with local and state laws regulating the licensing and service of alcohol.

Other than these laws, there are no regulations specific to the operation of a PAINT Nail Bar® Salon, but you must comply with all applicable local, state, and federal laws that apply generally to all businesses. You should investigate these laws.

We have responded to the pandemic by following CDC Guidelines, including masks, social distancing, Plexiglas dividers, increased sanitation like double washing hands by employees and clients and washing cell phones.

## ITEM 2
## BUSINESS EXPERIENCE

### Chief Executive Officer and Co-Founder: Mark Schlossberg

Mark Schlossberg is one of our cofounders and has been our Chief Executive Officer since our formation in August 2015. Mark has also served as co-founder and Chief Executive Officer of PNB since its inception in April 2014. He has been the CEO of PbP since its inception on July 1, 2020. Mark has been the Manager of PP since its inception on October 1, 2021.

### Chief Innovation Officer and Co-Founder: Michele Schlossberg

Michele Schlossberg is one of our cofounders and has been our Chief Innovation Officer since May 15, 2017. From our formation in August 2015 to May 15, 2017, she was our Chief Operating Officer. She has also been the Chief Operating Officer and co-founder of PNB since its inception in April 2014.

## Director Of Franchise Operations:  Ashley Koshinski

Ashley Koshinski was our and PNB's Director of Store Operations from January 10, 2018 to January 2019 when she became Director of Franchise Operations.  From 2010 to 2016, she was a Franchise Business Consultant for Huntington Learning Center in Oradell, New Jersey.

## PbP, Director of Product Development:  Marcie Kremppel

Marcie Kremppel is CEO of our affiliate PbP.  She has been CEO of Kremppel Associates, in Sarasota, Florida, since March 2013.  Kremppel Associates is a developmental consultancy for companies, national and international, in the beauty brand space.

## Director Of Training and Master Nail Technician:  Stephanie Valdez

Stephanie Valdez has been our Director of Training and Master Nail Technician since June 2016, as well as for PNB at its PAINT Nail Bar® Salon in Sarasota, Florida.

## Director of PAINT Nail Bar® Salon: Elissa Alvarez

Elissa Alvarez was a Manager of the PAINT Nail Bar® Salon in Sarasota, Florida from April 2019 until she became its Director on August 1, 2019.  From September 2018 to March 2019, Elissa worked as a Back of House coordinator at the salon.  From February 2015 to August 2018 she worked as a sales representative for Stoneworks in Bradenton, Florida.

## Director of Store Operations PAINT Nail Bar® Salon:  Monica McBride

Monica McBride has been a Director of Store Operations at the PAINT Nail Bar® Salon in Sarasota, Florida since August 2020.  From September 2018 to July 2020, Monica worked as lead server at The Lucky Pelican in Sarasota, Florida.  From April 2015 to August 2018, she was Director of Business Development for McBride Cowhorses in Scott Depot, West Virginia.

**ITEM 3**
**LITIGATION**

No litigation is required to be disclosed in this Item.

**ITEM 4**
**BANKRUPTCY**

No bankruptcy is required to be disclosed in this Item.

**ITEM 5**
**INITIAL FEES**

### Initial Franchise Fee

You will pay us an initial franchise fee (the "**Initial Fee**") of $45,000 in a lump sum when you sign the Franchise Agreement.  If you sign an ADA with us, the Initial Franchise fee is reduced to -0-.  In consideration of this Initial Fee, we grant you a franchise to operate a Salon at a Site we have approved and provide you with initial training.  The Initial Fee is uniform and fully earned when paid and is not refundable under any circumstances.

3

## Development Fee

We charge an up-front development fee for you to secure the exclusive right to open PAINT Nail Bar® Salons in a pre-determined territory in a specific amount of time, under the ADA.  The Development Fee is $45,000 for the first PAINT Nail Bar® Salon to be opened pursuant to the franchise agreement signed simultaneous with the ADA, plus:  (a) $35,000 for the second Salon, and (b) $30,000 each for the remaining Salons to be developed under the Development Schedule.  After payment of the Development Fee in full, the Initial Franchise Fee for each Salon is reduced to -0-.  The total initial payment is illustrated as follows:

| No. of Salons | Current Initial Franchise Fee | Development Fee | Total Initial Fees Due |
|---|---|---|---|
| 2 | $45,000 | $35,000 | $80,000 |
| 3 | $45,000 | $35,000 + $30,000 | $110,000 |
| 4 | $45,000 | $35,000 + (2 x $30,000) | $140000 |
| 5 | $45,000 | $35,000 + (3 x $30,0000)0 | $170,000 |

## Establishment Package Fee

Before opening your Salon, you must purchase all items required for the interior and exterior of your Salon, including all vendors, ordering instructions and set-up (the "**Establishment Package**").  The Establishment Package includes, but is not limited to:  Furniture (reception bar, waiting area couch and tables, manicure tables and chairs, pedicure chairs, technician stools), cabinetry, ceiling (cloud systems), wall and floor design elements, basins, faucets, foot rests and cushions, shelving (dispensary), countertops, barn doors and hardware, fixtures, décor (mural and door logos and decals), rugs, prints and frames, clocks, apron holders, blankets, candy holders, jars, candles, jewelry dishes and displays, floral elements; bathroom elements including wallpaper, storage elements, pillows and seat cushions, towel holders, baskets, mirrors; Buddha, all other display elements (branding); supply carts, dispensers, trays, lighting, computer hardware and software, credit and phone systems, appliances, sterilization equipment, towel equipment, waxing equipment, equipment glassware, signage, safe and lockbox, as well as other materials we may require from time to time.  You must pay to us, or our designee, a fee for the Establishment Package (the "**Establishment Package Fee**") in an amount ranging from $60,000 to $220,000 depending on the amount that you order for your Salon.  The Establishment Package Fee is nonrefundable and is paid to us or our designee prior to opening your Salon.

## Initial Inventory Package Fee

Before opening your Salon, you must purchase consumable products, including product skews, price per unit and number per unit required for opening (the "**Initial Inventory Package**").  The Initial Inventory Package includes, but is not limited to, the following: private label products, PP's jewelry line, specific vendor polishes (colors and formulas), base and top coats, removers, drops, lotions, scrubs, back bar set-ups, differentiated gel products and associated elements, nail art products and application tools, paraffin waxing products (vendor specific) and application/management tools, manicure and pedicure files, buffers, Sterilization apparatus, cotton products, dental products, all storage and supply bags, manicure and pedicure implements with differentiated specificity, gloves, flip-flops, all grocery store products for staff and clientele, differentiated liquid and non-liquid cleaning products, and all retail product lines for retail sales, including jewelry, balms, body lotions and creams.  You must pay us, or our designee, a fee (the "**Initial Inventory Package Fee**") in an amount ranging from $10,000 to $27,000 depending on the amount that you order for your Salon.  The Initial Inventory Package Fee is nonrefundable and is paid to us or our designee prior to opening your Salon.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

## Site Evaluation

You must engage a commercial real estate agent to assist you with site selection and pay that agent's fees. You also must promptly reimburse our reasonable travel and other costs and expenses in evaluating any prospective site that you propose for your Salon. We estimate our travel and related costs will range from $650 to $3,400 for each evaluation, and these payments to us are not refundable.

## Range of Initial Payments

The total amount of initial payments to us ranges between $115,650 to $295,400 for a single Unit Franchise and $150,650 to $420,400 for the first franchise under an ADA for 2 to 5 Salons, depending on the amount of items that you order for your Salon.

## ITEM 6
## OTHER FEES

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty Fee | 6% of Gross Revenues[2] | On the 8th day of each month | You are required to pay the Royalty and any other fees by electronic funds transfer or such other method as we determine from time to time. If you do not timely report Gross Revenues to us, we may draft your account for 150% of the previous month's actual Royalty amount paid to us. |
| Marketing Fund Contribution | 1% of Gross Revenues | On the 8th day of each month | We may defer or reduce the Marketing Fund Contributions upon 30 days' prior written notice to you, but we will not increase the Marketing Fund Contribution during the first 2 years of your Term. |
| Technology Fee | Currently $650 per month | On the 8th day of each month | We will develop a franchisee intranet as part of our website that will provide additional communications to assist you by providing training, marketing and benchmarking metrics to better manage your Salon. We may increase this fee upon 30 days' notice to you. |
| Additional Training or Assistance Fee | Currently an amount between $400 to $800 per day per trainee for sales training plus travel costs and expenses | Before training begins | The Initial Training Program described in Item 11 is included with the Initial Fee. However, we charge this fee if we require or you request, and we agree to provide, additional on-site training, or Opening Coordinator training, or if we train additional personnel beyond the Initial Training Program. Fee range may vary depending on the training or trainer provided. |
| Supplier Evaluation Fee | Cost of inspecting and testing new products or suppliers, plus travel expenses | 15 days after billing | This covers the costs of testing new products or inspecting new suppliers you propose. |
| Renewal/Successor Franchise Fee | 50% of our then-current Initial Fee | Upon signing | There are other conditions for the grant of a successor franchise. |

QB\40549416.55

| Type of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| | for new franchisees | Successor Franchise Agreement | |
| Purchase of Private Label Products | PbP's then-current wholesale price. | On the 8th day of each month | Payments are due our affiliate for products purchased during the preceding month. We anticipate that these products will become available beginning September 15, 2021. |
| Purchase of PP's Jewelry Line | PP's then-current wholesale price, which is cost plus 10%. | On the 8th day of each month | Payments are due our affiliate for products purchased during the preceding month. |
| Audit | Cost of inspection or audit plus travel | 15 days after billing | Payable only if you fail to furnish reports, supporting records or other required information or you under report Gross Revenues. |
| Administrative Fee | $100 per occurrence | On demand | We reserve the right to charge you this fee for each delinquent payment |
| Interest | Lesser of 18% per year or highest contract rate of interest allowed by law. | 15 days after billing. | Payable on all overdue amounts. |
| Costs and Attorneys' Fees | Will vary with circumstances. Our actual costs. | As incurred. | Payable upon your failure to comply with the Franchise Agreement. |
| Indemnification | Our actual costs; will vary according to loss. | On demand. | You must indemnify us if your actions result in a loss to us. |
| Transfer Fee | $15,000 | The Transfer Fee is due at the time of the Transfer. The training costs and expenses are due as incurred. | Payable by you or the transferee if we approve the transfer of your Salon. |
| Non-Compliance Fee | $500 | As incurred | Payable only if you fail to comply with our standards and specifications. |

## Explanatory Notes

(1)     All fees are imposed and collected by and payable to us, except that we may direct you to pay the Marketing Fund Contributions to an affiliate or another third party. All fees are non-refundable. We also may charge fees for additional products and services that we later determine to provide you during the Franchise Agreement's term. These fees are uniform for franchisees signing the Franchise Agreement.

You must sign and deliver to us the documents we periodically require to authorize us to debit your checking account automatically for the Royalty Fee and Marketing Fund Contribution and other amounts

QB\40549416.55

due under the Franchise Agreement or any related agreement between us (or our affiliates) and you. You must make required funds available for withdrawal by electronic transfer before the due date.

If you fail to report the Salon's Gross Revenue, we may debit your account for 150% of the last Royalty Fee and Marketing Fund Contribution that we debited. If the amounts we debit from your account are less than the amounts you actually owe us (once we have determined the Salon's actual Gross Revenue), we will debit your account for the balance, plus the administrative fees and interest, on the day we specify. If the amounts we debit from your account are greater than the amounts you actually owe us (once we have determined the Salon's actual Gross Revenue), we will credit the excess (without interest) against the amounts we otherwise would debit from your account during the following month(s). If you become delinquent in paying your Marketing Fund Contributions, in addition to our other remedies, we may require you to pay your Marketing Fund Contributions annually in advance. We may periodically change the mechanism for your payments of Royalty Fees, Marketing Fund Contributions and other amounts you owe to us and our affiliates under the Franchise Agreement or any related agreement.

(2) "**Gross Revenue**" means the total gross revenue from the provision of all products and services sold or performed by or for you or your affiliates relating to the Salon, whether in, at, from or away from the Salon, or through or by means of the Salon's business, whether from cash, check, credit card, debit card, barter or exchange, or other credit transactions, and regardless of collection, and including the following: (a) fees for services purchased at the Salon, (b) revenue you derive from merchandise and product sales and other Salon operations that you perform, (d) revenue that any of your affiliates derives from its providing any Salon-related products or Services, and (e) payments (for example, rent and license fees) that contractors or other third parties make to you or your affiliates relating to the Salon or its operations. However, the following amounts are deducted from "Gross Revenue" (i) sales taxes, use taxes, and other similar taxes you add to the sales price, collect from the customer and pay to the appropriate taxing authority, and (ii) any bona fide refunds and credits that you actually provide to customers. Gross Revenue does not include rent, license fees and other fees that you or your affiliate receives in return for subleasing part of the property on which the Salon is located (but not any part of the Salon itself) to an unrelated business.

## ITEM 7
## ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT

| Type of Expenditure[1] | Amount | | Method of Payment | When Due | To Whom Payment is To Be Made |
|---|---|---|---|---|---|
| Franchise Fee[2] | $0 | $45,000 | Lump Sum | Upon signing of Franchise Agreement | Us |
| Establishment Package[3] | $60,000 | $220,000 | Lump Sum | Upon signing of Franchise Agreement | Us, our Affiliates, or Third Parties |
| Initial Inventory Package[4] | $10,000 | $27,000 | Lump Sum | Upon signing of Franchise Agreement | Us, our Affiliates, or Third Parties |
| Site Selection [5] | $650 | $3,400 | As agreed | Prior to opening your Salon | Third Party |

| Type of Expenditure[1] | Amount | | Method of Payment | When Due | To Whom Payment is To Be Made |
|---|---|---|---|---|---|
| Social Media Fee [6] | $1,500 | $3,000 | As Agreed | Upon signing of Franchise Agreement | Third Party |
| Additional Training Fees[7] | $0 | $4,500 | Lump Sum | As Incurred | Us and Third Parties |
| Utility Deposits | $500 | $1,000 | Lump Sum | As Incurred | Third Parties |
| Construction, Improvements and other build-out not included with Establishment Package[8] | $75,000 | $262,500 | As Agreed | By agreement with Provider | Lessors, Contractors, Subs |
| Professional Fees (lawyer, accountant, etc.)[9] | $500 | $5,000 | As Agreed | By agreement with Provider | Third Parties |
| Rent (three months)[10] | $3,000 | $20,000 | As Agreed | By Agreement with Landlord | Third Parties |
| Office Equipment and Start-Up Supplies[11] | $5,000 | $8,000 | Lump Sum | As Incurred | Third Parties and Suppliers |
| Security Deposits[12] | $4,000 | $7,000 | Lump Sum | As Incurred | Third Parties |
| Insurance (premiums for first year)[13] | $800 | $1,300 | Lump Sum | As Incurred | Third Parties |
| Initial Marketing[14] | $3,000 | $6,000 | As Required | By agreement with Provider | Third Parties |
| State and local business licenses, permits, filing fees, etc.[15] | $300 | $500 | As Required | As Incurred | Third Parties |
| Signage | $100 | $5,000 | As agreed | Before opening your PAINT Nail Bar® Salon. | Third parties |
| Additional Funds – Initial Investment Period[16] | $20,000 | $95,500 | As Incurred | As Incurred | Third Parties |
| **Total Estimated Initial Investment (Unit)[17]** | **$184,350** | **$714,700** | | | |
| Area Development Fee[18] | $80,000 | $170,000 | Lump Sum | Upon signing the ADA | Us |
| **Total Estimated Initial Investment (ADA)[17]** | **$264,350** | **$884,700[19]** | | | |

**Explanatory Notes**

1.      All payments and fees due us or our affiliates in Item 7 are non-refundable.  Payments to third parties may be refundable if you and the third party agree to allow for a refund.  We currently do not offer financing directly or indirectly for any part of the initial investment.  The availability and terms of financing for third parties will depend on factors such as the availability of financing generally, your

8

creditworthiness, collateral you may have and lending policies of financial institutions from which you may request a loan

2.      The Initial Fee is $45,000 and paid to us upon signing the Franchise Agreement.  It is fully earned when paid and nonrefundable.  If you sign an ADA with us, the initial franchise fee is reduced to -0-.

3.      Payment of your Establishment Package Fee is paid to us, or our designee, prior to opening your Salon and it is not refundable.  The Establishment Package includes all items required for the interior and exterior of your Salon, including furniture and fixtures, computer hardware and software, credit and telephone systems, appliances, sterilization equipment, as well as other materials we may require from time to time.  The contents and quantities of a typical Establishment Package may vary and will be listed as an Exhibit to your Franchise Agreement.

4.      The Initial Inventory Package Fee is paid to us, or our designee, prior to opening your Salon and it is not refundable.  The Initial Inventory Package includes consumable products such as nail polishes and removers, waxing products, an inventory of PAINT Nail Bar® Products and other items we designate from time to time, including our private label products and PP's jewelry line.  The contents and quantities of a typical Initial Inventory Package may vary and will be listed as an Exhibit to your Franchise Agreement.

5.      Reimbursement for our Site Selection Expenses includes your payments to us for our reasonable travel and other costs in evaluating sites, and amounts for lodging, transportation and meals for your development planning session.

6.      You must engage our social media consultant and pay that consultant's fee.  We estimate the social media consultant's fee will range from $500 to $1,000 per month.

7.      The low end assumes no additional fees.  The estimate of Additional Training Fees includes your and your trainees' travel and living costs and, on the high end of the estimate, one (1) Additional Training Fee for one trainee.

8.      Leasehold improvements and construction costs, including floor coverings, wall treatment, ceilings, painting, and electrical, carpentry, and similar work, can range from $50 to $150 per square foot for a 1,500 square foot to $1,750 square foot PAINT Nail Bar® Salon.  Actual costs depend on location, the condition of the premises being remodeled, economic factors, and the Salon's size, which we estimate will be from 1,500 to 1,750 square feet.  This figure also covers costs for remolding, decorating, fixtures and other fixed assets.  Depending on the lease terms, your landlord might cover some of these costs.  This is the estimated cost of work requiring permits or that is otherwise necessary to bring the PAINT Nail Bar® Salon into accordance with our System Standards before the installation of the build-out décor included in the Establishment Package.  You will need to purchase and install all lighting switches, pictures and décor items.  While we or our affiliate may, at our or their option, arrange for the installation of some of the required build-out décor included in your Establishment Package, neither we nor our affiliate provides or arranges for any work requiring permitting or any work outside the work necessary to install and set up the build-out décor included with the Establishment Package.  For example, you will be responsible for any necessary electrical, plumbing, exterior painting and construction work.  These fees will vary significantly depending on the condition, location and size of the PAINT Nail Bar® Salon.

9.      This is the estimated cost to establish an entity and have the franchise documents reviewed.  You may incur additional costs for professional services, the costs of which may vary.

10. This amount estimates 3 months rent and deposit for lease. The figures in the table reflect our estimates for a newly-constructed 1,500 – 1,750 square foot PAINT Nail Bar® Salon. The Site may be in a rural or metropolitan area as long as we think there is a sufficient market in the area for the Salon's services. Rent and security deposit depend on the Site's size, condition, and location and demand for the premises among prospective lessees. However, rent can range from $15 per square foot per month for suitable space to $50 per square foot per month for prime space in a major metropolitan area. You might choose to purchase, rather than rent, real estate on which a building suitable for the Salon already is constructed or could be constructed. Real estate costs depend on location, size, visibility, economic conditions, accessibility, competitive market conditions, and the type of ownership interest you are buying. Because of the numerous variables that affect the value of a particular piece of real estate, this initial investment table does not reflect the potential purchase cost of real estate or the costs of constructing a building suitable for the Salon. Your PAINT Nail Bar® Salon space is estimated to be approximately 1,500 to 1,750 square feet of total space. Our business model suggests franchisees seek to obtain rental rates of $15 to $50 per square foot, triple net, but rental rates vary by local market conditions, geographic location, size, site profile, accessibility and other factors. It is also possible that you might choose to buy, rather than rent, real estate on which a building suitable for a PAINT Nail Bar® Salon already is constructed or could be constructed; however, we expect that you will lease space rather than own real estate and construct a building. Because of the numerous variables that affect the value of a particular piece of real estate, this estimated initial investment table does not reflect the costs of purchasing land and erecting a building. For a PAINT Nail Bar® Unit Franchise, assuming rent is paid in advance, the rental estimate of $3,000 to $15,000 reflects an estimate of your total leasing expenses for the time commencing on the Agreement Date to one (1) month following your Opening Date (a total of 1 to 4 months). The rental estimate includes first and last months' rent (as a deposit) plus first month's rent (a total of 3 months' rent).

11. This estimate is for items you will need to purchase in addition to those in the Establishment Package or Initial Inventory Package. However, you will be responsible for making sure your PAINT Nail Bar® Salon has a computer, printer, fax machine, telephones, and other relative technology. The low end of the range assumes you already have such equipment whereas the high end of the range assumes that all new equipment will need to be purchased. You will need to establish ACH/merchant account capabilities meeting our System Standards.

12. This estimate is for your rental/security deposits for your lease of the PAINT Nail Bar® Salon. We do not anticipate that you will purchase your real estate. If you are converting an existing business and intend to remain at the same site, we do not anticipate that you will have to pay any additional rental/security deposits. Rent is typically not refundable, except for the security deposit, which may be refundable if you comply with the terms of the lease.

13. You must obtain and maintain, at your own expense, insurance coverage that meets our minimum requirements. We must be named as an additional insured on these policies. Insurance costs vary based on policy limits, types of policies, nature of physical assets, gross revenues, claims history, number of employees, square footage, location, business, contacts and other factors.

14. You must implement an opening marketing program for the Salon according to our requirements and other System Standards. At least 90 days before you intend to open for business to the public, we (or a supplier we designate) and you will prepare a proposed opening marketing program that requires spending at least the minimum amount that we reasonably specify, currently from $3,000 to $6,000. You must make the changes to the program that we specify and implement the program as we approve it.

15. This figure includes amounts for business licenses, legal and accounting expenses, utility costs ($300 to $8,000 per month, plus deposits), workers compensation, public liability, and other insurance and other prepaid expenses.

16.    This item estimates your initial start-up expenses (other than the items identified separately in the table) for your Salon's first 3 months of operation, including miscellaneous supplies, inventory and equipment, laundry and janitorial services, payroll costs (but not any draw or salary for you), and other miscellaneous costs.  These figures are estimates, and we cannot guarantee that you will not have additional expenses in starting to operate your Salon.  Your costs depend on how closely you follow our methods and procedures, your management skill, experience, and business acumen, local economic conditions, the local market for your services, the prevailing wage rate, competition, and the sales level reached during the initial period.  This estimates additional funds you might need during the initial startup of your PAINT Nail Bar® Salon.  This estimate assumes you do not acquire additional e-mail addresses during this period.  We expect this may be necessary if you are unable to ramp up sales quickly enough to cover these costs.  It does not include additional training or assistance fees as listed in Item 6.  The Initial Investment Period begins on the Franchise Agreement date and ends 3 months thereafter.  These figures are estimates, and we cannot guarantee that you will not have additional or higher expenses and costs in starting the PAINT Nail Bar® Salon.  Your costs will also depend on factors such as: how much you follow our methods and procedures; your management skill, experience and business acumen; local economic conditions; the local market for your products and services; the prevailing wage rate; competition; and the sales level reached during the Initial Investment Period.  The Initial Investment Period used in this Item 7 is not intended to imply or represent that you will "break-even" or begin to see positive cash flow at any particular time.  We relied on our management experience at PAINT Nail Bar, LLC on 1417 First Street, Suite 1010, Sarasota, Florida to compile these estimates.  You should review these figures carefully with a business advisor before making any decision to purchase the franchise.  These estimates may vary for many reasons, including the capabilities of your management team.

17.    We relied on PNB's experience in operating a PAINT Nail Bar since 2014 to compile the estimate for additional funds and other estimates in this Item.  We also relied on our research and conversations with construction contractors, equipment vendors and other providers of products and services to PAINT Nail Bar® and similar concepts.  You should review these figures carefully with a business advisor before deciding to acquire the franchise.  We do not offer financing directly or indirectly for any part of the initial investment.  The availability and terms of financing depend on any factors, including the availability of financing generally, your credit worthiness and collateral, and lending policies of financial institutions.  The estimate does not include any finance charge, interest, or debt service obligation except for the security deposit under the Site's lease, which typically is refundable if you comply with the lease.  No amounts in the chart are refundable.

18.    We charge an up-front development fee for you to secure the exclusive right to open PAINT Nail Bar® Salons in a pre-determined territory in a specific amount of time, under the ADA.  The Development Fee is $45,000 for the first PAINT Nail Bar® Salon to be opened pursuant to the franchise agreement signed simultaneous with the ADA, plus:  (a) $35,000 for the second Salon, and (b) $30,000 each for the remaining Salons to be developed under the Development Schedule.  After payment of the Development Fee in full, the Initial Franchise Fee for each Salon is reduced to -0-.  The total initial payment is illustrated as follows:

| No. of Salons | Current Initial Franchise Fee | Development Fee | Total Initial Fees Due |
|:---:|:---:|:---:|:---:|
| 2 | $45,000 | $35,000 | $80,000 |
| 3 | $45,000 | $35,000 + $30,000 | $110,000 |
| 4 | $45,000 | $35,000 + (2 x $30,000) | $140000 |
| 5 | $45,000 | $35,000 + (3 x $30,000)0 | $170,000 |

These figures are estimates, and we cannot guarantee that you will not have additional or increased expenses and costs in starting a PAINT Nail Bar® Salon. You should review these figures carefully with a business advisor and speak with our existing franchisees before making any decision to purchase the franchise.

## ITEM 8
## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

The source for virtually all of your purchases is restricted in some way.

### Purchases from Us or Our Affiliates

You are required to purchase your Establishment Package and Initial Inventory Package from us, or our designee. You are also required to purchase certain inventory items from us, or our designee, during the operation of your Salon. The required purchases from us, or our designee, constitutes about 14% of the cost to establish a Salon and about 3% of the cost to operate a Salon. During the fiscal year ending December 31, 2020, we did not received any income from required purchases or leases by franchisees. Neither we, nor any of our affiliates, are the only approved supplier of anything other than the private label products. Our affiliate, PbP has developed, and will continue developing, private label brand nail care products to be sold via the Salons with sales and marketing scheduled to begin September 15, 2021. You are required to purchase them and market and sell them to Salon customers. PbP sells them to you at its then-current wholesale price at a markup from its costs. Our affiliate, PP, has been providing a jewelry line to PAINT Nail Bar Salons since October 1, 2021. You are required to purchase the jewelry line from PP and sell the jewelry line to Salon customers. PP currently sells the jewelry line to you at its costs, plus $10 for each piece of jewelry. During the fiscal year ending December 31, 2020, neither PbP nor PP received any income from required purchases from them by franchisees.

### Approved Suppliers

You must purchase or lease all products, supplies, equipment (including computer hardware and software), services (including social media services) and other items specified in the Manuals from time to time. If required by the Manuals, you agree to purchase certain goods and services only from suppliers designated or approved by us (which may include, or be limited exclusively to, us or our affiliate). We currently require you to use Alyssa Gay Consulting, 14940 Barrow Bluff Terrace, Bradenton, Florida 34212, alyssa@alyssayconsulting.com, 941.395.9325 for all of your social media services; Center State Bank, Deborah Joyce, Member Services Director, djoyce@centerstatebank.com, telephone number 904.301.2268 for merchant services; Tom Bell, National Franchise Director at ADP thomas.bell@adp.com for payroll services; and Keith Todoroff, 941.544.1393, designs@sarasotaarchitecture.us for architectural services. In our sole discretion, we may concentrate purchases with one or more approved or designated suppliers, to obtain lower prices, advertising support and/or other services, or for any other reason we deem appropriate. In such instances, we may limit the number of suppliers with whom you deal, designate sources that you will use, and refuse any request by you for another approved supplier of any applicable product or service. You agree to follow all of our policies and procedures for participation in or termination of any preferred vendor programs that we establish. If we receive rebates or other financial consideration from suppliers based upon franchisee purchases, we have no obligation to pass these amounts on to you or to use them for your benefit.

If you want us to approve a new supplier, product or service that you propose, you agree to submit to us sufficient written information about the proposed new supplier, product or service to enable us to approve or reject either the supplier or the particular item or service. We will have 30 days from receipt of the information to approve or reject the proposed new supplier, product or service. If we have not responded

to your request within this time period, the request is deemed disapproved and we will notify you in writing of such disapproval within 10 days of the end of such 30-day period. We may consider in providing such approval not just the quality standards of the products or services, but the proposed supplier's delivery capabilities, financing terms and ability to service our franchise system as a whole. We may terminate or withhold approval of any product or service, or any supplier of a product or service, that does not meet our quality standards by giving you written notice. If we do so, you agree to immediately stop purchasing from such supplier or using such product or service in your Salon. At our request, you agree to submit to us sufficient information about the proposed supplier, product or service to enable us to determine whether it meets our standards and specifications. We may charge a reasonable fee for evaluating alternative suppliers, products or services, plus the actual cost of travel and living expenses of our personnel and any fees we pay to third parties in furtherance of the evaluation.

We estimate that required purchases from approved or designated suppliers currently represents less than 45% of your total purchases in establishing your Business, and less than 20% of your overall purchases in operating the Business.

Except for our affiliates, PbP and PP, there are no suppliers in which any of our officers own an interest.

## Standards and Specifications

You agree to develop and operate your Salon in accordance with our standards and specifications. Our standards and specifications may regulate, among other things (a) a description of the authorized goods and services that you may offer at your Salon; (b) mandatory and suggested number of days and hours that your Salon must be open for business; (c) mandatory and suggested specifications, operating procedures, and quality standards for products, services and procedures that we prescribe from time to time for PAINT Nail Bar® Salons; (d) mandatory reporting and insurance requirements; (e) mandatory and suggested specifications for your Salon; and (f) a written list of goods and services (or specifications for goods and services) that you will purchase for the construction of your Salon and the development and operation of your Salon, and a list of any designated or approved suppliers for these goods or services (which may include us or our affiliate). Our standards and specifications may impose minimum requirements for quality, use, cost, delivery, performance, design and appearance. We will notify you in our Manuals or other communications of our standards and specifications and/or names of approved suppliers.

We estimate that required purchases according to our standards and specifications currently represent less than 15% of your total purchases in establishing your Business, and less than 4% of your overall purchases in operating the Business.

## Rebates

We may receive rebates, payments or other material benefits from suppliers based on franchisee purchases. We intend to negotiate relationships with suppliers to enable our franchisees to purchase certain items at discounted prices. If we succeed, you will be able to purchase these items at the discounted prices that we negotiate (less any rebates or other consideration paid to us).

As of December 31, 2020, neither we nor our affiliates received any revenue from our approved suppliers on account of purchases from franchisees.

**Site Selection and Salon Development**

You may not begin developing the Salon until we have approved your proposed Site. You must send us for our approval (which we will not unreasonably withhold) a copy of the proposed lease or sublease for the Site before you sign it. The lease or sublease must contain the provisions we periodically specify to protect our interests as your franchisor. If you or your affiliate owns the property where the Site is located, then in addition to complying with the obligations described above concerning the lease with your affiliate (if your affiliate owns the Site), you must provide us with a copy of the deed and title insurance policy for the property.

The Salon must satisfy our standard design requirements and specifications for layout, color scheme, finishes, improvements, and decor for PAINT Nail Bar® Salons similar to the Salon. The Salon must contain the Establishment Package that we specify. Currently, depending on the Site's layout, you may decide whether the Salon will offer waxing services and massage services. All other decisions relating to the Salon's development and its layout, design, color scheme, finishes, improvements, decor and Establishment Package are subject to our approval. At our option, you must use only the architects and contractors that we designate or approve.

You must submit to us for our approval all construction and remodeling plans and specifications before beginning build-out for the Salon and all revised or "as built" plans and specifications as they are prepared during the Salon's construction and development. You may not begin build-out for the Salon until we have approved the plans and specifications. You must develop the Salon according to the plans and specifications we have approved. You must buy all fixtures, equipment, signs and furnishings ("**Operating Assets**") and other products and services that we specify for the Salon's development only from suppliers that we designate or approve, which might include or be limited to us, our affiliates or our designated vendors. You may not install or use any unauthorized Operating Assets at the Salon.

**Salon Upgrades**

In addition to your obligations to maintain the Salon according to System Standards, we may periodically modify and supplement System Standards, which may require you to invest additional capital in the Salon and incur higher operating costs. You must incur any capital expenditures required in order to comply with this obligation and our System Standards, as they may be modified from time to time. You must complete all work according to the plans that we approve within the time period that we reasonably specify.

**Insurance**

You agree to obtain and maintain, at your own expense, such insurance coverage that we require from time to time and meet the other insurance-related obligations in the Franchise Agreement. The cost of this coverage will vary depending on the insurance carrier's charges, terms of payment and your history. You agree to send us copies of all insurance policies. Each policy is required to name us and our affiliates as additional insured parties. Our current insurance policy requirements include:

(a) comprehensive general liability insurance:
- $2,000,000 general aggregate
- $1,000,000 per occurrence
- $1,000 for fire damage
- $5,000 for medical expenses (any one person)
- $1,000,000 for personal injury

(b) property/casualty insurance ($50,000 per occurrence)

(c)  $500,000 worker's compensation insurance (minimum amount required by applicable law)

Upon 10 days' notice, we may increase the minimum protection requirement as of the renewal date of any policy, and require different or additional types of insurance at any time, including excess liability (umbrella) insurance, to reflect inflation, identification of special risks, changes in law or standards or liability, higher damage awards or other relevant changes in circumstances.  If you fail to maintain any required insurance coverage, we have the right, but not the obligation, to obtain such coverage on your behalf, and you will promptly complete all applications and other forms and instruments required to obtain the insurance and pay to us, within 10 days after invoicing, all costs and premiums that we incur.

## Computer Hardware and Software

The required computer system and software designated by us is stated in our Manuals.  You must use this computer system for on-line reporting of such sales and other information from your computer to us as required under the Franchise Agreement or Manuals.  This will require that you have a reliable internet service provider for your Salon.  For any time period during which the computer system or internet service provider is not functioning properly, you must report such sales and other information to us by facsimile weekly, and by certified/registered mail no less frequently than monthly.

## Marketing Materials

You must participate in the manner we periodically specify in all advertising, marketing and promotional programs that we periodically designate for the Salon in the System Standards or otherwise in writing, subject to the Local Marketing Spending Requirement.  You must notify us in advance if you desire to develop additional artwork or other Marketing Materials for the Salon (other than artwork and Marketing Materials we provided to you).  At our option, we may (i) develop or designate a supplier to develop the requested artwork or Marketing Materials for the Salon at your expense, (ii) allow you to develop the artwork or Marketing Materials at your expense, or (iii) reject your request to use the artwork or Marketing Materials.  At our option, you must acquire Marketing Materials and other advertising, marketing and promotional products and services only from one or more suppliers that we designate or approve, which may include or be limited to us, our affiliates, and/or other restricted sources.

In addition, at least 15 business days before you intend to use or implement them, you must send us (a) samples or proofs of all Marketing Materials that we have not prepared or already approved, or that we previously approved and which you propose to change in any way, and (b) descriptions of all other advertising, marketing or promotional programs for the Salon that we have not already approved.  However, you do not need to send us any Marketing Materials for which you have simply completed the missing Salon-specific or pricing information based on templates that we sent to you.  If we do not notify you of our approval of these materials or programs within 10 business days after we actually receive them, they are deemed disapproved.  You may not use any Marketing Materials or conduct any advertising, marketing or promotional programs for the Salon that we have not approved or have disapproved.  If the Salon is underperforming, then we may, in addition to our other rights, require you to contribute the shortfall to the Marketing Fund or to pay us the shortfall for us to spend on Marketing Materials and advertising, marketing and promotional programs for your Salon.

## Miscellaneous

There are no purchasing cooperatives although we reserve the right to establish one or more purchasing cooperatives in the future.  Other than lower negotiated prices as stated above, you do not receive any material benefits for using designated or approved suppliers.

# ITEM 9
# FRANCHISEE'S OBLIGATIONS

This table lists your principal obligations under the franchise and other agreements.  It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.

| Obligation | Section in Agreement | Disclosure Document Item |
|---|---|---|
| (a) Site selection and acquisition/lease | Franchise Agreement ("**FA**"): §§ 2.1 and 2.2 and Exhibits "L" & "M". | Items 7, 11 and 12 |
| | Development Addendum ("**ADA**"): §§ 3 and 4 | |
| (b) Pre-opening purchases/leases | FA: §§ 2.2, 2.3, 3.1, 4, 7.1, 14.5 | Items 5, 6, 7, 8, 11 and 16 |
| (c) Site development and other pre-opening requirements | FA: §§ 2, 3.1, 4, 7.1, and 14.5 | Items 5, 6, 7 and 11 |
| | ADA: §§ 3 and 4 | |
| (d) Initial and ongoing training | FA: § 4 | Item 11 |
| (e) Opening | FA: §§ 2.4 and 7.1 | Item 11 |
| | ADA: §§ 3 and 4 | |
| (f) Fees | FA: §§ 3, 7.1, 7.4, 9.3 and 9.4 | Items 5, 6 and 7 |
| | ADA: § 5 | |
| (g) Compliance with standards and policies/operating manuals | FA: §§ 4.3, 5, & 6 | Item 11 |
| | ADA: § 3 | |
| (h) Trademarks and proprietary information | FA: § 5 | Items 13 and 14 |
| (i) Restrictions on products/services offered | FA: §§ 2.3, and 6 | Items 11 and 16 |
| (j) Warranty and customer service requirements | None | None |
| (k) Territorial development and sales quotas | None | None |
| | ADA §§ 3 and 4 | Item 12 |
| (l) On-going product/service purchases | FA: §§ 2.3 & 6 | Item 8 |
| | ADA: § 4 | |
| (m) Maintenance, appearance and remodeling requirements | FA: §§ 2.3, 6.1 and 11 | Items 11 and 17 |
| (n) Insurance | FA: §§ 14.5 | Items 7 and 8 |
| (o) Advertising | FA: § 7 | Items 6, 7 and 11 |
| (p) Indemnification | FA: §§ 14.3 | Item 6 |
| (q) Owner's participation/ management/staffing | FA: §§ 4 and 6 | Items 11 and 15 |
| (r) Records and reports | FA: § 8 | Item 11 |
| (s) Inspections and audits | FA: § 8 | Items 6 and 11 |
| (t) Transfer | FA: §§ 9, 10 | Items 6 and 17 |
| | ADA: § 10 | |
| (u) Renewal | FA: § 11 | Items 6 and 17 |
| (v) Post-termination obligations | FA: § 13 | Item 17 |
| (w) Non-competition covenants | FA: §§ 5.9 and 13.4 | Item 17 |

16

| Obligation | Section in Agreement | Disclosure Document Item |
|---|---|---|
| (x)   Dispute resolution | FA: § 15 | Item 17 |

## ITEM 10
## FINANCING

We do not offer direct or indirect financing.  We do not guarantee your note, lease, or obligation.

## ITEM 11
## FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

**Before you open the Salon, we will:**

(1)      Evaluate for approval a Site that meets our requirements.  If you do not have an approved Site when you sign the Franchise Agreement, you must propose a suitable site in the Site Selection Area 90 days after the Franchise Agreement's effective date.   Otherwise, we may terminate the Franchise Agreement.   We will not unreasonably withhold our approval of a Site that meets our criteria for demographic characteristics, traffic patterns, parking, character of neighborhood, competition from, proximity to, and nature of other businesses, and size, appearance and other physical and commercial characteristics.  In determining whether to approve or disapprove a proposed Site, we also may consider the Site's proximity both to the Site Selection Area's boundaries and to other existing or potential sites for PAINT Nail Bar® Salons located outside the Site Selection Area.  You must promptly reimburse the reasonable travel and other expenses we incur in evaluating any sites you propose.  We typically will approve or disapprove a location you propose within 15 days after receiving the complete site report and other materials we request.  We do not own the premises for PAINT Nail Bar® Salons and lease them to franchisees.  (Franchise Agreement Section 2.1)

(2)      Approve a lease that meets our requirements.  You must present to us for approval a copy of the proposed lease or sublease for the Site at least 30 days before you intend to sign it.  The lease or sublease must contain the provisions we periodically specify to protect our interests as your franchisor.  Those lease terms currently include the following:

•      allowing you to display the Marks and signs at the Salon according to the System Standards and requiring cooperation with us to de-identify the Salon when the franchise term ends,

•      requiring the landlord to send us copies of all lease default notices and provide us 30 days prior written notice of its intent to terminate the lease or evict you,

•      allowing us 30 days to cure any of your alleged defaults under the lease,

•      allowing us or our designee to take an assignment of the lease, at our option, if you default under the lease, Franchise Agreement or related agreement, or we or you terminate the Franchise Agreement before its term expires (unless you terminate because of our default), and

17

- allowing us access to landlord's information of your records relating to your performance of your obligations under the lease, including your lease payment records.

We also may (but have no obligation to) provide you guidance or assistance relating to the lease or sublease and its negotiation. We typically will approve or disapprove a lease or sublease you propose within 15 days after receiving it. You must sign a lease or sublease that we approve for an approved Site within 12 months after the Franchise Agreement's effective date, otherwise, we may terminate the Franchise Agreement. You may not sign any lease or sublease (or any renewal or amendment of the lease or sublease) that we have not approved. (Franchise Agreement Section 2.2)

(3) Provide our mandatory and recommended standards for the development of your Salon. You are responsible for developing the Salon at your expense. The Salon must satisfy our standard design requirements and specifications for layout, color scheme, finishes, improvements and decor for PAINT Nail Bar® Salons. The Salon must contain Establishment Package we specify. Depending on the Site's layout, you may decide whether the Salon offers tanning and massage services. All other decisions relating to the Salon's development and its layout, design, color scheme, finishes, improvements, decor and Establishment Package are subject to our approval.

You must prepare all required construction and remodeling plans to suit the Salon and make sure they comply with the Americans With Disabilities Act (the "**ADA**") and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions. At our option, you must use only the architects and contractors that we designate or approve. You must submit to us for our approval all construction and remodeling plans and specifications before beginning build-out for the Salon and all revised or "as built'' plans and specifications as they are prepared during the Salon's construction and development. You may not begin build-out for the Salon until we have approved the plans and specifications. Our review of the plans and specifications is limited to reviewing your compliance with our design requirements. Our review is not designed to assess your compliance with the ADA and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions, as compliance with those requirements and restrictions is your responsibility. You must develop the Salon according to the plans and specifications that we have approved. We may, but have no obligation to, periodically inspect the Salon's Site during its development. Our services under the Franchise Agreement do not include assisting you in securing financing for the Salon's development. (Franchise Agreement Section 2.3)

(4) See you the Establishment Package or direct suppliers to do so. (Franchise Agreement Section 2.3)

(5) Sell you the Initial Inventory Package or direct suppliers to do so. (Franchise Agreement Section 2.3)

(6) As discussed in Item 8, identify the Operating Assets, supplies and other products and services that you must use to develop and operate the Salon, the minimum standards and specifications that you must satisfy, and the names of designated, approved and recommended suppliers. Neither we nor our affiliates currently provide items directly. We will provide names of approved suppliers for some items. The Manual provides specifications for some items. We do not deliver or install any items. (Franchise Agreement Section 2.3)

(7) Provide a planning session and a training program on developing and operating a PAINT Nail Bar® Salon. We describe this planning session and training later in this Item. (Franchise Agreement Section 4.1)

18

(8)     Provide you access to one set of the confidential manuals and forms consisting of materials that we generally furnish to our franchisees for use in operating PAINT Nail Bar® Salons (the "**Manual**"). Our Manual, bulletins, and other written and electronic materials we periodically provide to you contain our System Standards and other information on your obligations under the Franchise Agreement. However, except where the Franchise Agreement specifies otherwise, System Standards will not include any employment-related policies or procedures and will not regulate the terms and conditions of employment for your employees except where the Franchise Agreement specifies otherwise, any information we provide (whether in the Manuals or otherwise) concerning employment-related policies or procedures or relating to the terms and conditions of employment for your employees is for your optional use.

You must comply with the Manual. We periodically may modify the Manual to reflect changes in System Standards, and we will communicate any required changes to you. Our master copy controls. You must keep the Manual confidential and current and in a secure location at the Salon. You may not copy any part of the Manual other than to operate the Salon. You may review the Manual at our offices before you purchase a franchise.

At our option, we may post the Manuals and other bulletins and written materials containing System Standards on a restricted website to which you will have access. If we do so, you must periodically monitor the website for any updates to the Manuals or System Standards. You must keep confidential any passwords and other digital identifications necessary to access the Manuals on that website.

(9)     Arrange for our affiliate to sell you private label products we require you to purchase, utilize and resell at your Salon. (Franchise Agreement Section 2.4)

(10)     Approve an opening marketing program that meets our requirements in the Manuals and other System Standards. At least 90 days before you intend to open to the public for business, we (or a supplier we designate) and you will prepare a proposed opening marketing program that requires spending at least the minimum amount that we reasonably specify, from $3,000 to $6,000 during the 3 months following the Salon's opening. You must make the changes to the program that we specify and implement the program as we approved it. (Franchise Agreement Section 7.1)

(11)     Inspect the Salon and approve it for opening if it meets our requirements. We describe our opening requirements in more detail below. (Franchise Agreement Section 2.4.1)

**During your operation of the Salon, we will:**

(1)     Guide you on specifications, standards, operating procedures, and rules that PAINT Nail Bar® Salons use, purchasing required products, equipment, materials and supplies, and advertising and marketing programs. We will guide you in the Manual, bulletins, or other written materials, during telephone consultations, and/or during consultations at our office or the Salons. Our System Standards may regulate terms of products, services and programs, including the terms of service offering and maximum, minimum and other pricing requirements for promotions, special offers and discounts in which some or all Salons participate. (Franchise Agreement Sections 4.3 and 6.2)

(2)     Give you updates to the Manual and System Standards. Changes in System Standards may require you to invest additional capital in the Salon and incur higher operating costs. (Franchise Agreement Sections 4.3)

(3)     Advise you regarding the Salon's operation based on your reports and our evaluations. (Franchise Agreement Section 8.1)

(4)     Periodically evaluate the Salon to determine your compliance with our System Standards. (Franchise Agreement 8.1)

(5)     Maintain and administer the System Website (Franchise Agreement Section 7.5).

## Advertising, Marketing, and Promotion

### *Local Advertising*

You must participate at your expense in the manner we periodically specify in all advertising, marketing and promotional programs that we periodically designate for Salons in the System Standards or otherwise in writing, subject to the Local Marketing Spending Requirement.  System Standards may regulate your participation in and requirements for sales, promotional, public relations, advertising and/or marketing programs, and materials and media used in these programs.  At least 15 business days before you intend to use or implement them, you must send us: (a) samples or proofs of all Marketing Materials that we have not prepared or already approved, or that we previously approved and which you propose to change in any way, and (b) descriptions of all other advertising, marketing or promotional programs for the Salon that we have not already approved.  However, you do not need to send us any Marketing Materials for which you have simply completed the missing Salon-specific or pricing information based on templates that we sent to you.  If we do not notify you of our approval of these materials or programs within 10 business days after we actually receive them, they are deemed disapproved.  You may not use any Marketing Materials or conduct any advertising, marketing or promotional programs for the Salon that we have not approved or have disapproved.  (Franchise Agreement Sections 7.2 and 7.3)

### *Local Marketing Spending Requirement*

The "**Local Marketing Spending Requirement**" means the amount you must spend during each period described below on approved Marketing Materials and other approved advertising, marketing and promotional programs for the Salon.  However, we will not count any of the following expenditures towards your Local Marketing Spending Requirement:  Marketing Fund Contributions, service offers, discounts or similar price reductions that you provide as a promotion, permanent on premises signs, lighting, personnel salaries, administrative costs, transportation vehicles (even if they display the Marks), and other amounts that we, in our reasonable judgment, deem inappropriate for meeting the Local Marketing Spending Requirement.

The Local Marketing Spending Requirement during the period beginning on the Salon's opening date and ending on the last day of the 3rd full calendar month after that (the "**Initial Marketing Period**") ranges from $3,000 - $6,000 in the aggregate, in addition to conducting any remaining activities required under the opening marketing program.  After the end of the Initial Marketing Period, the Local Marketing Spending Requirement during each calendar month is the amount of 0.5% of the Salon's Gross Revenue during the previous calendar month.

We may periodically review your books and records and require you to submit reports to determine your advertising, marketing and promotional expenses.  If you fail to spend (or prove that you spent) the Local Marketing Spending Requirement in any period, then at our option, in addition to our other rights, you must contribute the shortfall to the Marketing Fund or pay us the shortfall for us to spend on Marketing Materials and advertising, marketing and promotional programs for the Salon.

20

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

*Marketing Fund*

We will establish, maintain and administer a fund (the "**Marketing Fund**") for advertising, marketing, and public relations programs and materials and related activities for the PAINT Nail Bar® Salon franchise network. (Franchise Agreement Section 7.4) Each month, you will pay us or our designated Affiliate, via electronic funds transfer or another payment method we specify, a contribution to the Marketing Fund (the "**Marketing Contribution**") in the amount equal to 1% of the Salon's Gross Revenue during the previous month. The Marketing Contribution is due on the 8th day of each month. Each PAINT Nail Bar® Salon that we operate will contribute to the Marketing Fund at the same rate as you. (Franchise Agreement Section 7.4)

We will direct all programs that the Marketing Fund finances and have sole control over all creative and business aspects of the Marketing Fund's expenditures. The Marketing Fund may pay for preparing, producing and placing video, audio, and written materials, electronic media and social media, developing, maintaining and administering one or more System Websites, administering national, regional and multi-regional marketing and advertising programs, including purchasing trade journal, direct mail, and other media advertising and using advertising, promotion, and marketing agencies and other advisors to provide assistance, and supporting public relations, market research, and other advertising, promotion, marketing and brand related activities. We may place advertising in any media, including print, radio, television and Internet, on a regional or national basis. Our in-house staff and/or national or regional advertising agencies may produce advertising, marketing, and promotional materials.

We will account for the Marketing Fund separately from our other funds and not use the Marketing Fund to pay any of our general operating expenses, except for reasonable salaries, administrative costs, travel expenses, and overhead we incur in activities we perform for the Marketing Fund, including administering the Marketing Fund and its programs, conducting market research, preparing advertising, promotion, and marketing materials, developing, maintaining and administering the System Website and collecting and accounting for Marketing Fund Contributions. The Marketing Fund's assets will repay us and our affiliates for advertising, marketing, promotional, and brand development expenses that we and our affiliates incurred on the Marketing Fund's behalf before you sign the Franchise Agreement and, for some expenses, before the Marketing Fund began operations or collecting contributions. We will not use any Marketing Fund Contributions principally to solicit new franchise sales, although part of the System Website is devoted to franchise sales. The Marketing Fund is not our asset nor a trust, and we do not owe you fiduciary obligations because of our maintaining, directing or administering the Marketing Fund or for any other reason. In any fiscal year, we may spend on the Marketing Fund's behalf more or less than the aggregate contributions of all PAINT Nail Bar® Salons in that year, and the Marketing Fund may borrow from us or others to cover deficits and invest any surplus for future use. We will use interest earned on Marketing Fund Contributions to pay costs before spending the Fund's other assets.

Upon your written request, we will send you a copy of the Marketing Fund's most recent budget and unaudited financial statements. Independent accountants currently do not audit the Marketing Fund because we have not yet established it.

We may delegate some or all of our rights and responsibilities regarding the Marketing Fund to any affiliate or other responsible third party, and that entity will have all of the rights and responsibilities described here. If we do, we will have no further liability or responsibility relating to the delegated rights and responsibilities.

The purpose of the Marketing Fund is to develop recognition and goodwill of the Marks, the products and services associated with the Marks, and patronage of all PAINT Nail Bar® Salons. We have no obligation to ensure that Marketing Fund expenditures proportionately benefit any particular geographic

QB\40549416.55

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

area or PAINT Nail Bar® Salon, and we need not spend any amount on advertising in the area where your Salon is located. We assume no other direct or indirect liability to you for collecting amounts due to, maintaining, directing, or administering the Marketing Fund.

We may at any time defer or reduce a franchisee's Marketing Fund Contributions and, on 30 days' notice, reduce or temporarily suspend the Marketing Fund's operations for one or more periods of any length, and terminate (and, if terminated, reinstate) the Marketing Fund. If we terminate the Marketing Fund, we will refund all unspent funds to us and our affiliates and franchisees who are then contributing to the Marketing Fund in proportion to our and their respective contributions during the preceding 12-month period. We also may forgive, waive, settle, and compromise all claims by or against the Marketing Fund.

During 2020, no Marketing Funds Contributions were collected or expended.

There currently are no franchisee advertising councils that advise us on advertising policies for PAINT Nail Bar® Salons and no local or regional advertising cooperatives in which PAINT Nail Bar® Salon franchisees must participate.

## System Website

At our option, we or one or more of our designees may maintain one or more websites to advertise, market, and promote PAINT Nail Bar® Salons, the products and services that they offer and sell, and the PAINT Nail Bar franchise opportunity (each a "**System Website**"). (Franchise Agreement Section 7.5) If we establish one or more System Websites, we will provide you with a webpage that references the Salon on one or more of the System Websites that we designate. You must give us the information and materials that we periodically request to develop, update and modify that webpage. We will update and modify the webpage on a schedule that we periodically specify. By providing the information and materials to us, you represent to us that they are accurate and not misleading and do not infringe upon any third party's rights. However, we will own all intellectual property and other rights in the System Website, your webpage, and all information they contain (including the domain name or URL for that webpage, the log of "hits" by visitors, and any personal or business data that visitors supply).

We will maintain the System Website, including your webpage, and may use the Marketing Fund's assets to develop, maintain and update the System Website. We periodically may update and modify the System Website (including your webpage). You must notify us whenever any information on your webpage changes or is not accurate. We will update or add information that we approve to your webpage at reasonable intervals. We have final approval rights over all information on the System Website (including your webpage). We may implement and periodically modify System Standards relating to the System Website.

We will maintain your webpage on the System Website only while you are in full compliance with the Franchise Agreement and all System Standards (including those relating to the System Website). If you are in default of any obligation under the Franchise Agreement or the System Standards, then we may, in addition to our other remedies, temporarily remove your webpage from the System Website until you fully cure the default. We will permanently remove your webpage from the System Website upon the Franchise Agreement's expiration or termination. We also may, at our option, discontinue all System Websites at any time.

All advertising, marketing and promotional materials that you develop for your Salons must contain notices of the System Website's domain name in the manner we designate. You may not develop, maintain or authorize any other website, other online presence or other electronic medium (such as mobile applications, kiosks and other interactive properties or technology-based programs) that describes you or

QB\40549416.55

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

the Salon or displays any of the Marks. Except for using social media according to our System Standards, you may not conduct commerce or directly or indirectly offer or sell any products or Services using any website, another electronic means or medium, or otherwise over the Internet or using any other technology-based program without our approval.

Nothing limits our right to maintain websites other than the System Website or to offer and sell merchandise bearing the Marks from the System Website, another website or otherwise over the Internet without payment or obligation of any kind to you.

## Computer System

We will have independent, unlimited access to all information and data in your Computer System, including but not limited to the Salon's databases, spreadsheets, financial, word processing, communications, email and calendaring information. We may, through our access to your Computer System or otherwise, have access to names, contact information, financial information and other personal information of or relating to the Salon's clients ("**Client Information**"). (Franchise Agreement Section 6.7) We and our affiliates may use Client Information in our and their business activities, but during the Franchise Agreement's term we and our affiliates will not use the Client Information that we or they learn from you or from accessing the Computer System to compete directly with the Salon. Upon the Franchise Agreement's termination, we and our affiliates may make all disclosures and use the Client Information in any manner that we or they deem necessary or appropriate. You must obtain from your clients all authorization, and provide them all notices that applicable law periodically specifies, to enable us and our affiliates to use the Client Information in the manner that the Franchise Agreement contemplates (Franchise Agreement Section 5.8).

We currently require you to have two 27 inch iMacs with retina 5K display with the following performance:

- Retina 5k Display
- 3.1 GHz 6-Core processor with Turbo Boost up to 4.5 GHz
- 256GB SSD Storage
- 3.0GHz 6-Core 10th generation Intel Core
- i5 processor
- Turbo Boost up to 4.1GHz
- 8GB 266 MHz DDR4 memory, configurable up to 128GB
- 1 TB Fusion Drive
- Radeon Pro 5300 with 4 GB of GDDR6 memory
- Two Thunderbolt 3 ports

We estimate that the cost to obtain the Computer System is between $1,799 and $3,600. You will be required to upgrade the hardware and software from time to time.

## Opening

We estimate that you will open your PAINT Nail Bar® Salon about 4 to 8 months after you sign the Franchise Agreement. The timing depends on the time it takes you to locate an approved Site and sign an approved lease, the Site's location and condition, the work needed to develop the Salon according to our System Standards, completing training, obtaining financing, obtaining insurance, and complying with local laws and regulations. You must open and begin operating the Salon within 1 year after you sign your franchise agreement or we may terminate the Franchise Agreement. You must give us written notice of the Salon's opening date at least 5 days before that date.

QB\40549416.55

You may not open the Salon for business until (a) we have inspected and approved the Salon for opening, (b) you (or your managing owner) or your Salon's general manager has satisfactorily completed training, (c) you have satisfied all bonding, licensing, and other legal requirements, (d) you have complied with your obligations relating to your opening marketing plan, (e) you have paid us and our affiliates all amounts due, (f) you have obtained the required insurance, and (g) you have signed and delivered to us our Request for Opening Form under which, among other things, you certify that you have satisfied all of the requirements in subsections (a) through (f). (Franchise Agreement Section 2.4)

**Training**

## TRAINING PROGRAM

| Subject | Hours of Pre-Requisite Training | Hours of Classroom Training | Hours of On the Job Training | Location |
|---|---|---|---|---|
| Training Prerequisites | 10 | 0 | 0 | Corporate Headquarters in Sarasota, Florida, or other designated Salon |
| Introduction to Paint Nail Bar Organization | 0 | 1 | 0 | Corporate Headquarters in Sarasota, Florida, or other designated Salon |
| Relationship with Franchisor Total | 0 | 1 | 0 | Corporate Headquarters in Sarasota, Florida, or other designated Salon |
| Pre-Opening Total | 0 | 2 | 0 | Corporate Headquarters in Sarasota, Florida, or other designated Salon |
| HR Total | 0 | 2 | 0 | Corporate Headquarters in Sarasota, Florida, or other designated Salon |
| Daily Operations and Sales Total | 0 | 16 | 10 | Corporate Headquarters in Sarasota, Florida, or other designated Salon |
| Office Management Total | 0 | 4 | 0 | Corporate Headquarters in Sarasota, Florida, or other designated Salon |
| Marketing Total | 0 | 4 | 0 | Corporate Headquarters in Sarasota, Florida, or other designated Salon |
| **TOTAL HOURS** | **10** | **30** | **10** | |

**Initial Training Program**

Before the Salon opens, we will furnish a management training program at our headquarters in Sarasota, Florida for up to 6 people from your Salon on operating a PAINT Nail Bar® Salon. More personnel may attend the initial training program (depending on our capacity) at your expense, we currently charge $500 per person per session. You must pay your and your employee's travel, living, and other expenses during training. Training occurs for you (or your managing owner) and/or the Salon's manager(s)

after you sign the Franchise Agreement and while you are developing the Salon.  Training for other Salon personnel may occur after you open the Salon for business.

Our trainers are Mark Schlossberg, Michele Schlossberg,  Ashley Koshinski, and Stephanie Valdez (see Item 2 for more information on these individuals).  Mark and Michele each have over 7 years of experience in the nail salon industry since PNB's opening of the PAINT Nail Bar® Salon in 2014.  Ashley has been with PNB and us for 4 years and has 4 years' experience in the nail salon industry and over 9 years' experience in franchise support.  Stephanie has 6 years' experience with us and PNB, and over 11 years' experience in the nail salon industry.  Monica has 1 year experience with us and PNB, and  3 years' experience in business management.

Training is mandatory for all franchisees.  You (or your managing owner) or the Salon's general manager must complete our initial training program to our satisfaction before you open the Salon.  Any person who works as a front desk staff member or manage at the Salon for 10 hours or more average each week, and/or has the responsibility for opening or closing the Salon, must complete, to our satisfaction, our training program at our designated site within 3 months of their date of hire. You must replace any manager who fails to satisfactorily complete our initial training program (Franchise Agreement Section 4).

We periodically may require you (or, if you are a legal entity, one of your Owners) and/or the Salon's general manager to attend and complete to our satisfaction any supplemental or refresher training programs on operating PAINT Nail Bar® Salons that we choose to provide. We may charge reasonable fees for these programs, and you will be responsible for your and your employees' wages and travel and living expenses (Franchise Agreement Section 4).

## Manual

The table of contents of our Manual, which contains 369 pages, is attached as Exhibit "G."

## ITEM 12
## TERRITORY

## Unit Franchise

If you have not yet located an approved Site when you sign the Franchise Agreement, we will designate a "**Site Selection Area**" when you sign that Agreement.  We typically identify Site Selection Areas using street names and locations as boundary points and there is no minimum size for a Site Selection Area.  The Site Selection Area is the area within which you must look for your Site.  During the period beginning on the Franchise Agreement's effective date and ending on the date we deliver our written notice approving the Salon's site (the "**Site Acceptance Date**"), we and our affiliates will not ourselves operate or authorize others to operate a PAINT Nail Bar® Salon, the physical premises of which are located within the Site Selection Area.  But, we may engage in any other activities we desire within and outside the Site Selection Area during this period, including (a) manufacture, distribute, market, and sell products identified by the Marks in any channel of distribution within or outside the Site Selection Area, (b) own, establish, operate, and license and/or franchise other to own, establish and operate Salons outside of the Site Selection Area, whether under the Marks or other trademarks, and (c) own, establish, operate, and license and/or franchise others to own, establish and operate Salons located within the Site Selection Area under trademarks other than the Marks.  You may not relocate your Salon without our prior written consent.  If you do request relocation of your Salon, you must comply with our then-current relocation policies and procedures and reimburse us for our out-of-pocket costs and expenses.

25

During the Franchise Agreement's term, neither we nor our affiliates will operate or authorize others to operate a PAINT Nail Bar® Salon, the physical premises of which are located within your Territory. The "**Territory**" means the geographic area comprised of a circle with the Salon's front entrance at the center that generally will be a radius of 2 to 5 miles, but may be larger or smaller depending on whether your Salon is in an urban, suburban, or rural area. Once we approve the Salon's Site, you will have no further territorial or other rights in those portions of the Site Selection Area that are outside the Territory. If you want to relocate the Salon, you must obtain our prior written consent, comply with our then-current relocation policies and procedures, and reimburse us for our out-of-pocket costs. However, we and our affiliates reserve all other rights that the Franchise Agreement does not expressly grant to you. This includes the right (without regard to proximity to the Salon), on the terms and conditions we deem appropriate, whether ourselves or through authorized third parties (including our affiliates), to (a) manufacture, distribute, market, and sell products identified by the Marks in any channel of distribution within or outside the Territory, (b) own, establish, operate, and license and/or franchise other to own, establish and operate Salons outside of the Territory, whether under the Marks or other trademarks, and (c) own, establish, operate, and license and/or franchise others to own, establish and operate Salons located within the Territory under trademarks other than the Marks.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control. We do provide a protected area where you have the exclusive right to locate a PAINT Nail Bar® Salon and we will not allow others to locate Salons within it. We are not required to pay any compensation to you for soliciting or accepting orders inside your Territory.

There are no restrictions on your soliciting guests outside your Territory or otherwise competing with other PAINT Nail Bar® Salons which are now, or may in the future be, located outside your Territory. You may not use other channels of distribution, such as the Internet, catalog sales, telemarketing, and other direct marketing, to make sales (as opposed to advertising and marketing) because you may only make sales at the Salon.

You have no options, rights of first refusal or similar rights to acquire additional franchises within your Territory or contiguous territories. Continuation of the exclusivity of your Territory does not depend on your achieving a certain sales volume, market penetration, or other contingency, and we may not alter your Territory or modify your territorial rights before your Franchise Agreement expires or is terminated (although we may do so upon renewal).

### Area Development Program

The Area Development Program is granted for specific geographical areas (the "**Development Area**") as identified in the ADA. There is no minimum territory granted under an Area Development Program. The Development Area may be different geographical locations throughout the United States. If you comply with the ADA and all Franchise Agreements with us, then during the term of the ADA, we will not operate (directly or through an affiliate) nor grant a franchise for the operation of a PAINT Nail Bar® Salon to be located within the Development Area, except for franchises granted to you. If you do not meet the Development Schedule, you will breach the ADA. We may then elect to terminate the ADA and you will forfeit any unused balance of the Development fee that you have paid to us. The criteria for our approval of a Site for any Salon in the Development Area will be as identified in our then-current Franchise Agreement, which may differ from the Franchise Agreement attached to this disclosure document as Exhibit "B."

You will not receive an exclusive territory. You may face competition from other franchisees, from Salons that we own, or from other channels of distribution or competitive brands that we control.

# ITEM 13
# TRADEMARKS

We grant you the non-exclusive right to use and display the Marks in operating, marketing, and advertising your Salon. The status of the registration of our principal Marks on the Principal Register of the United States Patent and Trademark Office (the "**PTO**") is as follows:

| | Registration Number | Registration Date |
|---|---|---|
| PAINT NAIL BAR® | 4874455 | December 22, 2015 |
| A LUXURY NAIL AFFAIR® | 4926293 | March 29, 2016 |
| PAINT NAIL BAR A LUXURY NAIL AFFAIR*+* | 5320334 | October 31, 2017 |

Our principal Marks are owned by 1 of our founders - Mark Schlossberg. He licenses them to us as 1 of our owners under an oral license.

The Mark for the private label nail products (Primers by PAINT™) is owned by Marcie Krempel, CEO of our affiliate PbP. Marcie licenses this Mark to us. She applied for registration with the USPTO on June 28, 2020 with application number 990016260. The License Agreement provides that owner of the mark has the right to specify, inspect, and oversee the quality standards of our services and products to assure the protection, enhancement, and goodwill of the Mark. The License Agreement is of perpetual duration and will remain in effect unless terminated by us or the owner of the Mark. If we breach the License Agreement, or if the License Agreement is otherwise terminated, you may lose your rights to use the Mark.

We have filed all required affidavits and renewal documents for these Marks. You must follow our rules when you use the Marks.

We do not have a federal registration only for Primers by PAINT™. Therefore, that trademark does not have many legal benefits and rights as a federally registered trademark. If our right to use the trademark is challenged, you may have to change to an alternative trademark, which may increase your expenses.

There are no currently effective material determinations of the PTO, the Trademark Trial and Appeal Board, the trademark administrator of any state, or any court, and no pending infringement, opposition, or cancellation proceedings or material litigation, involving the Marks. No agreement currently in effect significantly limits our right to use or sublicense the Marks in any manner material to the franchise.

You must notify us promptly of any claim by others (1) that you are infringing their trademark rights by using the Marks or (2) to any rights in the Marks which are inconsistent with the Franchise Agreement or our exclusive rights to the Marks. You must fully cooperate with us in prosecuting any infringement claim or defending a claim that you are infringing any other party's trademark rights. We may take the action we deem appropriate (including no action) and exclusively control any proceeding concerning the Marks. If you comply with the Franchise Agreement, we will defend you with counsel we select and indemnify you against all damages that you incur in a proceeding disputing your right to use the Marks under the Franchise Agreement. However, we will not defend or indemnify you for any claims involving unauthorized use of the Marks.

If, in our reasonable opinion, it is desirable to modify or discontinue using the Marks and/or to use one or more additional or substitute marks, you must comply with our directions within a reasonable time after receiving notice. We will not reimburse you for any costs or expenses associated with this obligation, including costs to change the Salon's signs, loss of revenue or profits, start-up or other expenses, or any other incidental or consequential expenses due to the change in Marks.

We do not know of either superior prior rights or infringing uses that could materially affect your use of the Marks.

You derive the right to use the Marks only under a franchise agreement.

## ITEM 14
## PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

No patents or patent applications are material to the franchise. We claim copyrights in the Manual, advertising, training and promotional materials, and similar items used in operating the franchise. We have not registered any copyrighted materials with the US Registrar of Copyrights, but need not do so at this time to protect them. You must modify or discontinue using the copyrighted materials as we direct.

There currently are no effective determinations of the PTO, United States Copyright Office or any court regarding any of the copyrighted materials. No agreement limits our right to use or license the copyrighted materials. We do not know of any superior prior rights or infringing uses that could materially affect your using the copyrighted materials. We need not protect or defend copyrights or take any action if notified of infringement, although we intend to do so if in our system's best interests. We may take the action we deem appropriate (including no action) and control any proceeding involving the copyrights. No agreement requires us to participate in your defense or indemnify you for damages or expenses in a proceeding involving a copyright or claims arising from your use of copyrighted items.

We will disclose certain Confidential Information to you during the Franchise Agreement's term. The Manuals contain Confidential Information. "**Confidential Information**" means information, processes, methods, techniques, procedures and knowledge, including know-how (which includes information that is secret and substantial), manuals and trade secrets (whether or not judicially recognized as a trade secret), that we or our predecessor, or our or its affiliates, developed or will develop relating to the development or operation of a PAINT Nail Bar® Salon. For this definition, "**secret**" means that the know-how as a body or in its precise configuration is not generally known or easily accessible and "**substantial**" means information which is important and useful to you in developing and operating the Salon. Confidential Information includes:

(1)     methods, techniques, equipment, specifications, standards, policies, procedures and information relating to the development, operation, and franchising of PAINT Nail Bar® Salons,

(2)     knowledge of suppliers and specifications for certain materials, equipment and fixtures for PAINT Nail Bar,

(3)     operating results and financial performance of PAINT Nail Bar® Salons other than your Salon,

(4)     all marketing, promotional or training materials used in the operation of or relating to PAINT Nail Bar® Salons, and

(5)     the System Standards and the Manuals.

You may disclose the Confidential Information to your owners and employees only to the extent reasonably necessary for the development and operation of your Salon.

You and those of your owners and employees who have access to the Confidential Information must maintain the confidentiality of the Confidential Information and may not, during or after the Franchise Agreement's term, use the Confidential Information in any other business or capacity or make unauthorized copies of any portion of the Confidential Information disclosed in written or other tangible or intangible form. You also must adopt and implement all reasonable procedures we periodically specify to prevent unauthorized use or disclosure of the Confidential Information, which includes requiring those of your owners and employees with access to the Confidential Information to sign confidentiality agreements in the form we periodically specify.

The restrictions on the disclosure and use of the Confidential Information will not apply to (a) information, methods, procedures, techniques and knowledge which are or become generally known to the general public, other than through disclosure (whether deliberate or inadvertent) by you or any owner or employee, and (b) the disclosure of the Confidential Information in judicial or administrative proceedings to the extent that you are legally compelled to disclose the information, if you have notified us before disclosure and used your best efforts to obtain, and afforded us the opportunity to obtain, an appropriate protective order or other assurance satisfactory to us of confidential treatment for the information.

You must promptly disclose to us all ideas, concepts, methods, techniques and products that you and/or your affiliates, owners, agents, representatives, contractors or employees conceive or develop during the term of the Franchise Agreement relating to the development or operation of a PAINT Nail Bar® Salon (collectively, "**Innovations**"). All Innovations are our sole and exclusive property, part of the franchise system, and works made-for-hire for us. If any Innovation does not qualify as a work made-for-hire for us, you must help us obtain all intellectual property rights in the Innovation. We have no obligation to make any lump sum or other payments to you or any other person relating to any Innovation. You must not use, nor allow any other person to use, those Innovations, whether at the Salon or otherwise, without obtaining our prior written approval.

You derive the right to use these items only under a franchise agreement with us.

## ITEM 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL
## OPERATION OF THE FRANCHISE BUSINESS

We do not require, but do recommend, that you (or your managing owner) personally supervise your Salon. Only a full-time, on-premises manager who (a) devotes his or her full working time and best efforts to the Salon's day-to-day on-premises operations, (b) has satisfactorily completed our management training program, and (c) is not engaged in any other business endeavor (except passive investments which do not interfere with the performance of his or her duties as manager), may serve as the Salon's manager. You must ensure that your managers agree to comply with the Franchise Agreement's confidentiality, non-competition, and innovations provisions. Unless we approve, you must at all times retain and exercise direct management control over all aspects of the Salon's business and the products and services it offers. You may not enter into any management arrangement, subcontracting arrangement or other arrangement under which any other party (including your affiliate) provides or exercises management control over any aspect of the Salon's operations or the products or services it offers without our approval. The Salon's manager need not have an equity interest in the Salon (or in you).

If you are a corporation, limited liability company, partnership, or other business entity, each owner we designate as a Guarantor must fully guarantee all of your monetary and non-monetary obligations to us

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

under the Franchise Agreement and agree to be personally bound by, and personally liable for the breach of, every provision of the Franchise Agreement, including the confidentiality, non-competition, fees and arbitration provisions, by signing the Principal Owner's Guaranty in the form attached as Exhibit "H" to the franchise disclosure document. **Guarantors**" means each owner having an ownership interest in you or any entity directly or indirectly controlling you of 20% or more (regardless of whether that owner is entitled to vote) and any other owner we may designate when the Franchise Agreement is signed. If your spouse or other family members are also owners of your business entity, they must sign the Principal Owner's Guaranty.

We will grant PAINT Nail Bar® Salon franchises under the Franchise Agreement only to you or your Affiliated Entitles. "**Affiliated Entity**" means a corporation, limited liability company, or other business entity of which you or one or more of your owners own at least 51% of the total authorized ownership interests, but only if you or your owner(s) have the right to control the entity's management and policies.

## ITEM 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer all products and services that we periodically require for PAINT Nail Bar® Salons. We may require you to stop offering any products or services that we no longer authorize. Currently, your Salon must offer manicures, pedicures, waxing and massage services. We currently do not authorize any other products or services for the Salon. We may periodically change the types of authorized services and products for your Salon and there is no limited on our right to do so.

Our System Standards may regulate maximum, minimum and other pricing requirements for products and services that the Salon offers, including requirements for promotions, special offers and discounts in which some or all PAINT Nail Bar® Salons participate, in each case to the maximum extent the law allows. They also may regulate participation in and requirements for loyalty programs for guests of PAINT Nail Bar® Salons.

## ITEM 17
## RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this disclosure document.**

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **Provisions** | **Section in Franchise or Other Agreements** | **Summary** |
| (a)   Length of the franchise term | FA: §1.2 | 10 years after the earlier of (a) the date on which the Salon first opens for guest services of any kind or (b) 365 days following the effective date of the franchise agreement. |
| | ADA:  §2 | Expires on the last day of the Development Schedule or the opening of the last Salon specified in the Development Schedule, whichever occurs first. |

QB\40549416.55

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **Provisions** | **Section in Franchise or Other Agreements** | **Summary** |
| (b)   Renewal or extension of the term | FA: §11 | If you are in good standing, you can acquire 1 additional 10-year term ("**1st Renewal Term**") on terms substantially similar to your current franchise agreement except that we may require a new Territory definition.  For any additional renewal terms, you will be required to sign our then-current form of franchise agreement, which may contain terms and conditions that are materially different. |
| (c)   Requirements for franchisee to renew or extend | FA: §11 | You must: maintain Salon or secure substitute Salon; bring Salon into compliance with our then current specifications and standards; sign new Franchise Agreement and ancillary agreements, general releases; satisfactorily complete training and refresher programs; pay fee; and sign a general release in the format attached as Exhibit "E" to this Disclosure Document.  For the 1st Renewal Term, you will be asked to sign a franchise agreement substantially similar to your current franchise agreement except that we may require a new Territory definition.  For any additional renewal terms, you will be required to sign our then-current form of franchise agreement, which may contain terms and conditions that are materially different. |
| (d)   Termination by franchisee | FA: §12.1 | You do not have any right to terminate other than when both (i) we have failed to cure within 30 days of such material breach after written notice, and (ii) you have given us the proper notice of termination. |
| (e)   Termination by franchisor without cause | None | None |
| (f)   Termination by franchisor with cause | FA: §12.2 ADA: §6 | We can terminate only if you commit one of several violations listed throughout the Franchise Agreement and/or Area Development Addendum.  A breach of the Franchise Agreement will not constitute a breach the Area Development Addendum nor will a breach of the Area Development Addendum constitute a breach of any Franchise Agreement. |
| (g)   "Cause" defined - curable defaults | FA: §12.2 | You have 5 days to cure: health, safety or sanitation law violations, monetary defaults to us or our Affiliates, unreported Gross Revenues, insurance policy defaults, repeated noncompliance with the Franchise Agreement or the System Standards; and 30 days to cure: monetary defaults to our approved suppliers and noncompliance with the Franchise Agreement and System Standards. |
| | ADA:  §6 | Failure to comply with Development Schedule. |

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **Provisions** | **Section in Franchise or Other Agreements** | **Summary** |
| (h) "Cause" defined - non-curable defaults | FA: §12.2 | Non-curable defaults include material misrepresentation or omission, failure to secure an approved Site and open the Salon within 365 days of the effective date of your franchise agreement, abandonment, unauthorized transfer, conviction or plea of no lo contendere to a felony or other crime, engaging in dishonest, dangerous or unethical conduct, loss of possession of the Site including foreclosure or lien on substantial portion of the Salon's assets, violation of confidentiality and non-competition provisions of the Agreement, failure to pay taxes to governmental authorities, and bankruptcy. |
| | ADA: §6 | Failure to comply with Development Schedule. |
| (i) Franchisee's obligations on termination/ non- renewal | FA: §13 | Obligations include payment of outstanding amounts, complete de-identification and return of confidential information (also see (r) below). |
| (j) Assignment of contract by franchisor | FA: §9.1 | No restriction on our right to assign. |
| (k) "Transfer" by franchisee - defined | FA: §9.2 | Voluntary or involuntary, direct or indirect assignment, sale, gift or other disposition of any interest in the Franchise Agreement, you or the Salon. |
| | ADA: §10 | You may not transfer the ADA. |
| (l) Franchisor approval of transfer by franchisee | FA: §§9 & 10 | We have the right to approve all transfers, even to a Business Entity controlled by you. |
| (m) Conditions for franchisor approval of transfer | FA: §9 | New franchisee qualifies, you pay us all amounts due, transferee and its managerial employees agree to complete training, transferee agrees to be bound by terms and conditions of Franchise Agreement, transfer fee paid, we approve material terms, you subordinate amounts due to you, and you sign other documents we require - including general releases in the form provided in Exhibit "E" (also see r below). |
| (n) Franchisor's right of first refusal to acquire franchisee's business | FA: §9.6 | We can match any offer for an ownership interest in you, your Franchise Agreement or your Salon provided that we may substitute cash for any form of payment at a discounted amount if an interest rate will be charged on any deferred payments, our credit will be deemed equal to that of any proposed purchaser, we will have no less than 60 days to prepare for closing and we receive all customary representations and warranties, |
| (o) Franchisor's option to purchase franchisee's business | None | N/A |

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **Provisions** | **Section in Franchise or Other Agreements** | **Summary** |
| (p)   Death or disability of franchisee | FA: §10 | Franchise or an ownership interest in you must be assigned to an approved buyer within 6 months and must be run by a trained manager during the period prior to the assignment.  Assignment is subject to our right of first refusal. |
| (q)   Non-competition covenants during the term of the franchise | FA: §5 | No interest in a competitive business, no controlling ownership interest in, or performance of services for, a competitive business anywhere, no recruiting or hiring of any person who is our employee or an employee of any Franchise.  A competitive business means any nail salon or one or more similar facilities or businesses that offer the same or similar products and services customarily offer by PAINT Nail Bar® Salons or an entity that grants franchises or licenses for any of these types of businesses, other than a Salon and other PAINT Nail Bar® Salons. |
| (r)   Non-competition covenants after the franchise is terminated or expires | FA: §13.4 | No interest in competing business for 2 years at, or within a 5-mile radius of the Salon, or within a 5-mile radius of any other PAINT Nail Bar® Salon |
| (s)   Modification of the agreement | FA: §15.2 | No modifications except by written agreement, but Manuals and System Standards are subject to change. |
| (t)   Integration/merger clause | FA: §15.11 | Only the terms of the Franchise Agreement (including the Manuals, System Standards, addenda and exhibits) are binding (subject to state law).  Any other statements or promises not in the Franchise Agreement, the agreements which are exhibits to this disclosure document, or in this Disclosure Document should not be relied upon and may not be enforceable. |
| (u)   Dispute resolution by arbitration of mediation | FA: §15.6 | Except for certain claims, all disputes must be arbitrated in Sarasota County, Florida (subject to state law). |
| (v)   Choice of forum | FA: §15.8 | Sarasota County, Florida (subject to state law). |
| (w)  Choice of law | FA: §15.7 | Florida law applies (subject to state law). |

## ITEM 18
## PUBLIC FIGURES

We do not use any public figure to promote our franchise.

QB\40549416.55

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

# ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if (1) a franchisor provides the actual records of an existing outlet you are considering buying, or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

We compiled the monthly Gross Revenues (which are unaudited figures) from the PAINT Nail Bar® Salons operated by our franchisees for the full 12 months of 2019 and 2020 and for the 60-month period ended June 30, 2021. As of December 31, 2019, there were 11 Salons operated by franchisees, but only 6 open for the entire year. Likewise, as of December 31, 2020, there were 19 Salons operated by franchisees, but only 12 open for the entire year. They offer substantially the same services to the public as the type of Salon we franchise.

The figures are based on the historical results from the Salon owned by PNB and our franchisees from the date the Salon opened for the fiscal years ended 2018, 2019 and the first 6-months of 2020.

These financial performance representations figures do not reflect the costs of sales, operating expenses or other costs or expenses that must be deducted from the gross revenue or gross sales figures to obtain your net income or profit. You should conduct an independent investigation of the costs and expenses you will incur in operating your PAINT Nail Bar® Salon. Franchisees or former franchisees, listed in the franchise disclosure document, may be one source of this information.

We obtained these figures from the information submitted by PNB and our franchisees. The sales figures we present are based on the cash basis of accounting and not generally accepted accounting principles. Neither we nor an independent certified public accountant has independently audited or verified the information.

QB\40549416.55

1.    **FYE 2019:**

| Salon | 01/19 | 02/19 | 03/19 | 04/19 | 05/19 | 06/19 | 07/19 | 08/19 | 09/19 | 10/19 | 11/19 | 12/19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salon 1 | $46,196 | $45,460 | $48,055 | $52,847 | $53,379 | $53,441 | $58,374 | $62,040 | $47,625 | $56,791 | $58,133 | $65,921 |
| Salon 2 | $25,534 | $27,806 | $36,253 | $41,610 | $44,052 | $44,052 | $40,459 | $44,310 | $39,375 | $44,851 | $49,338 | $53,352 |
| Salon 3 | $29,435 | $29,702 | $33,461 | $38,747 | $50,103 | $34,635 | $35,608 | $40,346 | $34,473 | $41,248 | $41,037 | $56,683 |
| Salon 4 | $28,240 | $29,115 | $36,542 | $38,310 | $49,660 | $49,184 | $48,234 | $51,643 | $40,981 | $40,589 | $42,638 | $55,128 |
| Salon 5 | $0 | $13,537 | $23,897 | $26,573 | $32,705 | $36,034 | $33,986 | $46,685 | $38,830 | $39,178 | $34,290 | $42,024 |
| Salon 6 | $31,527 | $32,607 | $41,273 | $41,425 | $50,224 | $44,385 | $43,933 | $46,568 | $37,151 | $42,514 | $45,272 | $52,635 |

2.    **FYE 2020:**  In mid-March of 2020, the COVID-19 pandemic had a material impact on the PAINT Nail Bar® Salon business. In light of the sudden drop in sales and the subsequent recovery, we provide the 2020 monthly Gross Revenues the first 6 months of the year (i.e., January through June).  During this 6-month period, most PAINT Nail Bar® Salon businesses experienced, and continue to experience operational restrictions limiting them to 25% to 50% capacity.

| Salon | 01/20 | 02/20 | 03/20 | 04/20 | 05/20 | 06/20 | 07/20 | 08/20 | 09/20 | 10/20 | 11/20 | 12/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salon 1 | $22,323 | $25,720 | $13,184 | 2,308 | Closed | $36,086 | $36,228 | $40,331 | $40,400 | $46,911 | $33,539 | $42,629 |
| Salon 2 | $39,227 | $39,235 | $21,328 | $10,284 | $2,370 | $23,699 | $46,833 | $47,235 | $44,315 | $42,737 | $40,052 | $54,865 |
| Salon 3 | $57,088 | $62,573 | $36,171 | $7,160 | $33,737 | $62,737 | $62,418 | $69,185 | $71,666 | %67,905 | $79,176 | $103,431 |
| Salon 4 | $37,340 | $57,555 | $27,741 | $8,783 | $8,956 | $43,138 | $50,281 | $51,342 | $53,581 | $56,222 | $51,660 | $60,037 |
| Salon 5 | $27,941 | $57,552 | $27,158 | $8,111 | $18,710 | $36,854 | $47,591 | $48,019 | $49,190 | $53,919 | $48,507 | $58,283 |
| Salon 6 | $15,719 | $23,812 | $9,911 | $1,221 | $7,107 | $32,438 | $22,218 | $18,330 | $20,569 | $24,071 | $20,860 | $24,482 |
| Salon 7 | $35,712 | $35,714 | $21,743 | $2,984 | $18,245 | $39,117 | $42,915 | $46,289 | $48,416 | $47,045 | $39,886 | $50,085 |
| Salon 8 | $38,761 | $37,740 | $22,824 | $6,587 | $15,888 | $49,003 | $46,486 | $47,305 | $47,691 | $53,014 | $42,386 | $50,482 |
| Salon 9 | $24,858 | $35,314 | $17,936 | $1,502 | $24,157 | $19,181 | $26,798 | $29,661 | $28,693 | $31,555 | $34,158 | $42,249 |
| Salon 10 | $40,491 | $30,351 | $23,820 | $4,971 | $36,096 | $35,044 | $39,757 | $35,994 | $36,873 | $31,617 | $30,626 | $43,968 |
| Salon 11 | $95,082 | $93,692 | $62,069 | $6,432 | $60,125 | $67,695 | $63,070 | $70,629 | $75,367 | $88,120 | $91,85 | $116,233 |

35

| Salon | 01/20 | 02/20 | 03/20 | 04/20 | 05/20 | 06/20 | 07/20 | 08/20 | 09/20 | 10/20 | 11/20 | 12/20 |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| Salon 12 | $30,479 | $36,520 | $16,432 | $2,259 | $13,583 | $22,920 | $19,773 | $20,913 | $20,070 | $$30,075 | $34,816 | $53,199 |

**3.** **January through September 2021:**

| Salon | 01/21 | 02/21 | 03/21 | 04/21 | 05/21 | 06/21 | 07/21 | 08/21 | 09/21 |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| Salon 1 | $39,779 | $41,318 | $47,230 | $53,980 | $56,897 | $45,125 | $48,478 | $51,731 | $55,306 |
| Salon 2 | $38,667 | $46,137 | $50,203 | $56,450 | $69,344 | $64,325 | $70,850 | $58,401 | $65,647 |
| Salon 3 | $87,387 | $92,500 | $92,652 | $99,196 | $107,753 | $102,366 | $111,029 | $106,568 | $99,471 |
| Salon 4 | $50,473 | $57,555 | $66,612 | $69,228 | $88,641 | $64,003 | $65,494 | $59,748 | $67,501 |
| Salon 5 | $49,095 | $57,552 | $58,558 | $61,137 | $75,055 | $73,509 | $89,720 | $86,799 | $88,456 |
| Salon 6 | $23,257 | $23,812 | $21,246 | $30,585 | $36,804 | $34,143 | $38,283 | $32,135 | $42,273 |
| Salon 7 | $40,256 | $45,862 | $58,523 | $59,742 | $64,634 | $64,462 | $59,6722 | $53,791 | $55,532 |
| Salon 8 | $41,707 | $39,296 | $58,105 | $59,481 | $60,510 | $44,775 | $45,475 | $41,133 | $50,646 |
| Salon 9 | $33,883 | $36,314 | $40,910 | $37,246 | $42,102 | $31,731 | $39,121 | $35,251 | $39,756 |
| Salon 10 | $35,049 | $33,448 | $43,468 | $43,817 | $51,365 | $43,326 | $51,963 | $42,463 | $53,081 |
| Salon 11 | $87,814 | $98,276 | $112,853 | $106,210 | $120,467 | $102,217 | $106,701 | $95,083 | $94,398 |
| Salon 12 | $47,734 | $47,906 | $62,606 | $74,364 | $82,169 | $76,906 | $79,023 | $77,154 | $80,791 |
| Salon 13 | $27,026 | $28,266 | $30,690 | $32,690 | $38,922 | $36,138 | $34,367 | $31,798 | $32,836 |
| Salon 14 | $18,305 | $19,332 | $29,165 | $40,860 | $49,076 | $41,527 | $46,254 | $42,461 | $50,221 |
| Salon 15 | $27,814 | $30,932 | $42,268 | $47,075 | $46,859 | $44,359 | $52,425 | $54,305 | $52,911 |
| Salon 16 | $19,519 | $19,841 | $23,033 | $29,690 | $37,641 | $37,396 | $34,028 | $29,272 | $31,430 |
| Salon 17 | $23,657 | $27,199 | $31,257 | $39,602 | $40,899 | $42,554 | $48,584 | $42,737 | $43,059 |
| Salon 18 | $12,304 | $15,152 | $23,670 | $23,719 | $28,037 | $27,082 | $22,909 | $21,835 | $23,562 |
| Salon 19 | $41,733 | $40,008 | $49,568 | $56,706 | $60,119 | $51,941 | $61,693 | $54,136 | $52,863 |

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

The Gross Revenues include sales of all products and services from or at the PNB Salon, including for nail technician care and polishing services; lash and waxing services; retail sales of merchandise (including nail and body products, lash products, candles, jewelry, clothing, etc.); sales of gift cards; commission proceeds from truck shows; and party fees. It is based on the same standards for computation of royalties under the franchise agreement.

**STATEMENT OF ACTUAL OPERATIONS OF
<u>AFFILIATED PAINT® NAIL BAR SALON</u>**

The following are the actual Profit and Loss Statements for the Salon owned by our affiliate PNB for the calendar years 2017, 2018, 2019 and 2020 and for the period from January 1, 2021 through August 31, 2021:

QB\40549416.55

# Paint Nail Bar
# Profit and Loss
### January - December 2017

| | | |
|---|---:|---:|
| **Income** | | |
| Income | | 1,091,600.54 |
| **Total Income** | $ | **1,091,600.54** |
| **Cost of Goods Sold** | | |
| Jewelry and Hand Bags[1] | | 11,794.63 |
| Nail Supplies[2] | | 75,108.50 |
| **Total Cost of Goods Sold** | $ | **86,903.13** |
| **Gross Profit** | $ | **1,004,697.41** |
| **Expenses** | | |
| Accounting | | 5,801.00 |
| Candles & Decor | | 1,681.02 |
| Charitable Donation | | 1,518.00 |
| Cleaning | | 3,581.50 |
| Computers & Software | | 5,076.55 |
| Consulting | | 3,652.94 |
| Credit Card Fees[3] | | 16,413.91 |
| Dues & Subscriptions | | 934.01 |
| Insurance | | 2,490.91 |
| Legal & Professional Fees | | 6,837.50 |
| Marketing | | 11,587.18 |
| Meals and Entertainment | | 4,750.44 |
| Office Expenses | | 4,883.44 |
| Payroll Fees | | 3,244.68 |
| Payroll Taxes | | 45,029.56 |
| Postage | | 516.22 |
| Rent or Lease[4] | | 52,290.02 |
| Repair & Maintenance | | 4,778.51 |
| Stationery & Printing | | 817.85 |
| Taxes & Licenses | | 609.10 |
| Telephone | | 1,681.94 |
| Utilities | | 1,906.42 |
| Wages | | 514,449.41 |
| **Total Expenses** | $ | **694,532.11** |
| **Net Operating Income** | $ | **310,165.30** |
| **Net Income** | $ | **310,165.30** |

[1] Cost of retail goods sold

[2] Includes all supplies utilized by techs and front desk to service customers

[3] Includes all merchant processing and other banking related fees and charges

[4] Includes all facility rent, CAM charges and associated sales taxes on rent (Florida-only)

(5) The Marketing Fund did not exist in 2017.

# Paint Nail Bar
## Profit and Loss
### January - December 2018

| | | |
|---|---:|---:|
| **Income** | | |
|    Income | | 1,171,718.35 |
| **Total Income** | $ | **1,171,718.35** |
| **Cost of Goods Sold** | | |
|    Jewelry and Hand Bags[1] | | 16,622.19 |
|    Nail Supplies[2] | | 60,448.04 |
| **Total Cost of Goods Sold** | $ | **77,070.23** |
| **Gross Profit** | $ | **1,094,648.12** |
| **Expenses** | | |
|    Accounting | | 5,922.00 |
|    Candles & Decor | | 940.01 |
|    Charitable Donation | | 2,117.39 |
|    Cleaning | | 4,800.00 |
|    Computers & Software | | 4,836.53 |
|    Consulting | | 6,026.92 |
|    Credit Card Fees[3] | | 12,817.26 |
|    Dues & Subscriptions | | 1,063.05 |
|    Insurance | | 3,362.32 |
|    Legal & Professional Fees | | 4,524.00 |
|    Marketing | | 11,505.96 |
|    Meals and Entertainment | | 6,279.88 |
|    Office Expenses | | 3,183.94 |
|    Payroll Fees | | 4,465.09 |
|    Payroll Taxes | | 43,869.18 |
|    Postage | | 608.61 |
|    Rent or Lease[4] | | 53,531.62 |
|    Repair & Maintenance | | 3,650.81 |
|    Stationery & Printing | | 125.56 |
|    Taxes & Licenses | | 629.94 |
|    Telephone | | 2,054.97 |
|    Utilities | | 3,124.80 |
|    Wages | | 536,539.43 |
| **Total Expenses** | $ | **715,979.27** |
| **Net Operating Income** | $ | **378,668.85** |
| **Net Income Before Deemed Marketing Fund Contribution** | $ | **378,668.85** |
| **Deemed Marketing Fund Contribution[5]** | | **11,717.18** |
| **Net Income After Deemed Marketing Fund Contribution** | $ | **366,951.67** |

[1] Cost of retail goods sold

[2] Includes all supplies utilized by techs and front desk to service customers

[3] Includes all merchant processing and other banking related fees and charges

[4] Includes all facility rent, CAM charges and associated sales taxes on rent (Florida-only)

[5] Marketing Fund Contribution of 1% of Gross Revenues that would be paid if not Corporate-owned

# Paint Nail Bar
# Profit and Loss
### January - December 2019

| | | |
|---|---:|---:|
| Income | | 979,578.69 |
| **Total Income** | $ | **979,578.69** |
| **Cost of Goods Sold** | | |
| Jewelry and Hand Bags[1] | | 9,324.97 |
| Nail Supplies[2] | | 57,812.82 |
| **Total Cost of Goods Sold** | $ | **67,137.79** |
| **Gross Profit** | $ | **912,440.90** |
| **Expenses** | | |
| Accounting | | 6,000.00 |
| Candles & Decor | | 1,135.69 |
| Charitable Donation | | 2,338.00 |
| Cleaning | | 2,773.89 |
| Computers & Software | | 3,179.30 |
| Consulting | | 4,783.87 |
| Credit Card Fees[3] | | 17,564.08 |
| Dues & Subscriptions | | 3,512.00 |
| Insurance | | 3,689.83 |
| Legal & Professional Fees | | 10,049.94 |
| Marketing | | 9,530.25 |
| Meals and Entertainment | | 7,086.98 |
| Office Expenses | | 1,123.36 |
| Payroll Fees | | 4,472.27 |
| Payroll Taxes | | 40,747.43 |
| Postage | | 191.71 |
| Rent or Lease[4] | | 55,905.73 |
| Repair & Maintenance | | 8,056.37 |
| Stationery & Printing | | 56.52 |
| Taxes & Licenses | | 1,117.96 |
| Telephone | | 2,193.01 |
| Utilities | | 2,474.28 |
| Wages | | 420,784.45 |
| **Total Expenses** | $ | **608,766.92** |
| **Net Operating Income** | $ | **303,673.98** |
| **Net Income Before Deemed Marketing Fund Contribution** | $ | **303,673.98** |
| Deemed Marketing Fund Contribution[5] | | 9,795.79 |
| **Net Income After Deemed Marketing Fund Contribution** | $ | **293,878.19** |

[1] Cost of retail goods sold

[2] Includes all supplies utilized by techs and front desk to service customers

[3] Includes all merchant processing and other banking related fees and charges

[4] Includes all facility rent, CAM charges and associated sales taxes on rent (Florida-only)

[5] Marketing Fund Contribution of 1% of Gross Revenues that would be paid if not Corporate-owned

# Paint Nail Bar
## Profit and Loss
### January - December 2020

| | | |
|---|---:|---:|
| Income | | 856,615.22 |
| **Total Income** | $ | **856,615.22** |
| **Cost of Goods Sold** | | |
| Jewelry and Hand Bags[1] | | 8,678.33 |
| Nail Supplies[2] | | 49,537.91 |
| **Total Cost of Goods Sold** | $ | **58,216.24** |
| **Gross Profit** | $ | **798,398.98** |
| **Expenses** | | |
| Accounting | | 7,200.00 |
| Candles & Decor | | 1,156.26 |
| Charitable Donation | | 6,410.00 |
| Cleaning | | 4,800.00 |
| Computers & Software | | 1,217.97 |
| Consulting | | 2,895.91 |
| Credit Card Fees[3] | | 11,553.46 |
| Dues & Subscriptions | | 4,383.11 |
| Insurance | | 3,516.55 |
| Marketing | | 9,273.00 |
| Meals and Entertainment | | 2,818.89 |
| Office Expenses | | 1,656.95 |
| Payroll Fees | | 4,604.26 |
| Payroll Taxes | | 37,977.96 |
| Postage | | 53.73 |
| Rent or Lease[4] | | 58,590.12 |
| Supplies | | 204.00 |
| Taxes & Licenses | | 1,390.39 |
| Telephone | | 979.56 |
| Utilities | | 3,625.76 |
| Wages | | 359,455.86 |
| **Total Expenses** | $ | **523,763.74** |
| **Net Operating Income** | $ | **274,635.24** |
| **Net Income Before Deemed Marketing Fund Contribution** | $ | **274,635.24** |
| **Deemed Marketing Fund Contribution[5]** | | 8,566.15 |
| **Net Income After Deemed Marketing Fund Contribution** | $ | **266,069.09** |

[1] Cost of retail goods sold

[2] Includes all supplies utilized by techs and front desk to service customers

[3] Includes all merchant processing and other banking related fees and charges

[4] Includes all facility rent, CAM charges and associated sales taxes on rent (Florida-only)

[5] Marketing Fund Contribution of 1% of Gross Revenues that would be paid if not Corporate-owned

# Paint Nail Bar
# Profit and Loss
### January - September 2021

| | |
|---|---:|
| Income | 861,275.73 |
| **Total Income** | **$ 861,275.73** |
| **Cost of Goods Sold** | |
| Jewelry and Hand Bags[1] | 4,402.44 |
| Nail Supplies[2] | 51,263.98 |
| **Total Cost of Goods Sold** | **$ 55,666.42** |
| **Gross Profit** | **$ 805,609.31** |
| **Expenses** | |
| Accounting | 5,400.00 |
| Candles & Decor | 213.47 |
| Charitable Donation | 195.77 |
| Cleaning | 3,303.70 |
| Computers & Software | 2,321.61 |
| Consulting | 923.72 |
| Credit Card Fees[3] | 21,338.74 |
| Dues & Subscriptions | 403.96 |
| Employee Relations | 244.62 |
| Insurance | 5,681.67 |
| Legal & Professional Fees | 420.00 |
| Marketing | 545.28 |
| Meals and Entertainment | 3,168.12 |
| Office Expenses | 705.29 |
| Payroll Fees | 1,338.07 |
| Payroll Taxes | 34,705.42 |
| Rent or Lease[4] | 61,520.50 |
| Repair & Maintenance | 4,331.72 |
| Telephone | 750.00 |
| Utilities | 4,643.90 |
| Wages | 377,964.29 |
| **Total Expenses** | **$ 530,119.85** |
| **Net Operating Income** | **$ 275,489.46** |
| **Net Income Before Deemed Marketing Fund Contribution** | **$ 275,489.46** |
| **Deemed Marketing Fund Contribution[5]** | **8,612.76** |
| **Net Income After Deemed Marketing Fund Contribution** | **$ 266,876.70** |

[1] Cost of retail goods sold

[2] Includes all supplies utilized by techs and front desk to service customers

[3] Includes all merchant processing and other banking related fees and charges

[4] Includes all facility rent, CAM charges and associated sales taxes on rent (Florida-only)

[5] Marketing Fund Contribution of 1% of Gross Revenues that would be paid if not Corporate-owned

**Some outlets have earned this amount. Your individual results may differ. There is no assurance that you'll earn as much.**

Written substantiation of the data used in preparing this financial performance representation will be made available to you upon reasonable request.

We recommend that you make your own independent investigation to determine whether or not your Salon may be profitable, and consult with an attorney and other advisors before executing the Franchise Agreement.

Other than the preceding financial information, PAINT Nail Bar Franchise Company, LLC, does not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual record of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Mark Schlossberg, 1432 First Street, Sarasota, Florida 34236, (301) 807-2971, the Federal Trade Commission, and the appropriate state regulatory agencies.

## ITEM 20
## OUTLETS AND FRANCHISEE INFORMATION

### Table No. 1
### System-Wide Summary Outlet for Years Ending December 31, 2018, 2019 and 2020

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised[1] | 2018 | 0 | 6 | +6 |
| | 2019 | 6 | 12 | +6 |
| | 2020 | 12 | 19 | +7 |
| Company-Owned[2] | 2018 | 1 | 1 | 0 |
| | 2019 | 1 | 1 | 0 |
| | 2020 | 1 | 1 | 0 |
| **Total Outlets** | **2018** | **1** | **7** | **+6** |
| | **2019** | **7** | **13** | **+6** |
| | **2020** | **13** | **20** | **+7** |

(1) We acquired a franchise that ceased operations in May 2021.
(2) This outlet is owned by our affiliate. PNB.

### Table No. 2
### Transfers of Outlets from Franchisees to New Owners (Other Than the Franchisor)
### for Years Ending December 31, 2018, 2019 and 2020

| State | Year | Number of Transfers |
|---|---|---|
| All States | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 1 |

| State | Year | Number of Transfers |
|---|---|---|
| **Total** | **2018** | **0** |
| | **2019** | **0** |
| | **2020** | **1** |

**Table No. 3**
**Status of Franchised Outlets For Years Ending December 31, 2018, 2019 and 2020**

| State | Year | Outlets at Start of Year | Outlets Opened | Terming-actions | Non-Renewals | Reacquired by Franchisor | Ceased Operations - Other Reasons | Outlets at End of Year |
|---|---|---|---|---|---|---|---|---|
| California | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| District of Columbia | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Florida(1) | 2018 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2019 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| | 2020 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| Kansas | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Maryland | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Minnesota | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Missouri | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| North Carolina | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Ohio | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Pennsylvania | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Tennessee | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

| State | Year | Outlets at Start of Year | Outlets Opened | Terming-actions | Non-Renewals | Reacquired by Franchisor | Ceased Operations - Other Reasons | Outlets at End of Year |
|---|---|---|---|---|---|---|---|---|
| Texas | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| Virginia | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Totals** | **2018** | **0** | **6** | **0** | **0** | **0** | **0** | **6** |
| | **2019** | **6** | **6** | **0** | **0** | **0** | **0** | **12** |
| | **2020** | **12** | **7** | **0** | **0** | **0** | **0** | **19** |

(1)     We reacquired a franchise in Florida permanently ceased operations in May, 2021.

**Table No. 4**
**Status of Company-Owned Outlets [1]**
**For Years Ending December 31, 2018, 2019 and 2020**

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of Year |
|---|---|---|---|---|---|---|---|
| Florida | 2018 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 |
| **Totals** | **2018** | **1** | **0** | **0** | **0** | **0** | **1** |
| | **2019** | **1** | **0** | **0** | **0** | **0** | **1** |
| | **2020** | **1** | **0** | **0** | **0** | **0** | **1** |

(1)     This outlet is owned by our affiliate. PNB.

**Table No. 5**
**Projected Openings as of December 31, 2020**

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets in the Next Fiscal Year (2019) | Projected New Company-Owned Outlets in the Next Fiscal Year (2019) |
|---|---|---|---|
| Arizona | 0 | 0 | 0 |
| California | 0 | 0 | 0 |
| Colorado | 1 | 1 | 0 |
| Connecticut | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 |
| Florida | 4 | 2 | 1 |
| Kansas | 0 | 0 | 0 |
| Maryland | 2 | 1 | 0 |
| Massachusetts++ | 0 | 0 | 0 |
| Michigan | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 |

45

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets in the Next Fiscal Year (2019) | Projected New Company-Owned Outlets in the Next Fiscal Year (2019) |
|---|---|---|---|
| Missouri | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 0 |
| North Carolina | 0 | 0 | 0 |
| Ohio | 1 | 0 | 0 |
| Pennsylvania | 0 | 0 | 0 |
| Tennessee | 0 | 0 | 0 |
| Texas | 3 | 2 | 0 |
| Virginia | 0 | 0 | 0 |
| **Total** | **12** | **6** | **0** |

++Salon to be located in Florida.

The name, address and telephone number of each current franchisee as of the date of this disclosure document are:

| Franchisee Name | Address | City | State | Zip | Telephone No. | Status |
|---|---|---|---|---|---|---|
| Paint Nail Bar Napa, LLC Elyse Quast PAINT Nail Bar – NAPA | 1300 First Street, Suite 322 | Napa | California | 94559 | 707-477-3135 | Opened 12/20 |
| Henseleigh, LLC (Raleigh and Seth Vincent) | 6908 Cumbre Vista Way | Colorado Springs | Colorado | 80924 | | Not Yet Opened |
| Capay Trail LLC Kevin and Amber Sutton PAINT Nail Bar - Arlington | 819 E Street, SE | Washington | District of Columbia | 20003 | 202.878.9436 | Opened 11/20 |
| Bayside Group, LLC Osant Geri PAINT Nail Bar - Aventura | 18275 Biscayne Blvd. | Aventura | Florida | 33160 | 309.423.0418 | Opened 7/18 |
| YWBG, Inc. Patricia Trino PAINT Nail Bar – Ft Myers | 6420 Plantation Park Court, Unit 103 | Fort Myers | Florida | 33966 | 239.225.9020 | Opened 8/20 |
| ***The Big T LLC Chelsea Dyer and Charles Garneau PAINT Nail Bar - Lakeland | 201 East Belmar Street | Lakeland | Florida | 33803 | 321.720.5436 | Opened 8/21 |
| Paint Naples LLC (John and Wendy Ciotti) + | 515 5th Avenue South | Naples | Florida | 34102 | 239.354.7800 | 11/19 |
| RVEDA Wellness LLC (Pearl and David Baker) | 365 Fifth Avenue | Naples | Florida | 34102 | | Not Yet Opened |

| Franchisee Name | Address | City | State | Zip | Telephone No. | Status |
|---|---|---|---|---|---|---|
| ***Karpe Diem Sisters, LLC Taylor Suzanne Karp PAINT Nail Bar – South Sarasota | 8216 S Tamiami Trail | South Sarasota | Florida | 34238 | 941.966-2021 | Opened 9/21 |
| I Just Ate a Bug, LLC Jennifer Lee PAINT Nail Bar- St. Pete | 320 Central Avenue | St. Petersburg | Florida | 33701 | 727.308.0381 | Opened 11/18 |
| Jessica Haworth | Wellen Park | Venice | Florida | | | Not Yet Opened |
| BRDBP Enterprises LLC Ron and Britten Moyers PAINT Nail Bar - Kansas City | 4941 W. 119th Street | Overland Park | Kansas | 66209 | 216.695.0327 | Opened 1/19 |
| ***Paint Nail Bar Annapolis, LLC Eddie and Sam Gilmore PAINT Nail Bar - Annapolis | 2077 Somerville Road, #150 | Annapolis | Maryland | 21401 | 240.417.8723 | Opened 2/21 |
| PAINT Nail Bar Bethesda, LLC (Cassidy Shollenberger and Nate Fassnacht) | 7900 Wisconsin Avenue | Bethesda | Maryland | 20814 | | Not Yet Opened |
| PAINT Nail Bar Birmingham, Inc (Rich Pfaff and Nicole Meadows | 229 North Old Woodward Ave | Birmingham | Michigan | 48009 | 249-940-4000 | Opened 11/20 |
| Gloss Beauty Bar LLC Angie Nobile PAINT Nail Bar - Rochester | 116 West 4th Street | Rochester | Michigan | 48307 | 248.621.3959 | Opened 5/8/18 |
| Dangela Enterprises' Inc. Dan and Angie Murphy PAINT Nail Bar - Wayzata | 1129 Wayzata Boulevartd | Wayzata | Minnesota | 55391 | 952.777.2778 | Opened 2/19 |
| Olive Row STL, LLC Whitey and Dustin Cole PAINT Nail Bar – St Louis | 63 Muirfield Spring Court | St. Charles | Missouri | 63304 | 808.336.0267 309.830.8462 | Opened 12/19 |
| Sasses LLC d/b/a PAINT Nail Bar (Sandy and Olivia Sessa) | 8 Beacon Hill Drive | Chester | New Jersey | 07930 | 908.963.3485 | Not Yet Opened |

47

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

| Franchisee Name | Address | City | State | Zip | Telephone No. | Status |
|---|---|---|---|---|---|---|
| Plume, LLC (Stuart and Nicole Rehfuss) | 8712 Lindholm Drive | Huntsville | North Carolina | 28078 | 704-343-8400 | Opened 09/18 |
| Just Run The Play, LLC (Sharece Curry-Miller and Mike Miller) | 4101 East Royalton Road | Broadview Heights` | Ohio | 44147 | | Not Yet Opened |
| Gray and Olivia, LLC (Kaitlin and Will Andrews) | 6134 Kruse Drive | Solon | Ohio | 44139 | 440-201-4164 | Opened 11/20 |
| The Kasmick Group, LLC PAINT Nail Bar - Pittsburgh | 2915 Persimmon Drive | York | Pennsylvania | 17404 | 717.654.0878 | Opened 11/19 |
| Brave and Chief LLC Kaitlin and Will Andrews PAINT Nail bar-Nashville | 3990 Hillsboro Pike, Suite 210 | Nashville | Tennessee | 37215 | 615.686-2860 | Opened 11/18 |
| MD Nail Bar Investments, LLC Keith and Mishon Wright Jason and Desiree Manning PAINT Nail Bar - Amarillo | 9180 Town Square Blvd., Suite 103 | Amarillo | Texas | 79119 | 806.223.6646 | Opened 3/2020 |
| Simplicity First LLC Dave and Shelley Simpson PAINT Nail Bar - Dallas | 3536 Haynie Avenue | Dallas | Texas | 75205 | 713.857.3845 713.376.6674 | Opened 1/2020 |
| Authenticity Inspired LLC (Shelley and Dave Simpson)-2nd location | 6565 Hillcrest Avenue Suite 120 | Dallas | Texas | 75205 | | Not Yet Opened |
| 9899 Holdings, LLC (Tommi and Brent Seidenberg) | 206 N Milam Street, Unit B | Fredericksburg | Texas | 78624 | | Not Yet Opened |
| PAINT Nail Bar, LLC Micah Pratt PAINT Nail Bar - Lubbock | 10305 Quaker Lane Suite 100 | Lubbock | Texas | 79424 | 806.368-5966 | Opened 1/11/18 |
| BA Intentional Investments, LLC (Alissa and Byron Hoover) | 107 S Main | Perryton | Texas | 79070 | | Not Yet Opened |

QB\40549416.55

| Franchisee Name | Address | City | State | Zip | Telephone No. | Status |
|---|---|---|---|---|---|---|
| Felicity LLC Karen Willis PAINT Nail Bar - Loudoun | 1601 Village Market Blvd. SE, Suite 117 | Leesburg | Virginia | 20175 | 571.216.6887 | Opened` 9/19 |

\*\*\*Opened in 2021
+ Closed and reacquired franchise May, 2021

The name, city and state, and the current business telephone number (or, if unknown, the last known home telephone number) of any franchise who, is our most recent full fiscal year: (a) had an outlet terminated, cancelled, or not renewed; (b) otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement, as application or (c) who has not communicated with us within 10 weeks of the issue date of this disclosure document is listed below:

| Franchisee Name | City | State | Zip | Telephone No. | Status |
|---|---|---|---|---|---|
| Paint Naples LLC (John and Wendy Ciotti) | Naples | Florida | 34102 | 239.354.7800 | Closed 5/21 and Reacquired |
| Don Klein | Lakewood Ranch | Florida | 34202 | 616.560.3242 | Reacquired 3/23/21 |

**If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.**

We are not offering any existing franchised outlets to prospective franchisees, including those that either have been reacquired by us or are still being operated by current franchisees pending a transfer. If we begin to offer any such outlet, specific information about the outlet will be provided to you in a separate supplement to this disclosure document.

During the last 3 fiscal years, no current franchisees have signed confidentiality clauses that restrict them from discussing with you their experiences as a franchisee in our franchise system. In some instances former franchisees have signed provisions restricting their ablity to speak openly about their experience with the PAINT® Nail Bar franchise system. You may wish to speak with current and former franchisees, but be aware that not all such franchisees will be able to communicate with you.

There are no (i) trademark-specific franchisee organizations associated with the franchise system being offered that we have created, sponsored or endorsed; or (ii) independent franchisee organizations that have asked to be included in this disclosure document.

## ITEM 21
## FINANCIAL STATEMENTS

Our audited financial statements as of December 31, 2020, December 31, 2019 and December 31, 2018 are attached to this disclosure document as Exhibit "D." Our unaudited balance sheet and statement of income as of August 31, 2021, are also attached as Exhibit "D."

## ITEM 22
## CONTRACTS

The following agreements are exhibits to this disclosure document

Exhibit B          Franchise Agreement

| | |
|---|---|
| Exhibit C | Area Development Addendum |
| Exhibit E | Form of Release |
| Exhibit F | State-Specific Riders to Franchise Agreement |
| Exhibit H | Principal Owner's Guaranty |
| Exhibit I | Principal Owner's Statement |
| Exhibit J | Conditional Assignment of Telephone Numbers and Listing and Internet Addresses |
| Exhibit K | Confidentiality, Nonsolicitation and Noncompetition Agreement |
| Exhibit L | Lease Addendum |
| Exhibit M | Lender Consent |
| Exhibit N | Franchise Compliance Certificate |

**ITEM 23**
**RECEIPT**

Exhibit "P" to this disclosure document are detachable receipts. You are to sign both, keep one copy and return the other copy to us.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT A TO THE DISCLOSURE DOCUMENT**

---

**LIST OF STATE AGENCIES/AGENTS FOR SERVICE OF PROCESS**

---

Our registered agent for service of process in Florida is:

HBK CPAs & Consultants
1777 Main Street, Suite 301
Sarasota, Florida  34236

If a state is not listed below, we have not appointed an agent for service of process in that state in connection with the requirements of the franchise laws. There may be states in addition to those listed below in which we have appointed an agent for service of process. There also may be additional agents appointed in some of the states listed below.

| STATE | STATE REGULATORY AGENCY | AGENT TO RECEIVE PROCESS IN STATE, IF DIFFERENT THAN THE STATE REGULATORY AGENCY |
|---|---|---|
| California | Department of Financial Projection and Innovation<br>*Los Angeles*<br>320 West 4th Street<br>Suite 750<br>Los Angeles, CA 90013-2344<br>(213) 576-7500<br>*Sacramento*<br>12101 Arena Blvd.<br>Sacramento, CA 95834<br>(916) 445-7205<br>*San Diego*<br>1350 Front Street, Room 2034<br>San Diego, CA 92101-3697<br>(619) 525-4233<br>*San Francisco*<br>One Sansome Street, Suite 600<br>San Francisco, CA 94104-4428<br>(415) 972-8565 | Commissioner of Financial Protection and Innovation |
| Hawaii | Department of Commerce and Consumer Affairs<br>Business Registration Division<br>Commissioner of Securities<br>P.O. Box 40<br>Honolulu, Hawaii 96810<br>(808) 586-2744 | Commissioner of Securities<br>Department of Commerce and Consumer Affairs<br>Business Registration Division<br>Securities Compliance Branch<br>335 Merchant Street, Room 203<br>Honolulu, Hawaii 96813 |
| Illinois | Franchise Bureau<br>Office of Attorney General<br>500 South Second Street<br>Springfield, IL 62706<br>(217) 782-4465 | |
| Indiana | Franchise Section<br>Indiana Securities Division<br>Secretary of State<br>Room E-111<br>302 W. Washington Street<br>Indianapolis, Indiana 46204<br>(317) 232-6681 | |

1

| STATE | STATE REGULATORY AGENCY | AGENT TO RECEIVE PROCESS IN STATE, IF DIFFERENT THAN THE STATE REGULATORY AGENCY |
|---|---|---|
| Maryland | Office of the Attorney General Securities Division 200 St. Paul Place Baltimore, MD  21202-2020 (410) 576-7042 | Maryland Securities Commissioner 200 St. Paul Place Baltimore, Maryland  21202-2020 |
| Michigan | Michigan Attorney General's Office Consumer Protection Division Attn:  Franchise Section 525 W. Ottawa Street Williams Building, 1st Floor Lansing, MI  48933 (517) 373-7117 | |
| Minnesota | Minnesota Department of Commerce Securities Unit 85 7th Place East, Suite 280 St. Paul, Minnesota  55101-2198 (651) 539-1600 | Commissioner of Commerce 85 7th Place East, Suite 280 St. Paul, Minnesota  55101-2198 (651) 539-1600 |
| New York | Office of the New York State Attorney General Investor Protection Bureau of Franchise 28 Liberty Street, 15th Floor New York, NY 10005 (212) 416-8222 | Attention:  Uniform Commercial Code New York Department of State One Commerce Plaza 99 Washington Avenue, 6th Floor Albany, NY 12231-0001 (518) 473-2492 |
| North Dakota | North Dakota Securities Department State Capitol 5th Floor, Dept. 414 600 East Boulevard Avenue Bismarck, ND  58505-0510 (701) 328-4712 | Securities Commissioner North Dakota Securities Department State Capitol 5th Floor, Dept. 414 600 East Boulevard Avenue Bismarck, ND  58505-0510 (701) 328-4712 |
| Oregon | Department of Consumer & Business Services Division of Finance and Corporate Securities Labor and Industries Building Salem, Oregon  97310 (503) 378-4140 | |
| Rhode Island | Department of Business Regulation Securities Division 1511 Pontiac Avenue John O. Pastore Complex–69-1 Cranston, RI  02920-4407 (401) 462-9527 | |

2

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

| STATE | STATE REGULATORY AGENCY | AGENT TO RECEIVE PROCESS IN STATE, IF DIFFERENT THAN THE STATE REGULATORY AGENCY |
|---|---|---|
| South Dakota | Division of Insurance Securities Regulation 124 S. Euclid, Suite 104 Pierre, SD 57501 (605) 773-3563 | |
| Virginia | State Corporation Commission 1300 East Main Street 9th Floor Richmond, VA 23219 (804) 371-9051 | Clerk State Corporation Commission 1300 East Main Street, 1st Floor Richmond, VA 23219 |
| Washington | Department of Financial Institutions Securities Division P.O. Box 9033 Olympia, WA 98507-9033 (360) 902-8760 | Department of Financial Institutions 150 Israel Road SW Tumwater, WA 98501 |
| Wisconsin | Division of Securities Department of Financial Institutions Post Office Box 1768 Madison, Wisconsin 53701 (608) 266-2801 | |

QB\40549416.55

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT B TO THE DISCLOSURE DOCUMENT**

---

**FRANCHISE AGREEMENT**

---



**FRANCHISE AGREEMENT**

FRANCHISEE NAME AND ADDRESS:

Kenny Eric Eddleman
234 E 28th St
Houston, TX 77008

EFFECTIVE DATE OF AGREEMENT:

11/22/2021

ADDRESS OF SALON:

NA

PAINT NAIL BAR® SALON NAME:

PAINT NAIL BAR® SALON NUMBER:

# TABLE OF CONTENTS

1.    GRANT OF FRANCHISE. ...................................................................................................1

  1.1    Grant ......................................................................................................................1

  1.2    Term.......................................................................................................................1

  1.3    Location .................................................................................................................1

  1.4    Territory ................................................................................................................1

  1.5    Reservation of Rights............................................................................................2

  1.6    Guaranty................................................................................................................2

2.    DEVELOPMENT OF THE SALON.....................................................................................2

  2.1    Site Selection and Deadline for Obtaining Site Acceptance.................................2

  2.2    Lease Approval ......................................................................................................3

  2.3    Development of Salon ...........................................................................................3

  2.4    Private Label Products ..........................................................................................4

  2.5    Opening..................................................................................................................4

3.    FEES. ...................................................................................................................................5

  3.1    Initial Fee ..............................................................................................................5

  3.2    Royalty...................................................................................................................5

  3.3    Technology Fee......................................................................................................6

  3.4    Social Media Fee ...................................................................................................6

  3.5    Non-Compliance Fee .............................................................................................6

  3.6    Automatic Debit.....................................................................................................6

  3.7    Interest on Delinquent Payments ..........................................................................6

  3.8    Application of Payments and Right of Set-Off......................................................6

4.    TRAINING AND GUIDANCE............................................................................................7

  4.1    Initial Training. .....................................................................................................7

  4.2    Manager Training ..................................................................................................7

  4.3    Manuals and System Standards .............................................................................7

  4.4    Supplemental Training...........................................................................................8

  4.5    Delegation..............................................................................................................8

5.    MARKS, CONFIDENTIAL INFORMATION AND EXCLUSIVE RELATIONSHIP..............8

  5.1    Right to Use Marks ...............................................................................................8

  5.2    Ownership and Goodwill of Marks........................................................................8

  5.3    Rules For the Use of Marks ..................................................................................8

  5.4    Notification and Defense of Claims......................................................................8

  5.5    Indemnification By Us...........................................................................................8

Table of Contents
(continued)

5.6     Discontinuance of Use of Marks ............................................................. 9

5.7     Confidential Information ........................................................................ 9

5.8     Client Information ................................................................................ 10

5.9     Exclusive Relationship ......................................................................... 11

5.10    Innovations ......................................................................................... 12

6.      OPERATION OF THE SALON AND SYSTEM STANDARDS. ........................... 12

6.1     Condition and Appearance of the Salon ................................................. 12

6.2     Compliance with System Standards and Applicable Laws ......................... 12

6.3     Salon Management ............................................................................... 14

6.4     Notices of Independent Ownership ........................................................ 14

6.5     Standards for and Sources of Products and Services ............................... 14

6.6     Client Surveys .................................................................................... 15

6.7     Computer System and Salon Management System ................................. 15

7.      ADVERTISING, PROMOTION, AND MARKETING. ...................................... 16

7.1     Opening Marketing Program ................................................................ 16

7.2     Use and Approval of Marketing Materials .............................................. 16

7.3     Local Marketing Spending Requirement ................................................ 16

7.4     Marketing Fund ................................................................................... 17

7.5     Franchise System Website ................................................................... 18

7.6     Program Participation .......................................................................... 19

8.      EVALUATIONS, AUDITS AND REPORTS .................................................. 19

8.1     Evaluations ......................................................................................... 19

8.2     Our Right to Audit .............................................................................. 19

8.3     Records, Reports, and Financial Statements .......................................... 20

9.      TRANSFER. ......................................................................................... 20

9.1     Transfer by Us .................................................................................... 20

9.2     Transfer by You - Defined .................................................................... 20

9.3     Transfers of Non-controlling Ownership Interest .................................... 21

9.4     Transfers of the Franchise Agreement, the Salon or controlling Ownership
        Interest ............................................................................................. 21

9.5     Transfer to an Entity ........................................................................... 23

9.6     Our Right of First Refusal .................................................................... 23

10.     DEATH OR DISABILITY. ...................................................................... 25

Table of Contents
(continued)

| | | |
|---|---|---|
| 10.1 | Transfer Upon Death or Disability | 25 |
| 10.2 | Operation Upon Death or Disability | 25 |
| 11. | EXPIRATION OF THIS AGREEMENT. | 25 |
| 11.1 | First Renewal Franchise | 25 |
| 11.2 | Process | 26 |
| 11.3 | Renewal Documents | 26 |
| 11.4 | Process. | 26 |
| 11.5 | Additional Renewal Franchises | 26 |
| 11.6 | Relocation | 27 |
| 11.7 | Documentation | 27 |
| 12. | TERMINATION OF AGREEMENT | 28 |
| 12.1 | Termination By You | 28 |
| 12.2 | Termination by Us | 28 |
| 12.3 | Assumption of Salon's Management | 29 |
| 12.4 | Other Remedies Upon Default | 30 |
| 13. | EFFECT OF TERMINATION OR EXPIRATION OF THIS AGREEMENT. | 30 |
| 13.1 | Payment of Amounts Owed to Us | 30 |
| 13.2 | Marks | 30 |
| 13.3 | Confidential Information | 31 |
| 13.4 | Covenant Not to Compete | 32 |
| 13.5 | Our Right to Purchase Salon Assets. | 32 |
| 14. | RELATIONSHIP OF THE PARTIES; INDEMNIFICATION. | 33 |
| 14.1 | Independent Contractors | 33 |
| 14.2 | Taxes | 34 |
| 14.3 | Your Indemnification and Defense of Paint Nail Bar Indemnified Parties. | 34 |
| 14.4 | Our Indemnification of Franchise Owner Indemnified Parties | 34 |
| 14.5 | Insurance | 35 |
| 15. | STANDARD CLAUSES. | 35 |
| 15.1 | Severability | 35 |
| 15.2 | Amendment | 36 |
| 15.3 | Waiver of Obligations | 36 |
| 15.4 | Costs and Attorneys' Fees | 36 |

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

Table of Contents
(continued)

15.5     No Off-Sets. Cumulative Rights ...................................................................................... 36

15.6     Arbitration ....................................................................................................................... 36

15.7     Governing Law ................................................................................................................ 37

15.8     Consent to Jurisdiction ................................................................................................... 37

15.9     Waiver of Punitive Damages and Jury Trial ................................................................. 38

15.10    Limitation of Claims ...................................................................................................... 38

15.11    Construction .................................................................................................................... 38

15.12    Notices and Payments .................................................................................................... 39

15.13    Time ................................................................................................................................ 39

15.14    Binding Effect ................................................................................................................ 39

15.15    Exercise of Our Business Judgment ............................................................................. 39

15.16    Electronic Mail ............................................................................................................... 39

EXHIBIT A     INDEX OF TERMS

EXHIBIT B     BASIC TERMS

QB\40341653.31

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**
**FRANCHISE AGREEMENT**

**THIS FRANCHISE AGREEMENT** ("**Agreement**") is made effective as of
11/22/2021
_____, 2019 (the "**Effective Date**"), regardless of when the parties execute and date this Agreement, by and between **PAINT NAIL BAR FRANCHISE COMPANY, LLC**, a Florida limited liability company, whose principal business address is 1432 First Street, Sarasota, Florida 34236 ("**we**," "**us**," or "**our**" or "**Franchisor**"), and _____, whose principal business address is _____ ("**you**" or "**your**" or "**Franchisee**").

We have developed valuable and proprietary business formats and systems ("**Systems**") that are used in developing and operating aesthetically superior, sanitary, and environmentally friendly nail and beauty salons identified by the service mark "PAINT Nail Bar®" and related commercial symbols that we periodically specify, as we may periodically modify them (the "**Marks**").

We franchise others the right to operate nail and beauty salons identified by the "PAINT Nail Bar®" name and/or other Marks, using the Systems and offering the products and services (and only the products and services) that we periodically specify (collectively, "**PAINT Nail Bar® Salons**"). You have applied for a franchise to own and operate a PAINT Nail Bar® Salon, and we wish to grant you such a franchise on the terms and conditions contained in this Agreement.

An Index of defined terms is included in this Agreement as Exhibit A.

In consideration of the mutual undertakings and commitments set forth in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **GRANT OF FRANCHISE.**

1.1 <u>Grant</u>. On the terms and conditions of this Agreement, we grant you a franchise ("**Franchise**") to operate one PAINT Nail Bar® Salon, and to use the Systems and the Marks in its operation, at the site identified in Exhibit B (the "**Site**"). (If the Site is not determined as of the Effective Date, it will be determined in accordance with Subsection 2.1).

1.2 <u>Term</u>. The term of the Franchise (the "**Term**") begins on the Effective Date and ends 10 years after the earlier of (a) the date on which the Salon first opens for guest services of any kind (the "**Actual Opening Date**") or (b) 365 days following the Effective Date. This Agreement may be terminated before it expires in accordance with its terms.

1.3 <u>Location</u>. You may not operate the Salon from any location other than the Site without our prior written consent. If you request our consent to the relocation of the Salon, you will comply with our then-current relocation policies and procedures and reimburse us for our out-of-pocket costs and expenses promptly upon receipt of our invoice.

1.4 <u>Territory</u>. We will grant you a "**Territory**" comprised of a circle with the Salon's front entrance at the center that generally will be a radius of between 2 and 5 miles, but may be larger or smaller depending on whether your Salon is in an urban, suburban, or rural area. Continuation of the exclusivity of your Territory does not depend on your achieving a certain sales volume, market penetration, or other contingency, and we may not alter your Territory or modify your territorial rights before your Franchise Agreement expires or is terminated (although we may do so upon renewal).

1.5     Reservation of Rights.  We reserve all rights not expressly granted to you in this Agreement without limitation and without regard to proximity to the Salon. We, and our affiliates reserve the right, on such terms and conditions as we deem appropriate, ourselves or through authorized third parties (including our affiliates), to:

(a)     manufacture, distribute, market, and sell products identified by the Marks in any channel of distribution within or outside of the Territory;

(b)     own, establish, operate, and license and/or franchise others to own, establish and operate nail salons outside of the Territory, whether under the Marks or other trademarks; and

(c)     own, establish, operate, and license and/or franchise others to own, establish and operate PAINT Nail Bar® Salons located within the Territory under trademarks other than the Marks.

The term "**affiliate**" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling us.  For the purposes of determining affiliate status, the term "**control**" means ownership or control of a majority of the voting ownership of an entity or any combination of voting ownership and/or one or more agreements that together afford control of the management and policies of such entity.

1.6     Guaranty.  The Guarantors will fully guarantee all of your financial and other obligations to us under this Agreement or otherwise arising out of the relationship established by this Agreement, and agree to personally comply with this Agreement's terms, by signing our form of Principal Owner's Guaranty, a copy of which is attached as an exhibit to our FDD.  The name of each Owner and his, her or its percentage Ownership Interest in you must be set forth in our Principal Owner's Statement, a copy of which is attached to our FDD.  You will notify us of any change in such information within 10 days after the change occurs. For purposes of this Agreement "**Guarantors**" means each Owner having an Ownership Interest in you, or in any entity directly or indirectly owning a controlling Ownership Interest in you, of 20% or more (regardless of whether such Owner is entitled to vote thereon).  For purposes of this Agreement, an "**Ownership Interest**" means (a) in relation to a corporation, shares of capital stock or other equity interests in the corporation, (b) in relation to a limited liability company, membership interests or other equity interests in the limited liability company, (c) in relation to a partnership, a general or limited partnership interest, or (d) in relation to a trust, the ownership of the beneficial interest of such trust.

2.     **DEVELOPMENT OF THE SALON.**

2.1     Site Selection and Deadline for Obtaining Site Acceptance.  If you have not done so prior to signing this Agreement you must within 90 days of the Effective Date, locate a Site that we (in our reasonable discretion) have approved solely within the site selection area identified in Exhibit B (the "**Site Selection Area**").  Your proposed Site, must be available for lease or purchase in time for you to develop and open the Salon at that Site on or before 365 days after the Effective Date (the "**Opening Deadline** ").  During the period beginning on the Effective Date and ending on the Site Acceptance Date (defined below), we and our affiliates will not ourselves operate nor authorize others to operate a PAINT Nail Bar® Salon within the Site Selection Area.  Except as set forth in this Subsection during the period before the Site Acceptance Date, we may engage in any other activities we desire within and outside the Site Selection Area.

You must deliver to us for our review and approval a complete Site report and other materials and information we request for a suitable Site within the Site Selection Area.  We will not unreasonably withhold our acceptance of a Site that meets our criteria for demographic characteristics, traffic patterns, parking, character of neighborhood, competition from, proximity to, and nature of other businesses, other

2

commercial characteristics, and the proposed Site's size, appearance, and other physical characteristics.  In determining whether to accept or reject a proposed Site, we also may consider the Site's proximity both to the Site Selection Area's boundaries and to other existing or potential sites for PAINT Nail Bar® Salons located outside the Site Selection Area. You must promptly reimburse us for all reasonable travel and other costs and expenses we incur in evaluating any Site that you propose. We will use our reasonable efforts to review and accept or reject a Site you propose within 15 days after receiving the complete Site report and other materials we request.  You must work with a commercial real estate agent, either of your choice or our recommendation, to assist you with site selection, and you must pay that vendor's fees.  You acknowledge that if we or the commercial real estate agent recommends or gives you information regarding the Site, it is not a representation or warranty of any kind, express or implied, of the Site's suitability for a PAINT Nail Bar® Salon.  Our recommendation or acceptance indicates only that we believe the Site meets our then-acceptable criteria. However, demographic and/or other factors included in or excluded from our criteria could change, altering the Site's potential. The uncertainty and instability of these criteria are beyond our control, and we are not responsible if the Site we recommend or accept fails to meet your expectations. Your acceptance of the Site is based on your own independent investigation of, or agreement in the future to investigate, the Site's suitability.

The date on which we deliver to you our written notice of our approval of the Site is called the "**Site Acceptance Date**."  Your rights in the Site Selection Area end on the Site Acceptance Date, and we may engage in any activities we desire within the Site Selection Area.

2.2     Lease Approval.  You must obtain our approval at least 30 days before you sign must approval any lease, sublease or any renewals and amendments of any lease or sublease (collectively, the "**Lease**") that will govern your occupancy and lawful possession of the Site.   Our approval of the Lease will not be unreasonably withheld, The Lease will either: (a) include our form lease addendum; or (b) provide in the body of the Lease the terms and conditions found in the lease addendum. You may not sign any Lease that we have not approved. We may (but have no obligation to) provide you guidance or assistance relating to the Lease and its negotiation. You acknowledge that our guidance and assistance (if we choose to provide it) and approval of the Lease are not a guarantee or warranty, express or implied, of the success or profitability of a PAINT Nail Bar® Salon to be operated at the Site or of the suitability of the Lease for your business purposes.

If you or one of your affiliates owns a fee simple or similar interest in the Site, then, in addition to complying with your other obligations under this Agreement with respect to the lease between your affiliate and you (if your affiliate owns the Site), you must provide us with a copy of the deed and title insurance policy for such property.

You must sign the approved Lease for an approved Site within 6 months after the Effective Date. The date on which you sign the Lease for the Site that we have approved, regardless of that Lease's effective date, is called the "**Lease Signing Date**."

2.3     Development of Salon.  Promptly after the Lease Signing Date, you must secure all financing required to develop and operate the Salon, obtain all permits and licenses required to construct and operate the Salon, and engage all Salon staff and employees.

You are responsible for developing the Salon at your expense.  The Salon must satisfy our standard design requirements and specifications for layout, color scheme, finishes, improvements and decor for PAINT Nail Bar® Salons similar to the Salon.  The Salon must contain the Establishment Package we specify.  Depending on the Site's layout, you may decide whether the Salon offers massage, waxing, or other beauty services.  All other decisions relating to the Salon's development and its layout, design, color scheme, finishes, Improvements, decor and Establishment Package are subject to our approval.

3

You must prepare all required construction and remodeling plans to suit the Salon and make sure they comply with the Americans with Disabilities Act (the "**ADA**") and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions. At our option, you must use only the architects and contractors that we designate or approve. You must submit to us for our approval all construction and remodeling plans and specifications before beginning build-out for the Salon and all revised or "as built'' plans and specifications as they are prepared during the Salon's construction and development. You may not begin build-out for the Salon until we have approved the plans and specifications. Our review of the plans and specifications is limited to reviewing your compliance with our design requirements. Our review is not designed to assess your compliance with the ADA and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions, as compliance with those laws, requirements and restrictions is your responsibility. You must develop the Salon in accordance with the plan and specifications that we have approved. We may, but have no obligation to, periodically inspect the Salon's site during its development.

Prior to opening your Salon, you agree to purchase all of the Furniture (reception bar, waiting area couch and tables, manicure tables and chairs, pedicure chairs, technician stools), cabinetry, ceiling (cloud systems), wall and floor design elements, basins, faucets, foot rests and cushions, shelving (dispensary), countertops, barn doors and hardware, fixtures, décor (mural and door logos and decals), rugs, prints and frames, clocks, apron holders, blankets, candy holders, jars, candles, jewelry dishes and displays, floral elements; bathroom elements including wallpaper, storage elements, pillows and seat cushions, towel holders, baskets, mirrors; Buddha, all other display elements (branding); supply carts, dispensers, trays, lighting, computer hardware and software, credit and phone systems, appliances, sterilization equipment, towel equipment, waxing equipment, equipment glassware, signage, safe and lockbox, as well as other materials we may require from time to time (the "**Establishment Package**"), specific vendor polishes (colors and formulas), base and top coats, removers, drops, lotions, scrubs, back bar set-ups, differentiated gel products and associated elements, nail art products and application tools, paraffin waxing products (vendor specific) and application/management tools, manicure and pedicure files, buffers, Sterilization apparatus, cotton products, dental acrylics and bonding agents, all storage and supply bags, manicure and pedicure implements with differentiated specificity, gloves, flip-flop sandals, all grocery store products for staff and clientele, differentiated liquid and non-liquid cleaning products, and all retail product lines for retail sales, including jewelry, balms, body lotions and creams (the "**Initial Inventory Package**") and other products and services that we specify for the Salon's development only from suppliers that we designate or approve, which might include or be limited to us, our affiliates or our designated vendors. You may not install or use any unauthorized fixtures, equipment, signs and furnishing ("**Operating Assets**") at the Salon. Your Establishment Package and Initial Inventory Package are set forth on Exhibit B.

2.4 <u>Private Label Products</u>. In addition to other requirements to carry products or resell products or services from us or our affiliates, you must purchase, utilize and sell all private label branded nail care products (our "**Private Label Products**") that we designate from time to time. We will arrange for our affiliate to supply our Private Label Products to you. You must purchase all of your requirements of those products, maintain a level of inventory of them in accordance with our requirements and feature, display, use and resell them in the manner and method we direct. You must resell them only to retail customers and you must not sell or supply them on a wholesale basis or for resale to anyone. You must timely pay us or our affiliates for your purchases of Private Label Products at then-current prices which may change from time to time. You must maintain the amount of Private Label products at your Salon as specified in our Manuals from time to time.

2.5 <u>Opening</u>. You must open the Salon for business on or before the Opening Deadline in accordance with our Systems. However, you may not open the Salon for business unless and until:

(a)     We have inspected and approved the Salon as having been developed in accordance with our specifications and standards. We may, as an alternative, or in addition to, our physical inspection of the Salon, require you to send us videos and/or photographs of the Salon. Our inspection and approval are limited to ensuring your compliance with our standards and specifications, although our approval is not a representation that the Salon complies with our standards and specifications or a waiver of our right to enforce any provision of this Agreement. Our inspection and approval are not designed to assess compliance with federal, state or local laws or regulations, including the ADA, as compliance with such laws is your responsibility. We will not unreasonably withhold our approval of the Salon.

(b)     You (or your managing owner) or the Salon's general manager has completed all pre-opening training to our satisfaction.

(c)     You have satisfied all bonding, licensing, and other legal requirements for the lawful operation of your Salon.

(d)     You have complied with your obligations relating to your Opening Marketing Program.

(e)     All amounts due to us and our affiliates have been paid.

(f)     We have received satisfactory evidence that you maintain the insurance required by this Agreement, and

(g)     You have signed and delivered to us a Request for Opening Form in the form we specify under which, among other things, you certify that all of the requirements in Subsections (a) through (f) above have been satisfied.

At least 5 days prior to the Actual Opening Date, you must notify us in writing of the Salon's Actual Opening Date. If the Salon's Actual Opening Date does not occur on or before the Opening Deadline, this Agreement will automatically expire.

3.     **FEES.**

3.1     Initial Fee.  You agree to pay us a nonrecurring and nonrefundable initial fee (the "**Initial Fee**" in the amount $45,000. The Initial Fee must be paid in in a lump sum upon the Effective Date. This Initial Fee is fully earned by us when paid and is not refundable in whole or in part.

3.2     Royalty.  You agree to pay us a Royalty in an amount equal to 6% of the Salon's Gross Revenue during the previous month. Payment is due on the 8th day of each month. "**Gross Revenue**" means the total gross revenue from the provision of all products and services sold or performed by or for you or your affiliates relating to the Salon, whether in, at, from or away from the Salon, or through or by means of the Salon's Business, whether from cash, check, credit card, debit card, barter or exchange, or other credit transactions, and irrespective of the collection thereof, and including, without limitation, the following:  (a) revenue you derive from providing services and merchandise and product sales and other Salon operations that you perform, (b) revenue that any of your affiliates derives from its providing any Salon-related products or services, and (c) payments (for example, rent and license fees) that contractors or other third parties make to you or your affiliates relating directly or indirectly to the Salon or its operations. Notwithstanding the foregoing, the following amounts are deducted from Gross Revenue: (i) sales taxes, use taxes, and other similar taxes added to the sales price and collected from the customer and paid to the appropriate taxing authority, and (ii) any bona fide refunds and credits that are actually provided to customers. For the avoidance of doubt, Gross Revenue does not include rent, license fees and other fees

that you or your affiliate receives in return for subleasing part of the property on which the Salon is located (but not any part of the Salon itself) to an unrelated Business.

3.3    Technology Fee.  We will develop a franchisee intranet as part of our website that will provide additional communications to assist you by providing training, marketing and benchmarking metrics to better manage your Salon.  You must pay us our then-current ongoing monthly fee (the "**Technology Fee**") for the use of the intranet.  The Technology Fee is currently $650 per month but we may increase it upon 30 days' notice to you.  Payment is due in advance on the 8th day of each month.

3.4    Social Media Fee.  Upon signing this Agreement, you agree to engage the social media consultant that we designate from time to time and pay the fee charged by that consultant (the "**Social Media Fee**"). We currently require you to pay this consultant directly, but we reserve the right to require that the Social Media Fee be paid to us.  You must use the consultant we designate for this purpose and we may change it from time to time.

3.5    Non-Compliance Fee.  You agree to pay us our then-current fee (the "**Non-Compliance Fee**") for your failure to comply with our standards and specifications.  The Non-Compliance Fee is currently $500 per occurrence, but we may increase it upon 30 days' notice.  Payment is due immediately upon our written notification to you specifying the nature of the non-compliance.

3.6    Automatic Debit.  You must sign and deliver to us the documents we periodically require to authorize us to debit your checking account automatically for the Royalty, Marketing Contributions and other amounts due under this Agreement or any related agreement between us (or our affiliates) and you. Under our current automatic debit program for the Salon, we will debit your checking account on or after the 8th day of each month for the Royalty, Marketing Contributions and certain other amounts due us or our affiliates. You agree to make the funds available for withdrawal by electronic transfer before each due date. If you fail to report the Salon's Gross Revenue, we may debit your account for 150% of the last Royalty and Marketing Contribution that we debited.  If the amounts that we debit from your account are less than the amounts you actually owe us (once we have determined the Salon's actual Gross Revenue), we will debit your account for the balance, plus the amounts due for such delinquent payments, on the day we specify. If the amounts that we debit from your account are greater than the amounts you actually owe us (once we have determined the Salon's actual Gross Revenue), we will credit the excess (without interest) against the amounts we otherwise would debit from your account during the following month(s). We may periodically change the mechanism for your payments of amounts you owe to us and our affiliates under this Agreement or any related agreement.

3.7    Interest on Delinquent Payments.  In addition to all other remedies we have, including, without limitation, the right to terminate this Agreement, if you fail to pay (or make available for withdrawal from your account) any amounts you owe us or our affiliates, including, without limitation, amounts for Royalties and/or Marketing Contributions, whether such amounts are reflected as due on any report you submit to us or are subsequently determined by verification, examination or audit to have been due, those amounts will bear interest at the rate of 18% per annum from the due date, calculated from the date such payment was due until it is received by us, but not to exceed the highest commercial contract rate of interest permitted by law. In addition, you must pay us a $100 administrative fee for each payment which you do not make to us when due (or for each dishonored payment) to cover the increased costs and expenses we will incur as a result of your failure to pay the amounts when due.

3.8    Application of Payments and Right of Set-Off.  Notwithstanding any designation you make, we may apply any of your payments to any of your past due indebtedness to us (or our affiliates).  We may set-off any amounts you or your affiliates owe us or our affiliates against any amounts that we (or our affiliates) owe you or your affiliates, whether in connection with this Agreement or otherwise.

4.       **TRAINING AND GUIDANCE.**

4.1      <u>Initial Training</u>.

      4.1.1    Within 30 days after the Lease Signing Date, we will furnish, and you or the individual responsible for making decisions concerning the Salon's development must attend, a planning session relating to the development of your Salon. The planning session will last about 1 day and will be at our principal offices. We do not charge for this planning session, but you will be responsible for the compensation, travel and living expenses of you and your employees.

      4.1.2    We will furnish without additional charge at our designated training Salon a management training program on the operation of a PAINT Nail Bar® Salon for up to 2 people from your Salon.  Before the Actual Opening Date, either you (or your managing owner) or the Salon's proposed general manager must complete our training program to our satisfaction. Any person who works as a front desk staff member or manager at the Salon for 10 hours or more average each week, and/or has the responsibility for opening or closing the Salon, must complete, to our satisfaction, our training program at our designated site within 3 months of their date of hire. Other people from your Salon may attend our training program after the Salon opens for business. You will be responsible for the compensation, travel and living expenses of you and your employees during training. If you request training for more than 2 people, you must pay us our then current fee, in advance, for each additional person.

4.2      <u>Manager Training</u>.  You must replace any manager who does not satisfactorily complete a management training program, and all new general managers must satisfactorily complete a management training program before they begin their employment duties. These management training programs may be conducted by us at our designated training Salon or by you at your Salon with our prior approval, or they may be self-study programs that we approve or provide in advance. You must pay our then current fee for any additional training or self-study programs that we provide. In addition, at least once every 5 years during the Term (and any renewal), you must send the Salon's general manager to complete our then current management training program. We will not charge tuition for that program, but you must pay your general manager's wages, travel and living expenses.

4.3      <u>Manuals and System Standards</u>.  We will provide you access during the Term to 1 set of our manuals and forms, consisting of such materials that we generally furnish to our Franchisees from time to time for use in operating PAINT Nail Bar® Salons (collectively, "**Manuals**"). The Manuals, bulletins, and other written and electronic materials provided to you from time to time contain mandatory specifications, standards, operating procedures, and rules that periodically prescribe for the development, operation and maintenance of the Salon (the "**System Standards**") and information relating to your other obligations under this Agreement. The Manuals may be modified from time to time to reflect changes in System Standards, and we will communicate any required changes to you. Our master copy controls. You agree to keep your copy of the Manuals current and in a secure location at the Salon. We are the sole owner of the copyright in and all other rights to the Manuals, and you may not reproduce or use them for any purpose other than in connection with your performance under this Agreement.

      At our option, we may post the Manuals and certain other bulletins and other written materials containing System Standards on a restricted website to which you will have access. If we do so, you must periodically monitor the website for any updates to the Manuals or System Standards. You must keep confidential any passwords and other digital identifications necessary to access the Manuals on such a website.

4.4     Supplemental Training.  During the Term, we periodically may require you (or, if you are a legal entity, one of your Owners) and/or the Salon's general manager to attend and complete to our satisfaction any supplemental or refresher training programs on operating PAINT Nail Bar® Salons that we choose to provide. We may charge reasonable fees for these programs, and you will be responsible for your and your employees' wages and travel and living expenses.

4.5     Delegation.  We have the right, from time to time, to delegate the performance of any portion or all of our obligations under this Agreement to designees, whether they are our affiliates, agents or independent contractors with which we contract to provide such services.

5.      **MARKS, CONFIDENTIAL INFORMATION AND EXCLUSIVE RELATIONSHIP.**

5.1     Right to Use Marks.  Your right to use the Marks is derived solely from this Agreement and is limited to your development and operation of the Salon in accordance with and subject to all System Standards and all restrictions contained in this Agreement. Except to the extent we authorize you to do so, you may not use or authorize the use of any Mark or any abbreviations thereof, or any references to you or the Salon, as part of any domain name, electronic address, meta tag, website or otherwise on the Internet, the World Wide Web, or any other similar proprietary or common earner electronic delivery system.

5.2     Ownership and Goodwill of Marks.  You acknowledge and agree that we and own all rights in and to the Marks and all related goodwill. You will never (during or after the Term) challenge our exclusive rights to the Marks. Your unauthorized use of the Marks will be a material breach of this Agreement and deemed to be an intentional infringement of our trademark rights. Your usage of the Marks and any goodwill established by such use and attributable to such intellectual property will be exclusively for our benefit, which means that you have no right to the Marks or the goodwill associated with the Marks (other than the right to use the Marks as provided in this Agreement). All provisions of this Agreement applicable to the Marks apply to all proprietary trademarks, service marks, and commercial symbols we authorize you to use during the Term.

5.3     Rules For the Use of Marks.  You must use the Marks (and only the Marks) as the sole identification of the Salon at the Site, and only in the manner we prescribe in the Manuals, bulletins, and other notices to you, and give such notice of registration or other claim of trademark rights as we reasonably prescribe. You may not use any Mark, any part of any Mark or any abbreviations thereof, or any other trademark or trade name that we or any of our affiliates own or use, as part of your company name. You may not use the Marks or any abbreviations thereof (a) for any purpose not expressly authorized by this Agreement, (b) on or to identify any services, merchandise, products, or equipment, except in accordance with System Standards, or (c) at any location other than the Salon at the Site except in approved advertising and Marketing. You may not manufacture, use, sell, or distribute, or contract with any party other than our or our affiliate's authorized licensees to manufacture, use, sell, or distribute, any products, merchandise, or equipment bearing any of the Marks without our prior written approval.

5.4     Notification and Defense of Claims.  You must notify us promptly of any claim by others (a) that you are infringing then trademark rights in connection with your use of the Marks or (b) to any rights in the Marks which are inconsistent with this Agreement or our exclusive rights to the Marks. You must fully cooperate with us and follow instructions we give you with respect to our prosecution of any infringement claim or our defense of a claim that you are infringing the trademark rights of any third party. We have the exclusive right to control any such prosecution or defense.

5.5     Indemnification By Us.  Provided you comply with the provisions of this Section, we will indemnify, defend, and hold harmless you and your Owners, directors, officers, employees, agents, successors, and assignees (collectively, the "**Franchise Owner Indemnified Parties**") against, and

8

reimburse all of the Franchise Owner Indemnified Parties for, all Losses incurred by the Franchise Owner Indemnified Parties in any trademark infringement proceeding disputing your authorized use of any Mark under this Agreement. For the purposes of this Agreement, "**Losses**" means any and all losses, expenses, obligations, diminutions in value, liabilities, damages (actual, consequential, punitive or otherwise), and reasonable defense costs that an indemnified party incurs. For purposes of this definition, defense costs include, without limitation, accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration, or alternative dispute resolution, regardless of whether litigation, arbitration, or alternative dispute resolution is commenced.

Notwithstanding the foregoing, we will not indemnify, defend or hold harmless the Franchise Owner Indemnified Parties for any unauthorized use of the Marks. We may control the defense of any proceeding arising from your use of any Mark (whether authorized or unauthorized) under this Agreement. This indemnification will continue in full force and effect notwithstanding this Agreement's termination or expiration.

5.6     <u>Discontinuance of Use of Marks</u>.  If, in our reasonable opinion, it is desirable to modify or discontinue the use of any of the Marks and/or use one or more additional or substitute Marks, you must comply with our directions within a reasonable time after receiving notice. We will not reimburse you for any costs or expenses associated with this obligation, including, without limitation, costs to change the Salon's signs, loss of revenue or profits, start-up or other such expenses, or any other incidental or consequential expenses attributable to the change in Marks.

5.7     <u>Confidential Information</u>.  You acknowledge and agree that we and our affiliates own all right, title and interest in and to the Confidential Information. We will disclose to you such parts of the Confidential Information as we determine (in our sole judgment) are required for the operation of a PAINT Nail Bar® Salon during training and in guidance and assistance furnished to you during the Term. The Manuals contain Confidential Information, and you may learn or otherwise obtain from us Additional Confidential Information during the Term. You and each of your Owners acknowledge and agree that neither you, the Owners nor any other person or entity will acquire any interest in or right to use the Confidential Information, other than your right to utilize certain Confidential Information in the operation of the Salon, and that the use or duplication of the Confidential Information in any other business would constitute an unfair method of competition with us and our Franchisees. You must disclose the Confidential Information to your Owners and employees only to the extent reasonably necessary for the operation of the Salon.

For purposes of this Agreement, "**Confidential Information**" means certain information, processes, methods, techniques, procedures and knowledge, including know-how (which includes information that is secret and substantial), manuals and trade secrets (whether or not judicially recognized as a trade secret), developed or to be developed by us, our predecessor, or our or its affiliates relating directly or indirectly to the development or operation of a PAINT Nail Bar® Salon.  With respect to the definition of know-how, "secret" means that the know-how as a body or in its precise configuration is not generally known or easily accessible and "substantial" means information which is important and useful to you in developing and operating the Salon.  Without limiting the foregoing, Confidential Information includes, but is not limited to:

(a)     methods, techniques, equipment, specifications, standards, policies, procedures and information relating to the development, operation, and franchising of PAINT Nail Bar® Salons,

(b)     knowledge of suppliers and specifications for certain materials, equipment and fixtures for PAINT Nail Bar® Salons,

(c)      operating results and financial performance of PAINT Nail Bar® Salons other than your Salon,

(d)      any and all marketing, promotional or training materials used in the operation of or relating to PAINT Nail Bar® Salons, and

(e)      the System Standards and the Manuals.

You acknowledge and agree that the Confidential Information is confidential to and a valuable asset of us and our affiliates, is proprietary, and is disclosed to you solely on the condition that you, your Owners and your employees who have access to it agree, and each Owner does hereby agree (on behalf of and with respect to himself/herself only) and you do hereby agree, that, during and after the Term, you, the Owners and such employees:

(a)      will not use the Confidential Information in any other business or capacity,

(b)      will maintain the absolute secrecy and confidentiality of the Confidential Information,

(c)      will not make unauthorized copies of any portion of the Confidential Information disclosed in written or other tangible or intangible form, and

(d)      will adopt and implement all reasonable procedures prescribed from time to time by us to prevent unauthorized use or disclosure of or access to the Confidential Information, including, without limitation, requiring employees at the level of assistant manager and above who will have access to such information to execute confidentiality agreements in a form periodically prescribed by us. You must maintain such confidentiality agreements on file for 4 years after the employee executing such agreement has left your employment, and provide us, at our request, with an executed originals of each such agreement.

Notwithstanding anything to the contrary contained in this Agreement and provided you have obtained our prior written consent, the restrictions on your disclosure and use of the Confidential Information does not apply to the following (i) information, methods, procedures, techniques and knowledge which are or become generally known to the general public, other than through disclosure (whether deliberate or inadvertent) by you or your Owners or employees, and (ii) the disclosure of the Confidential Information in judicial or administrative proceedings to the extent that you are legally compelled to disclose such information, provided you notify us prior to disclosure and have used your best efforts to obtain, and have afforded us the opportunity to obtain, an appropriate protective order or other assurance satisfactory to us of confidential treatment for the information required to be so disclosed. For purposes of this Agreement, "**Proceedings**" means any claim asserted or inquiry made (whether formally or informally), and any legal action, investigation or other proceeding (including, without limitation, any arbitration proceeding) brought, by any governmental agency or other person or entity.

5.8      <u>Client Information</u>.

5.8.1    You must comply with any reasonable instruction by us regarding the organizational, physical, administrative and technical measures and security procedures to safeguard the confidentiality and security of names, contact information, financial information and other personal information of or relating to the Salon's guests and prospective guests (the "**Client Information**") and, in any event, employ reasonable means to safeguard the confidentiality

and security of Client Information. You must comply with all applicable laws governing the use, protection, and disclosure of Client Information. If there is a suspected or actual breach of security or unauthorized access involving Client Information, you must notify us immediately after becoming aware of such actual or suspected occurrence and specify the extent to which Client Information was compromised or disclosed.

5.8.2    We and you acknowledge that we and our affiliates may, through the Salon Management System or otherwise, have access to Client Information. We and our affiliates may use Client Information in our and their business activities, but during the Term we and our affiliates will not use the Client Information that we or they learn from you or from accessing the Salon Management System to compete directly with the Salon. Upon termination of this Agreement, we and our affiliates reserve the right to make any and all disclosures and use the Client Information in any manner that we or they deem necessary or appropriate. You must obtain from your guests and prospective guests all authorizations, and provide them all notices that applicable law periodically specifies, to enable us and our affiliates to use the Client Information in the manner that this Agreement contemplates.

5.9    <u>Exclusive Relationship</u>.  We have granted the Franchise to you in consideration of and reliance upon your (and your Owners') agreement to deal exclusively with us. We would be unable to protect the Confidential Information against unauthorized use or disclosure or to encourage a free exchange of ideas and information among our franchisees if you (or your Owners) were permitted to hold interests in or perform services (other than you serving as an employed nail technician providing services directly to clients for a salon owned by others) for a nail salon or one or more similar facilities or businesses that offer the same or similar products and services customarily offered by PAINT Nail Bar® Salons, or an entity that grants franchises or licenses for any of these types of businesses, other than the Salon and other PAINT Nail Bar® Salons (a "**Competitive Business**").  You agree that, during the Term, neither you nor any of your Owners, directors, or officers (nor any of your or your Owners', directors', or officers' spouses) will:

(a)    have any direct or indirect interest as an owner whether of record, beneficially or otherwise perform or engage in services as a director, officer, manager, employee, consultant, representative, or agent for, a Competitive Business (this restriction is not applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent less than 3% of the number of shares of that class of securities issued and outstanding);

(b)    directly recruit or solicit for hire any of our employees or the employees of any PAINT Nail Bar® Salon without obtaining our or the employer's prior written permission (general advertising or solicitation directed to the public in general is not restricted;

(c)    direct any prospective or existing business or economic opportunities away from us, our affiliate, the Salon or any other PAINT Nail Bar® Salon to a Competitive Business; or

(d)    perform any act prejudicial or injurious to the goodwill associated with the Marks.

Nothing in this Section prohibits you or your affiliate from subleasing part of the property on which the Salon is located (but not any part of the Salon Itself) to a business which is not a Competitive Business, provided that such business (i) must have a separate street address and entrance that its customers must use without using any part of the Salon, (ii) may not use any of the Marks on its premises or otherwise advertise, market or promote the business as being associated with the Salon or the Paint Nail Bar® brand, and (iii) operates in a way that does not damage or reflect adversely on the Paint Nail Bar® brand.

5.10     Innovations.  You agree to promptly disclose to us all ideas, concepts, methods, techniques and products conceived or developed by you and/or any of your affiliates, Owners, agents, representatives, contractors or employees during the Term relating to development or operation of a PAINT Nail Bar® Salon ("**Innovations**"). All Innovations are our sole and exclusive property, part of the Systems, and works made-for-hire for us. To the extent any Innovation does not qualify as a work made-for-hire for us, by this paragraph you assign ownership of that Innovation, and all intellectual property and other rights to the Innovation, to us and agree to sign and deliver such instruments and documents, provide such assistance and perform such other acts as we periodically designate in order for us or our designee to obtain exclusive rights in such Innovations. We have no obligation to make any lump sum or other payments to you or any other person or entity with respect to any such Innovations. You will not use, nor will you allow any other person or entity to use, any such Innovations, whether in connection with the Salon or otherwise, without obtaining our prior written approval.

## 6.     **OPERATION OF THE SALON AND SYSTEM STANDARDS.**

6.1     Condition and Appearance of the Salon.  You may not use, nor allow any other party to use, any part of the Salon for any purpose other than your operation of a PAINT Nail Bar® Salon in compliance with this Agreement. You agree to place or display, according to our guidelines, at the Salon (interior and exterior) only those signs, emblems, designs, artwork, lettering, logos and display and advertising materials that we periodically specify. You agree to maintain the condition and appearance of the Salon, the Site and the Operating Assets in accordance with the System Standards. Without limiting that obligation, you agree to take, at your expense, the following actions during the Term (a) thorough cleaning, repainting and redecorating of the interior and exterior of the Salon at intervals that we may periodically specify and at our direction, (b) interior and exterior repair of the Salon and the Site as needed, and (c) repair or replacement, at our direction, of damaged, worn-out or obsolete Operating Assets at intervals that we periodically specify (or, if we do not specify an interval for replacing any Operating Asset, as that Operating Asset needs to be repaired or replaced).

6.2     Compliance with System Standards and Applicable Laws.  You alone are responsible for operating the Salon in full compliance with all applicable laws, ordinances and regulations (including, without limitation, bonding and licensing requirements) and agree to comply with all System Standards, as we may periodically modify them, as if they were part of this Agreement. You will not offer, sell, or provide at or from the Salon any goods or services not authorized in the Manuals. You must offer, sell, and furnish all those goods and services we prescribe from time to time.

System Standards may regulate any aspect of the Salon's development, operation and maintenance. Without limiting the generality of the foregoing, System Standards may regulate any one or more of the following:

(a)     staffing levels for the Salon, dress/appearance and uniforms for your employees, standards and requirements for training Salon employees, insurance requirements for staff, and standards for providing competent and courteous service to customers of your Salon (provided that you are solely responsible for all of your hiring decisions and your employees' terms and conditions of employment),

(b)     evaluation programs used to evaluate the quality of the experience that PAINT Nail Bar® Salon guests have at their salons, including, without limitation, all equipment, processes and systems used in those programs,

(c)     participation in and requirements for sales, promotional, public relations, advertising and/or marketing programs and materials and media used in these programs,

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

(d)     the design and appearance of the Salon and its Operating Assets, including, but not limited to, the Salon's branding and cleanliness and schedules for the maintenance, repair and replacement of equipment ,

(e)     minimum and required standards and specifications for products, equipment, materials, and supplies and services that your Salon uses and/or sells,

(f)     participation in and requirements for group purchasing programs for certain Operating Assets and/or other products that PAINT Nail Bar® Salons use or sell,

(g)     participation in and requirements for customer loyalty programs,

(h)     the terms of service offerings and maximum, minimum and other pricing requirements for products and services that the Salon offers, including, without limitation, requirements for promotions, special offers and discounts in which some or all PAINT Nail Bar® Salons participate, in each case to the maximum extent the law allows,

(i)     participation in market research and test programs that we periodically require or approve concerning various aspects of the Systems, including, without limitation, new or updated procedures, systems, equipment, signs, trade dress, supplies, Marketing Materials and strategies, merchandising strategies, products and/or services,

(j)     standards and procedures for your or your employees' and other representatives' authorization to use and use of blogs, common social networks like Face Book and MySpace, professional networks like Linked-In, live-blogging tools like Twitter, virtual worlds, file, audio and video sharing sites and other similar social networking media and tools ("**Social Media**") that in any way references the Marks or involves the Salon,

(k)     use and display of the Marks, usage of the Salon and required signage and postings,

(l)     days and hours of operation,

(m)     accepting credit and debit cards, other payment systems and check verification services,

(n)     bookkeeping, accounting, data processing and recordkeeping systems and forms, including, without limitation, document retention requirements ,

(o)     participation in industry organizations that we periodically specify,

(p)     the initial letter and materials that we send to you for you to complete and return to us, including, but not limited to, the letter of transmittal, transfer term worksheet, application package, current franchise disclosure document and receipt (if applicable), and a copy of the letter of intent or purchase agreement between you and a proposed purchaser (the "**Initial Transfer Package**"), material requested by us to document and complete the Transfer, including, but not limited to, your buy/sell agreement, entity formation documents, and loan or financing agreements, together with any guarantees and amendments to this Agreement and releases of claims that we periodically specify (the "**Transfer Package Material**") and other forms and procedures which you must use to submit any proposed Transfer for our approval, and

QB\40341653.31

(q)     any other aspects of developing, operating and maintaining the Salon that we determine to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and PAINT Nail Bar® Salons.

Except for the training and qualifications of the Salon's managers and staff, System Standards will not include any employment-related policies or procedures and will not dictate or regulate the terms and conditions of employment for your employees.  Except as otherwise described in this Agreement, any information we provide (whether in the Manuals or otherwise) concerning employment-related policies or procedures, or relating to the terms and conditions of employment for your employees, is for your optional use.

We have the right periodically to modify and supplement System Standards, which may require you to invest additional capital in the Salon and incur higher operating costs, and such System Standards constitute legally binding obligations upon you when communicated to you. Although we retain the right to establish and periodically modify the Systems and System Standards that you have agreed to follow, you retain the responsibility for the day-to-day management and operation of the Salon and for implementing and maintaining the System Standards at the Salon.

6.3     Salon Management.  Unless we approve in writing, you must at all times retain and exercise direct management control over all aspects of the Salon's business and the products and services it offers. You may not enter into any management agreement, subcontracting arrangement or other arrangement under which any other party (including, without limitation, your affiliate) provides or exercises management control over any aspect of the Salon's operations or the products and services it offers without our approval. The Salon must be managed by a person who devotes his or her full working time and best efforts to the day-to-day, on-premises operation of the Salon, has satisfactorily completed our management training program, and is not engaged in any other business endeavor except passive investments which do not interfere with the performance of his or her duties as manager. You must ensure that your managers agree to comply with the confidentiality and non-competition restrictions of this Agreement.

6.4     Notices of Independent Ownership.

6.4.1    Notices to Public. You will prominently display in the Salon all statements that we prescribe from time to time identifying you as the independent owner of the Salon and our authorized franchisee. All written materials, including checks, invoices, stationery and advertising materials which you use in operating your Salon must also have a statement in the form we periodically prescribe identifying you as the independent owner of the Salon and indicating that you are our authorized franchisee.

6.4.2    Notices to Employees. You must prominently post signs at the Salon (including in the area in which all official employment-related notices are posted) and at your offices informing your employees and independent contractors that their relationship is solely with you and that they are not an employee of us or any of our affiliates. You are solely liable for any employment-related issues. Similar language must be included in all of your employment contracts, offer letters and employee handbooks. We may promulgate and periodically modify the language and specifications for such required postings and notices.

6.5     Standards for and Sources of Products and Services.  We may periodically designate and approve standards, specifications, brands, models, manufacturers, suppliers and/or distributors of the Operating Assets and other products and services that we periodically authorize for use at or sale by Paint Nail Bar Facilities.  You must purchase or lease all Operating Assets and other products and services that you use or sell at the Salon only according to our System Standards and, if we require, only from suppliers or

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

distributors that we designate or approve (which may include or be limited to us, our affiliates, and/or other restricted sources). We and/or our affiliates may derive revenue based on your purchases and leases, including, without limitation, from charging you for products and services that we or our affiliates provide to you and from promotional allowances, volume discounts and other payments made to us and our affiliates by suppliers that we designate, approve or recommend for some or all PAINT Nail Bar® Salon franchisees. We and our affiliates may use all amounts received from suppliers, whether or not based on your and other franchisees' prospective or actual dealings with them, without restriction for any purposes that we and our affiliates deem appropriate.

If you wish to purchase or lease any Operating Assets or other products or services from a supplier or distributor which we have not then approved (if we require you to buy or lease the product or service only from an approved supplier or distributor), then you must establish to our reasonable satisfaction that the product or service is of equivalent quality and functionality to the product or service it replaces and that the supplier or distributor is, among other things, reputable, financially responsible, and adequately insured for product liability claims. Upon request, you must pay any actual expenses we may incur in order to determine whether or not any such products, services, suppliers or distributors meet these requirements and specifications. We may condition our approval of a supplier or distributor on requirements relating to product, quality, prices, consistency, warranty, reliability, financial capability, labor relations, customer relations, frequency of delivery, concentration of purchases, standards of service (including prompt attention to complaints), and/or other criteria. We have the right to inspect the proposed supplier's or distributor's facilities and to require the proposed supplier or distributor to deliver product samples or items, at our option, either directly to us or to any third party we designate for testing. Notwithstanding the foregoing, we may limit the number of approved suppliers and/or distributors with whom you may deal, designate sources that you must use, and/or refuse any of your requests for any reason, including, without limitation, that we have already designated any exclusive source (which might be us or our affiliate) for a particular item or service or if we believe that doing so is in the best interests of the PAINT Nail Bar® Salon network.

6.6     <u>Client Surveys</u>. We may periodically coordinate or conduct market research studies and similar programs for the PAINT Nail Bar® Salon network, and you must assist us in collecting information (including, without limitation, by distributing surveys to your Salon's clients and encouraging clients to complete surveys on our System Website).

6.7     <u>Computer System and Salon Management System</u>. During the Term, you must acquire the computer hardware, dedicated telephone and power lines, modems, other computer-related accessories and peripheral equipment, software, and related technology that we periodically specify in accordance with this Agreement (the "**Computer System**") components and other products and services that we periodically specify and operate the Computer System at the Salon in the manner we specify. You will use the Computer System to (among other things) operate the integrated, computer-based systems and services that we periodically specify for administering the management and operation of your Salon, which might include any one or more of point-of-sale, guest management, prospect management, sales and marketing, billing and collections, accounting and payroll, and communications functions (the "**Salon Management System**"). At our option, you must acquire those components, products and services only from the supplier or suppliers that we designate or approve, which might include or be limited to us or our affiliates. We may, at our option, periodically change the Computer System that we designate or approve for PAINT Nail Bar® Salons. If we do, you agree to acquire the Computer System components and other products and services required for the replacement Computer System and switch the Salon's operations to the replacement Computer System in the manner we specify.

Despite the fact that you agree to buy, use, and maintain the Computer System according to our standards and specifications, you will have sole and complete responsibility for (1) the acquisition,

QB\40341653.31

installation, operation, maintenance, and upgrading of the Computer System, (2) the manner in which your Computer System interfaces with our and any third party's computer system, and (3) any and all consequences if the Computer System is not properly installed, operated, maintained, and upgraded. You must ensure that your Computer System permits us to have 24 hours per day, 7 days per week independent, unlimited electronic access to all information and data in the Computer System in the manner that we periodically specify.

7.    **ADVERTISING, PROMOTION, AND MARKETING.**

7.1    Opening Marketing Program. You agree, at your expense, to implement an opening marketing program (the "**Opening Marketing Program**") for the Salon in accordance with the requirements in the Manuals and other System Standards. At least 90 days before you intend to open, we (or a supplier we designate) and you will prepare a proposed opening marketing program that requires spending at least the minimum amount that we reasonably specify. You agree to make the changes to the program that we specify and to execute the program as approved by us.

7.2    Use and Approval of Marketing Materials. You agree at your expense to participate in the manner we periodically specify in all advertising, marketing and promotional programs that we periodically designate for the Salon in the System Standards or otherwise in writing, subject to the Local Marketing Spending Requirement. All advertising, promotion, and marketing materials relating to the Salon ("**Marketing Materials**") must be legal and not misleading and conform to the policies set forth in the Manuals as we prescribe from time to time. You must notify us in advance if you desire to develop additional artwork or other Marketing Materials for the Salon (other than artwork and Marketing Materials we provided to you). At our option, we may (i) develop or designate a supplier to develop the requested artwork or Marketing Materials for the Salon at your expense, (ii) allow you to develop the artwork or Marketing Materials at your expense, or (iii) reject your request to use the artwork or Marketing Materials. At our option, you must acquire Marketing Materials and any or all other advertising, Marketing and promotional products and services for the Salon only from 1 or more suppliers that we designate or approve, which may include or be limited to us, our affiliates, and/or other restricted sources.

In addition, at least 15 Business Days before you intend to use or implement them, you must send us (a) samples or proofs of all Marketing Materials that we have not prepared or already approved, or that we previously approved and which you propose to change in any way, and (b) descriptions of all other advertising, marketing or promotional programs for the Salon that we have not already approved. However, you do not need to send us any Marketing Materials for which you have simply completed the missing Salon-specific or pricing information based on templates that we sent to you. If we do not notify you of our approval of these materials or programs. Within 10 Business Days after we actually receive them, they are deemed disapproved. You may not use any Marketing Materials or conduct any advertising, marketing or promotional programs for the Salon that we have not approved or have disapproved. All Marketing Materials must list our System Website address in the manner we specify. For purposes of this Agreement, "**Business Day**" means any day other than Saturday, Sunday or the following holidays: New Year's Day, Martin Luther King Day, President's Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving and Christmas.

7.3    Local Marketing Spending Requirement. The "**Local Marketing Spending Requirement**" means the amount you must spend during each 3-month period described below on approved Marketing Materials and other approved advertising, marketing and promotional programs for the Salon. However, we will not count any of the following expenditures towards your Local Marketing Spending Requirement: Marketing Contributions, free service offers, discounts or price reductions that you provide as a promotion, permanent on-premises signs, lighting, personnel salaries, administrative costs, transportation vehicles (even if they display the Marks), Yellow Pages advertising, employee incentive programs, and other expenditures that

16

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

we, in our reasonable judgment, deem inappropriate for meeting the Local Marketing Spending Requirement.

The Local Marketing Spending Requirement during the period beginning on the Actual Opening Date and ending on the last day of the 3rd full calendar month thereafter (the "**Initial Marketing Period**") ranges from $3,000 to $6,000 in the aggregate, in addition to conducting any remaining activities required under the Opening Marketing Program. After the end of the Initial Marketing Period, the Local Marketing Spending Requirement during each calendar month is 0.5% of the Salon's Gross Revenue during the previous calendar month.

We may review your books and records from time to time and require you to submit reports periodically to determine your advertising, marketing and promotion expenses. If you fail to spend (or prove that you spent) the Local Marketing Spending Requirement in any period, then we may, in addition to and without limiting our other rights and remedies, require you to contribute the shortfall to the Marketing Fund or to pay us the shortfall for us to spend on Marketing Materials and advertising, marketing and promotional programs for the Salon.

7.4     <u>Marketing Fund</u>.  We have established, administer and control a fund ("**Marketing Fund**") for advertising, marketing, and public relations programs and materials and related activities. Each month, you will pay us or our designated affiliate, via electronic funds transfer or another payment method we specify and together with each payment of the Royalty, a contribution to the Marketing Fund ("**Marketing Contribution**") in the amount equal to 1% of the Salon's Gross Revenue during the previous month. Payment of the Marketing Contributions are due on the same day as the Royalty payments.

We may periodically increase your Marketing Contribution by any amount. But we will not increase the amount to over 1% of Gross Revenue unless at least 2/3 of the owners of all PAINT Nail Bar® Salons located in the United States (including those operated by us, our affiliates, and our franchisees and licensees) vote for the increase, with each owner receiving 1 vote for each PAINT Nail Bar® Salon that it owns. However, we will give you at least 30 days' prior written notice of such increase if you become delinquent in payment of your Marketing Contributions, we may require you to pay your estimated Marketing Contributions annually, in advance, in addition to any remedy we have by reason of such failure.

Marketing Contributions are not our asset nor are they deemed trust funds. We need not segregate the Marketing Contributions from our other funds. We do not owe you fiduciary obligations because of our maintaining, directing or administering the Marketing Fund or for any other reason.

We will direct all programs financed by the Marketing Fund, with sole control over all creative and business aspects. The Marketing Fund may pay for preparing, producing and placing video, audio and written materials, electronic media and, developing, maintaining and administering one or more System Websites, including, without limitation, lead management and customer retention programs, administering national, regional and multiregional marketing and  advertising programs, including, without limitation, purchasing trade journal, direct mail, and other media advertising and using advertising, promotion, and marketing agencies and other advisors to provide assistance, and supporting public and customer relations, market research, and other advertising, promotion, marketing and brand-related activities.

We will account for the Marketing Fund separately from our other funds and not use the Marketing Fund to pay any of our general operating expenses, except for reasonable salaries, administrative costs, travel expenses, and overhead we incur in connection with activities performed for the Marketing Fund, including, without limitation, administering the Marketing Fund and its programs, conducting market research, preparing advertising, promotion, and marketing materials, developing, maintaining and administering the System Website, and collecting and accounting for Marketing Fund Contributions.

QB\40341653.31

Without limiting the generality of the foregoing, you acknowledge that the Marketing Fund's assets will repay us and our affiliates for advertising, marketing, promotional and brand development expenses that we and our affiliates incurred on the Marketing Fund's behalf before the Effective Date and, for some expenses, before the Marketing Fund began operations or collecting Contributions. We may spend, on behalf of the Marketing Fund, in any fiscal year more or less than the aggregate Marketing Contributions of all PAINT Nail Bar® Salons in that year, and the Marketing Fund may borrow from us or others to cover deficits or invest any surplus for future use. We will use all interest earned on Marketing Contributions (if any) to pay costs before using the Marketing Fund's other assets. Upon written request by you, we will send you a copy of the Marketing Fund's most recent budget and unaudited financial statements. We may forgive, waive, settle and compromise all claims by and against the Marketing Fund. We may at any time delegate some or all of our rights and responsibilities with respect to the Marketing Fund to an affiliate or other responsible third party. If we do, we will have no further liability or responsibility to you relating directly or indirectly to the delegated rights and responsibilities.

The Marketing Fund is intended to develop goodwill in connection with the Marks, and the products and services associated with the Marks, and the patronage of all PAINT Nail Bar® Salons. We have no obligation to ensure that expenditures by the Marketing Fund proportionately benefit any particular geographic area or PAINT Nail Bar® Salon. We assume no other direct or indirect liability to you for collecting amounts due to, maintaining, directing, or administering the Marketing Fund.

Upon 30 days' advance notice, we may terminate entirely, reduce, or temporarily suspend Marketing Contributions and operation of the Marketing Fund (and, if terminated, suspended, deferred, or reduced, reinstate such Marketing Contributions). If the Marketing Fund is terminated, all unspent funds on the date of termination will be distributed to our franchisees who are then making Marketing Contributions, and to us and our affiliates, in proportion to their, and our, respective Marketing Contributions during the preceding 12-month period.

7.5     Franchise System Website. At our option, we or one or more of our designees may maintain one or more websites to advertise, market, and promote PAINT Nail Bar® Salons, the products and services that they offer and sell, and the PAINT Nail Bar® Salon franchise opportunity (each a "**System Website**"). If we establish one or more System Websites, we will provide you with a webpage that references the Salon on one or more of the System Websites that we designate. You must give us the information and materials that we request from time to time to develop, update and modify such webpage. We will update and modify such webpage on a schedule that we periodically specify. By providing the information and materials to us, you will be representing to us that they are accurate and not misleading and do not infringe upon any third party's rights. However, we will own all intellectual property and other rights in the System Website, your webpage, and all information they contain (including the domain name or URL for such webpage, the log of "hits" by visitors and any personal or business data that visitors supply).

We will maintain the System Website, including your webpage, and may use the Marketing Fund's assets to develop, maintain and update the System Website. We periodically may update and modify the System Website (including your webpage). You must notify us whenever any information on your webpage changes or is not accurate. We will update or add information that we approve to your webpage at reasonable intervals. You acknowledge that we have final approval rights over all information on the System Website (including your webpage). We may implement and periodically modify System Standards relating to the System Website.

We will maintain your webpage on the System Website only while you are in full compliance with this Agreement and all System Standards (including those relating to the System Website). If you are in default of any obligation under this Agreement or the System Standards, then we may, in addition to our other remedies, temporarily remove your webpage from the System Website until you fully cure the default.

We will permanently remove your webpage from the System Website upon this Agreement's expiration or termination. We also may, at our option, discontinue any or all System Websites at any time.

All advertising, marketing and promotional materials that you develop for your Salon must contain notices of the System Website's domain name in the manner we designate. You may not develop, maintain or authorize any other website, other online presence or other electronic medium (such as mobile applications, kiosks and other interactive properties or technology-based programs) that mentions or describes you or the Salon or displays any of the Marks. Except for using Social Media according to our System Standards, you may not conduct commerce or directly or indirectly offer or sell any products or services using any website, another electronic means or medium, or otherwise over the Internet or using any other technology-based program without our approval.

Nothing in this Section limits our right to maintain Websites other than the System Website or to offer and sell merchandise bearing the Marks from the System Website, another website or otherwise over the Internet without payment or obligation of any kind to you.

7.6 <u>Program Participation</u>. From time to time, through the Marketing Fund or otherwise, we may develop and implement various sales, marketing, advertising and/or program. The programs may consist of limited time offers, special menu items, special or discount pricing, "two for one" and other discount offerings, free or reduced prices for companion purchased products or services and others that we may specify. You must fully participate in these programs if we designate them as mandatory and utilize all and only the materials and media we specify for them.

## 8. <u>EVALUATIONS, AUDITS AND REPORTS.</u>

8.1 <u>Evaluations</u>. We and our designated representatives have the right (but no obligation) before you open the Salon for business and thereafter from time to time during your regular business hours, and without prior notice to you, to inspect and evaluate the Salon, observe and record operations, interview personnel and guests, and inspect your books and records relating to business conducted at the Salon. You will cooperate with us in these activities. We will give you a written summary of our evaluation. Without limiting our other rights and remedies under this Agreement, you agree promptly to correct at your own expense all deficiencies (including failures to comply with System Standards) noted by our evaluators within the time period we specify following your receipt of our notice of such deficiencies. We then may conduct one or more follow-up evaluations to confirm that you have corrected these deficiencies and otherwise are complying with this Agreement and all System Standards. We may charge you an evaluation fee to compensate us for our costs and expenses during any such follow-up evaluation or any evaluation that you request.

8.2 <u>Our Right to Audit</u>. We may at any time during your business hours, and without prior notice to you, examine the Salon's business, bookkeeping and accounting records, sales and income tax records and returns, and other records. You agree to fully cooperate with our representatives and independent accountants hired by us to conduct any such inspection or audit. If any inspection or audit discloses an understatement of the Salon's Gross Revenue, you must pay us, within 15 days after receiving the inspection or audit report, the Royalties, Marketing Contributions and any other amounts due on the amount of the understatement, plus our administrative fee and interest from the date originally due until the date of payment. If any inspection or audit discloses an overstatement of the Salon's Gross Revenue, we will credit you (without interest) for any overpayments you made to us. Further, if an inspection or audit is made necessary due to your failure to furnish reports, supporting records or other information as required, or to furnish these items on a timely basis, or if our examination reveals a Royalty or Marketing Contribution understatement exceeding 2% of the amount that you actually reported to us for the period examined, you agree to reimburse us for the cost of our examination, including, without limitation, legal fees and

independent accountants' fees, plus the travel expenses, room and board, and compensation of our employees. These remedies are in addition to our other remedies and rights under this Agreement and applicable law.

8.3     Records, Reports, and Financial Statements.  You agree to establish and maintain at your own expense a bookkeeping, accounting, and recordkeeping system conforming to the requirements and formats (including, at our option, the accounting principles) that we prescribe from time to time.  We may require you to use a Computer System to maintain certain revenue data and other information (including Client Information) and provide us access to that data and other information in the manner we specify.  You agree to give us in the manner and format that we prescribe from time to time:

(a)     on or before the 10th day of each month, a report on the Salon's Gross Revenue during the previous month,

(b)     on or before the 10th day of the month following the end of each calendar quarter, a profit and loss statement for the Salon for the recently completed calendar quarter;

(c)     within 30 days after the end of the Initial Marketing Period  and each calendar quarter thereafter, a report on your expenditures to satisfy the Local Marketing Spending Requirement for the previous period; and

(d)     within 90 days after the end of each calendar year, a profit and loss and source and use of funds statement(s) for the Salon for the recently completed calendar year, and a balance sheet for the Salon as of the end of that calendar year.

We may periodically specify the form and content of the reports and financial statements described above.  You agree to verify and sign each report and financial statement in the manner we prescribe.  We will not publicly disclose data derived from these reports unless we make such public disclosure without disclosing your identity or your Salon's financial results on an individual unconsolidated) basis.

You agree to preserve and maintain all records, in the periodically specify, in a secure location at the Salon for at least 5 years after the end of the fiscal year to which such records relate.  If we reasonably determine that any report or financial statement submitted to us is willfully and materially inaccurate, then following our delivery of written notice to you, we may require you to have audited financial statements prepared annually during the Term.

9.     **TRANSFER.**

9.1     Transfer by Us.  We may assign this Agreement and delegate all or any part of our obligations to any person or entity who or which we reasonably believe is capable of performing our obligations under this Agreement.  We also may change our ownership or form without restriction.

9.2     Transfer by You - Defined.  Your rights and duties under this Agreement are personal to you.  The Franchise has been granted to you in reliance upon our perceptions of your (or your Owners') individual and collective character, skill, aptitude, attitude, business ability, and financial capacity.  Accordingly, neither this Agreement (nor any right granted by or interest in this Agreement), any Ownership Interest or other interest in you, nor any of the Salon's assets (including the equipment of the Salon) may be Transferred without our prior written approval in accordance with the provisions of this Section.  Any violation of this restriction or other unauthorized Transfer is a breach of this Agreement and will be without effect.  We reserve the right to promulgate and periodically modify System Standards pertaining to the forms, procedures and other aspects of the Transfer process described in this Section.

(a)     For purposes of this Agreement, "**Transfer**," whether used as a noun or a verb, includes, without limitation, your (or your Owners') voluntary, involuntary, direct, or indirect assignment, sale, gift, encumbering, pledge, delegation, or other disposition of this Agreement (or any interest in this Agreement), an Ownership Interest in you, or the Salon or substantially all of its assets (including the equipment of the Salon).

(b)     We will not unreasonably withhold our approval of your granting a security interest in the Salon's assets (but not this Agreement or any rights granted under this Agreement) to any lender that finances your acquisition, development and/or operation of your Salon (a "**Lender**") if you and the Lender sign the form of Lender Consent agreement that we then specify to protect our rights as franchisor. The current version of Lender Consent is attached as an Exhibit to our FDD.

9.3     <u>Transfers of Non-controlling Ownership Interest</u>. If you are a corporation, partnership, limited liability company, or other legal entity, we will not unreasonably withhold our approval to a proposed Transfer of a Non-controlling Ownership Interest, provided you and the Transferring Owners comply with all of the requirements in this Section. Transfers of Non-controlling Ownership Interests are not subject to our right of first refusal. You must comply with our then current Transfer policies and procedures, including, without limitation, by providing us with all the materials requested in the Initial Transfer Package and paying us a transfer fee of $15,000 at least 60 days prior to the proposed Transfer's effective date. You acknowledge and agree that it would be reasonable for us to disapprove any proposed Transfer of a Non-controlling Ownership Interest based on any and all reasonable factors, including, without limitation, if:

(a)     the proposed Transferee does not, in our reasonable judgment, meet our then applicable reasonable standards for owners of new franchisees, including, but not limited to, the requirement that the Transferee not directly or indirectly own any interest in, or perform services for, a Competitive Business (this restriction is not applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent less than 3% of the number of shares of that class of securities issued and outstanding),

(b)     you are not then in full compliance with this Agreement and all related agreements (including, without limitation, the payment of all Royalties and Marketing Contributions),

(c)     you have failed to provide us the Initial Transfer Package materials at least 60 days prior to the proposed Transfer's effective date, or

(d)     you, your Owners, and the Transferee and its owners (as applicable) have failed to sign and deliver to us the Transfer Package Material, including, without limitation, a general release of any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, agents, successors and assigns

9.4     <u>Transfers of the Franchise Agreement, the Salon or controlling Ownership Interest</u>. For purposes of this Agreement a "**controlling Ownership Interest**" means the amount or percent of your voting shares or other voting rights that results in control of the Ownership Interests and/or voting interests or rights of your Owners as determined either immediately before or after the time the determination is made.

9.4.1     <u>Transfer Conditions</u>. The terms and conditions of this Section will apply to any proposed Transfer of this Agreement (or any right granted by or interest in this Agreement), the Salon or all or substantially all of its assets, or a controlling Ownership Interest, whether in one Transfer or a series of Transfers. Any Transfer under this Section is subject to our right of

first refusal. If we do not exercise our right of first refusal, then subject to the other provisions of this Section, and provided you (and your Owners) are then in compliance with this Agreement (including, but not limited to, the payment of all Royalties and Marketing Contributions), we will not unreasonably withhold our approval of a Transfer that satisfies all of the requirements in this Section, including, without limitation, the following conditions:

(i) The proposed Transferee and each of its Owners are individuals who, in our reasonable judgment, meet our then applicable reasonable standards for new franchisees, including, but not limited to, the fact that they do not directly or indirectly own or perform services for a Competitive Business (this restriction is not applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent less than 3% of the number of shares of that class of securities which are issued and outstanding),

(ii) You are then in full compliance with this Agreement and all related agreements (including, without limitation, the payment of all Royalties and Marketing Contributions),

(iii) You provide us the Initial Transfer Package materials at least 60 days prior to the proposed Transfer's effective date,

(iv) The proposed Transferee (or its managing Owner) and its general manager (if different from your general manager) have completed or agree promptly to complete our management training program to our satisfaction (unless the Transferee is an existing licensee, franchisee, or Owner and the Salon will continue to be managed after the Transfer by the same general manager and principal employees who managed the Salon before the Transfer),

(v) We receive a transfer fee of $25,000, if the Transfer involves either (A) the Transfer of a controlling Ownership Interest (whether in one Transfer or a series of Transfers) to a member of the Immediate Family of an Owner, or the Transfer of this Agreement, the Salon and all or substantially all of its assets to a member of the Immediate Family of an Owner or a business entity in which a member of the Immediate Family of an Owner owns a controlling Ownership Interest (an "**Immediate Family Transfer**"), or (B) a Transfer to a franchisee who operates a PAINT Nail Bar® Salon under a franchise agreement with us, and is then in full compliance with such agreement, or a person or business entity who is an affiliate of such a franchisee (a "**Paint Franchisee Transfer**"), or $10,000 if the Transfer is neither an Immediate Family Transfer nor a Paint Franchisee Transfer. For purposes of this Agreement "**Immediate Family**" means, with respect to an individual, that individual's spouse or natural or adoptive father, mother, brother, sister, son or daughter,

(vi) If you or your Owners finance any part of the sale price of the Transferred interest, you and your Owners agree that all of the Transferee's obligations pursuant to any promissory notes, agreements, or security interests that you or your Owners have reserved are subordinate to the Transferee's

obligation to pay Royalties, Marketing Contributions and other amounts due to us and otherwise to comply with this Agreement,

(vii)    You and your Transferring Owners agree in writing for our and the Transferee's benefit to comply with the confidentiality and non-competition restrictions of this Agreement,

(viii)    You, your Owners, the Transferee and its owners (as applicable) sign and deliver to us the Transfer Package Material, including, without limitation, signed general releases, in a form satisfactory to us, of any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, agents, successors and assigns, and

(ix)    The proposed Transferee agrees in writing to be bound by all of the terms and conditions of this Agreement. If the Transfer is the first Transfer under this Section during the Term, otherwise, if the Transfer is not the first Transfer under this Section during the Term, then we may, at our option, require the proposed Transferee and its owners to sign the form of franchise agreement and ancillary agreements we then are using in connection with the grant of new PAINT Nail Bar® Salon franchises, which may differ materially from this Agreement (including, without limitation, fees and conditions for Additional Transfers), except that the term under such franchise agreement will be the then remaining Term.

9.5    <u>Transfer to an Entity</u>.  If you are an individual or group of individuals and are in compliance with this Agreement, then upon no less than 10 days' prior written notice to us, and upon your compliance with our then current Transfer policies and procedures, you may Transfer this Agreement to a legal entity formed solely to operate the Salon and, if applicable, other PAINT Nail Bar® Salons in which you maintain management control, and of which you own 100% of the financial and voting interests, provided that all assets of the Salon are owned, and the entire business of the Salon is conducted, by such entity.  If you are a group of individual s, any such individual who will not own an Ownership Interest in such entity must sign the form of agreement that we reasonably require in which each such individual releases any rights under this Agreement and releases any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, agents, successors and assigns.  Transfers of Ownership Interests in the new entity, including, without limitation, the issuance of new Ownership Interests in such entity to any person other than you, will be subject to the applicable provisions of this Section.  All Owners of the new entity (including you) must execute and deliver to us the appropriate forms of Principal Owner's Guaranty and Principal Owner's Statement, the current forms of which are attached as exhibits to our FDD.  You will remain liable for performance of this Agreement by any entity to which you Transfer this Agreement.  You also agree to enter into an amendment to this Agreement or other document to reflect the new entity as franchisee and ownership structure.

9.6    <u>Our Right of First Refusal</u>.  During the Term, if you or any of your Owners wish to consummate any Transfer, you agree to comply with the following requirements.  You acknowledge and agree that we may, at any time during the process described in this Section, assign any or all of our rights and obligations under this Section to a designee (who may be our affiliate) for any one or more proposed Transfers which are subject to our right of first refusal, and our designee has all of our rights and obligations described herein.

(a)    You must obtain a bona fide, arm's-length, executed written offer from a responsible, bona fide and fully-disclosed purchaser in connection with any proposed Transfer.  Promptly

after receiving such offer, you must send us a copy of such offer, including, without limitation, any letter of intent and proposed contracts. Upon receipt of such information, we will have 15 days to determine our preliminary interest in exercising our right of first refusal. Our failure to notify you of our interest in exercising our right of first refusal within that 15-day period will be deemed our irrevocable decision not to exercise that right of first refusal for the offer you submitted to us.

(b)     If we are preliminarily interested in exercising our right of first refusal, then you must submit to us any financial, operational and other information we reasonably request to assist us in evaluating the transaction. Our requesting this information does not bind us to move forward with our exercise of our right of first refusal. We will have 30 days after receiving all information we request to evaluate the offer and decide whether to purchase such interest for the price and on the terms and conditions contained in the offer. If we elect to purchase the offered interest pursuant to this Section, then

(i)     we may substitute cash for any other form of payment proposed in the offer (such as ownership interests in a privately-held entity),

(ii)    our credit will be deemed equal to the credit of any proposed buyer (meaning that, if the proposed consideration includes promissory notes, we may provide promissory notes with the same terms as those offered by the proposed buyer, except as to subordination. Regarding subordination, you acknowledge and agree that our obligations under any promissory notes we provide in the transaction would be subordinate to our obligations under the promissory notes then outstanding to any and all lenders, although senior to the equity rights of our owners in us),

(iii)   we will have not less than 60 days, but no more than 90 days, after we provide you our notice electing to purchase the offered interest to complete the sale, and

(iv)    we must receive, and you (and each Guarantor) must provide, all customary representations, warranties and indemnities given by the seller of the assets of a business or the ownership interests in a legal entity, as applicable, including, without limitation, representations and warranties regarding ownership and condition of and title to Ownership Interests and/or assets, hens and encumbrances relating to Ownership Interests and/or assets, and validity of contracts and the liabilities, contingent or otherwise, of the entity whose Ownership Interests or assets are being purchased, and indemnities for all actions, events and conditions that existed or occurred in connection with the Salon or your business prior to the closing of our purchase.

(c)     If we do not exercise our right of first refusal, you or your Owners may complete the proposed Transfer to the proposed buyer, but only on the original offer's terms, and subject to our approval of the Transfer as provided in this Agreement and your compliance with the provisions this Agreement. This means that, even if we do not exercise our right of first refusal, if the proposed Transfer otherwise would not be allowed under this Agreement, you or your Owners may not move forward with the Transfer at all.

(d)     If you or your Owners do not complete the Transfer to the proposed buyer on the original offer's terms within 90 days after we notify you that we do not intend to exercise our right of first refusal (or after the last day of the 15-day initial review period described above, if applicable), then any proposed Transfer thereafter once again must comply with all of the provisions of this Section, as though there had not previously been a proposed Transfer.

## 10.    **DEATH OR DISABILITY.**

10.1    <u>Transfer Upon Death or Disability</u>.  Upon your death or Disability or, if you are a legal entity, upon the death or Disability of an Owner, your or the Owner's executor, administrator, conservator, guardian, or other personal representative must, within a reasonable time (not to exceed 6 months after such death or Disability), Transfer your or the Owner's interest in compliance with the terms and conditions applicable to Transfers contained in this Agreement.  If your or the Owner's heirs desire to receive an assignment of the interest we will allow them to do so if they satisfy the conditions this Agreement, including our right of first refusal (if applicable).  For purposes of this Agreement "**Disability**" means the inability of a person to perform his or her normal responsibilities at the Salon for a consecutive period of at least 90 days or for a total of 180 days during any 12-month period.

10.2    <u>Operation Upon Death or Disability</u>.  If you or one of your Owners was the manager of the Salon at the time of your or such Owner's death or Disability, then, within 30 days after such death or Disability, your or your Owner's executor or other personal representative must appoint a qualified manager to operate the Salon.  Such manager will be required to complete our management training program to our satisfaction.  In addition, if, at any time following the death or Disability of you or one of your Owners, we determine that the Salon is not being managed properly according to our System Standards, we or our designee have the right (but not the obligation) to enter the Site and assume the Salon's management for any period of time that we deem appropriate. All funds from the Salon's operation during the period of our (or our designee's) management will be kept in a separate account and all Salon expenses will be charged to such account.  In addition to all other fees and payments owed hereunder, we may charge you a reasonable management fee that we specify, not to exceed 3% of the Salon's Gross Revenue, plus any out-of-pocket expenses incurred in connection with the Salon's management.  We, or our designee, have a duty only to use reasonable efforts upon assuming the Salon's management and will not be liable to you for any debts, losses or obligations that the Salon incurs, or to any creditors for any supplies or other products or services purchased for the Salon, in connection with such management.

## 11.    **EXPIRATION OF THIS AGREEMENT.**

11.1    <u>First Renewal Franchise</u>.  Upon the expiration of the Term, you will have the right to extend the Term for 1 additional renewal term of 10 years (the "**First Renewal Franchise**") if you meet all of the terms and conditions of this Section

(a)     you (and each of your Owners) are then in full compliance with this Agreement and all other agreements between you and us or our affiliates and have been in substantial compliance with this Agreement and all other agreements between you and us or our affiliates throughout the Initial Term;

(b)     you have completed and sent us the forms and other information we then require and demonstrate to our satisfaction that you and your Owners meet our then current financial and operational criteria for new PAINT Nail Bar® Salon franchisees and their owners;

(c)     you maintain possession of and agree to remodel the Salon, add or replace improvements, equipment, fixtures, furnishings, and signs, and otherwise modify the Salon as we require

25

to bring it into compliance with specifications and standards then applicable for new PAINT Nail Bar® Salons;

(d)     you must give us written notice of your election to acquire the First Renewal Franchise at least 12 months prior to the expiration of the initial Term; and

(e)     together with that notice, you must pay us a fee in the amount equal to 50% of the standard initial franchise fee that we then are charging to new PAINT Nail Bar® Salon franchisees (the "**Renewal Franchise Fee**"). If you fail to give us your notice and pay us the Renewal Franchise Fee by the required deadline, we will interpret that to be your election not to acquire a First Renewal Franchise, and we will take action in reliance on that election.

11.2    <u>Process</u>. Within 90 days after our receipt of your notice (together with the Renewal Franchise Fee), we will give you written notice (i) of our determination whether or not we will grant you the First Renewal Franchise (and, if applicable, stating the reasons for a refusal to grant you the First Renewal Franchise), (ii) advising you of any deficiencies which you must correct before we will grant you the First Renewal Franchise, stating what actions you must take to correct the deficiencies and specifying the time period in which such deficiencies must be corrected; (iii) advising you of our requirements to modify the Salon to bring it into compliance with specifications and standards then applicable for new PAINT Nail Bar® Salon, and/or (iv) advising you of any changes which we propose to make to your Territory during the remaining Term.

11.3    <u>Renewal Documents</u>. To obtain the First Renewal Franchise, you and your Owners must execute and return to us the form of "**Renewal Franchise Letter**" that we then are using for the grant of first renewal franchises under forms of franchise agreement which are substantially similar to this Agreement. The Renewal Franchise Letter will extend the Term and this Agreement's expiration date for an additional 10 years. The Renewal Franchise Letter also may (at our option) contain a new definition of the Territory which will apply during the extended Term. However, except as set forth in this Section, the Renewal Franchise Letter will extend the Term on the same terms and conditions of this Agreement. As a further condition to the grant of the First Renewal Franchise, you and your Guarantors must also execute and deliver to us, to the extent permitted by applicable law, general releases, in a form prescribed by us, of any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, agents, successors and assigns. If you, your Guarantors and/or Owners each fail to sign and deliver to us such Renewal Franchise Letter and releases within 30 days after delivery to you, you will be deemed to have elected not to obtain the First Renewal Franchise.

11.4    <u>Process</u>.. Within 90 days after our receipt of your notice, we will give you written notice (A) of our determination whether or not we will grant you the Additional Renewal Franchise and/or (B) advising you of any deficiencies which you must correct before we will grant you the Additional Renewal Franchise, stating what actions you must take to correct the deficiencies and specifying the time period in which such deficiencies must be corrected. We will give you written notice of a decision not to grant you the Additional Renewal Franchise based upon your failure to cure such deficiencies not less than 90 days prior to the expiration of the Term (unless you breach this Agreement during that 90-day period). Such notice will state the reasons for our refusal to grant you the Additional Renewal Franchise.

11.5    <u>Additional Renewal Franchises</u>. An "**Additional Renewal Franchise**" is the right to operate a PAINT Nail Bar® Salon at the Site or a substitute Site that we approve under our then-current form of franchise agreement and related documents, with such franchise agreement's term commencing immediately after the expiration date of the extended Term. If you have validly exercised the First Renewal Franchise, then, subject to the terms and conditions set forth in this Section, upon the expiration of the

extended Term for the First Renewal Franchise, you will have the opportunity to acquire an Additional Renewal Franchise upon the expiration of the extended Term, if:

(a)     you must give us written notice of your election to acquire the Additional Renewal Franchise at least 12 months prior to the expiration of the extended Term. We may require you to provide certain financial information relating to you, your Owners and the Salon's operation along with your notice. If you fail to give us your notice by the required deadline, we will interpret that to be your election not to acquire the Additional Renewal Franchise, and we will take action in reliance on that election;

(b)     you (and each of your Owners) are then in full compliance with this Agreement and all other agreements between you and us or our affiliates and have been in substantial compliance with this Agreement and all other agreements between you and us or our affiliates throughout the Term;

(c)     you have completed and sent us the forms and other information we then require and demonstrate to our satisfaction that you and your Owners meet our then current financial and operational criteria for new PAINT Nail Bar® Salon franchisees and their owners, and

(d)     you either (i) maintain possession of and agree to remodel the Salon, add or replace improvements, equipment, fixtures, furnishings, and signs, and otherwise modify the Salon as we require to bring it into compliance with specifications and standards then applicable for new PAINT Nail Bar® Salons, or (ii) if you are unable to maintain possession of the Site, or if, in our reasonable judgment based on changed market and economic conditions then in effect in your local market, the Salon should be relocated, you: (x) secure a substitute Site we approve, (y) develop the substitute Site in compliance with specifications and standards then applicable for new PAINT Nail Bar® Salons, and (z) continue to operate the Salon at the original Site as is reasonable until operations are transferred to the substitute Site.

11.6     Relocation. Notwithstanding our right in subparagraph (c) above to require you to relocate the Salon, we will not require you to relocate the Salon in connection with your acquisition of an Additional Renewal Franchise until the then current term of the lease or sublease for your Salon expires (in the case where this Agreement expires before your then current lease term expires). However, you must comply with your obligations in subparagraph (c) above and, if appropriate, commence preparation to relocate the Salon to a new location before the then current term of your lease or sublease expires in order to minimize as reasonably as practicable the time period during which you do not have a PAINT Nail Bar® Salon open for Business.

11.7     Documentation. To obtain the Additional Renewal Franchise, you and your Owners must execute and return to us the form of franchise agreement and/or any ancillary agreements we are then using in connection with the grant of renewal franchises for PAINT Nail Bar® Salons, the terms of which may differ materially from this Agreement (including, without limitation, Territory definition, territorial rights and fees), provided, however, that (1) we will not charge you an initial franchise fee for the Additional Renewal Franchise that exceeds 25% of the initial franchise fee that we are then charging for new PAINT Nail Bar® Salon franchises, and (2) the term of such franchise agreement will be 10 years and you will have the right to acquire 1 Additional Renewal Franchise for an additional 10-year term under the terms and conditions we are then using for the grant of renewal franchises. As a further condition to the grant of the Additional Renewal Franchise, you and your Guarantors must also execute and deliver to us, to the extent permitted by applicable law, general releases, in a form prescribed by us, of any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, agents, successors and assigns.

27

If you, your Guarantors and/or Owners each fail to sign and deliver to us such agreements and releases within 30 days after delivery to you, you will be deemed to have elected not to obtain the First Renewal Franchise

## 12.    **TERMINATION OF AGREEMENT**

12.1    Termination By You.  You may terminate this Agreement if we commit a material breach of any of our obligations under this Agreement and fail to correct such breach within 30 days after your delivery of written notice to us of such breach, provided, however, that if we cannot reasonably correct the breach within this 30-day period but provide you, within  this 30-day period, with reasonable evidence of our effort to correct the breach within a reasonable time period, then the cure period runs through the end of such reasonable time period.

12.2    Termination by Us.  Upon the occurrence of any one of the following events, we may, at our option, terminate this Agreement, effective immediately upon delivery of written notice to you.

(a)    You (or any of your Owners) have made or make any material misrepresentation or omission in connection with your application for and acquisition of the Franchise or your operation of the Salon, including, without limitation, by intentionally, or through your gross negligence, understating the Salon's Gross Revenue for any period.

(b)    You fail to secure an approved Site by purchase or under a lease or sublease that we approve within 12 months after the Effective Date, or you fail to develop, open and begin operating the Salon in accordance with this Agreement and our System Standards on or before the Opening Deadline.

(c)    You abandon or fail to actively operate the Salon offering full services to its guests during all of the hours we specify (other than due to any event or condition beyond the reasonable control of the subject party, including, but not limited to, acts of God or a governmental authority ("**Force Majeure**")) for 2 or more consecutive days, or for 3 or more days during any calendar month, although you may close the Salon for up to 30 days for remodeling and repairs which have been pre-approved in writing by us (but if your remodeling or repairs will take more than 30 days, your guests must be able to use an alternate location within 2 miles of your Salon).

(d)    You or any of your Owners makes a purported Transfer in violation of this Agreement.

(e)    You (or any of your Owners with a controlling Ownership Interest) are or have been convicted of, or plead or have pleaded either guilty or no contest to, a felony, or to another crime of lesser offense that may adversely affect your reputation, the reputation of your Salon or the goodwill associated with the Marks.

(f)    You (or any of your Owners with a controlling Ownership Interest) engage in any dishonest, dangerous or unethical conduct which, in our sole opinion, adversely affects our reputation and/or the goodwill associated with the Marks.

(g)    You lose the right to possession of the Site.

(h)    A Lender forecloses on its lien on a substantial and material portion of the Salon's assets.

(i)     You (or any of your Owners) misappropriate any Confidential Information or violate any provisions of this Agreement, including, but not limited to, by holding interests in or performing services for a Competitive Business.

(j)     You violate any material law, ordinance, or regulation applicable to the Salon and do not begin to correct such noncompliance or violation immediately, or do not completely correct such noncompliance or violation within the time period prescribed by law, unless you are in good faith contesting your liability for such violation through appropriate proceedings.

(k)     You fail to report the Salon's Gross Revenue or fail to make any payment due to us or any of our affiliates, and do not correct such failure within 5 days after delivery of written notice of such failure.

(l)     You fail to maintain the insurance required by this Agreement or to furnish us with satisfactory evidence of such insurance within the required time and do not correct such failure within 5 days after delivery of written notice of such failure.

(m)     You fail to pay when due any federal or state income, service, sales, employment, or other taxes due from the operations of the Salon, unless you are in good faith contesting your liability for such taxes through appropriate proceedings.

(n)     You (or any of your Owners) breach this Agreement or any other agreement between us (or any of our affiliates) and you (or any of your Owners or affiliates) on 3 or more separate occasions within any period of 12 consecutive months and we provide you with written notice of such breaches, whether or not such breaches are corrected after notice from us. Provided, however that a breach of this Agreement will not terminate any Area Development Addendum among the parties which will remain in effect.

(o)     You repeatedly fail to pay amounts owed to our designated, approved, or recommended suppliers within 30 days following the due date (unless you are contesting the amount in good faith), or you default (and fail to cure within the allocated time) under any note, lease, or agreement we deem material pertaining to the operation or ownership of the Salon.

(p)     Any other contract or agreement between us (or any of our affiliates) and you (or any of your Owners or affiliates) is terminated before its term expires, regardless of the reason.

(q)     You make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due, you consent to the appointment of a receiver, trustee, or liquidator of all or a substantial part of your property, the Salon is attached, seized, or levied upon, unless such attachment, seizure, or levy is vacated within 60 days, or any order appointing a receiver, trustee, or liquidator of you or the Salon is not vacated within 60 days following the entry of such order.

(r)     You fail to comply with any other obligation under this Agreement or any other agreement between us (or any of our affiliates) and you, including, without limitation, any System Standard, and do not correct the failure to our satisfaction within 30 days after we deliver written notice of the failure to you.

12.3    Assumption of Salon's Management.  If you abandon or fail to actively operate the Salon for any period, if we have terminated this Agreement and provided you written notice that we have exercised or are determining whether to exercise our rights to purchase your Salon assets, or our other remedies upon your

29

default, we or our designee have the right (but not the obligation) to enter the Site and assume the Salon's management for any period of time that we deem appropriate all funds from the Salon's operation during the period of our (or our designee's) management will be kept in a separate account and all Salon expenses will be charged to such account. In addition to all other fees and payments owed hereunder, we may charge you a reasonable management fee that we specify, not to exceed 3% of the Salon's Gross Revenue, plus any out-of-pocket expenses incurred in connection with the Salon's management. We or our designee will have a duty only to use reasonable efforts upon assuming the Salon's management and will not be liable to you for any debts, losses or obligations that the Salon incurs, or to any creditors for any supplies or other products or services purchased for the Salon in connection with such management.

12.4 <u>Other Remedies Upon Default</u>. Upon your failure to remedy any failure to comply with any provision of this Agreement or any System Standard, or other default specified in any written notice issued to you, within the time period (if any) we specify in our notice to you, then we have the right, until you correct the failure or remedy the default to our satisfaction to take any one or more of the following actions:

    (a)     suspend your right to participate in one or more advertising, marketing or promotional programs that we or the Marketing Fund provide, including, without limitation, your Salon's webpage on the System Website;

    (b)     suspend or terminate any temporary or permanent fee reductions to which we might have agreed (whether as a policy, in an amendment to this Agreement or otherwise);

    (c)     refuse to provide any operational support that this Agreement requires; and/or

    (d)     assume the Salon's management.

Our exercise of any of these rights will not constitute an actual or constructive termination of this Agreement nor be our sole and exclusive remedy for your failure to comply or other default. If we exercise our right not to terminate this Agreement but to implement any remedies in this Section, we may at any time after the appropriate cure period under the written notice has lapsed (if any) terminate this Agreement without giving you any additional corrective or cure period. During any suspension period, you must continue to pay all fees and other amounts due under, and otherwise comply with, this Agreement and all related agreements. Our election to suspend your rights as provided above will not be a waiver by us of any breach of this Agreement. If we rescind any suspension of your rights, you will not be entitled to any compensation (including, without limitation, repayment, reimbursement, refunds, or offsets) for any fees, charges, expenses, or losses you might have incurred due to our exercise of any suspension right provided above.

## 13. <u>EFFECT OF TERMINATION OR EXPIRATION OF THIS AGREEMENT.</u>

13.1 <u>Payment of Amounts Owed to Us</u>. Upon termination or expiration of this Agreement for any reason, you will pay us all amounts remaining due under this Agreement within 10 days after such termination or expiration (or within 10 days after the amount is known, if the amount is not known on the effective date of expiration or termination).

13.2 <u>Marks</u>. Upon the termination or expiration of this Agreement, you must de-identify the Salon in accordance with this Section and as reasonably required by us de-identification includes, but is not limited to, taking the following actions:

    (a)     you will take such action as may be required to cancel all or fictitious assumed name(s) or equivalent registrations relating to your use of any of the Marks and, at our option, to assign

to us (or our designee) or cancel any electronic address, domain name or website, or rights maintained in connection with any search engine, that associates you with us, the Salon, or the Marks;

(b)     you will notify the telephone company and all telephone directory publishers of the termination or expiration of your right to use any telephone, telecopy, or other numbers associated with the Salon and any regular, classified, or other telephone directory listings associated with any of the Marks or the Salon, authorize the transfer of such numbers and directory listings to us or our nominee, or instruct the telephone company to forward all calls made to your telephone numbers to numbers we specify;

(c)     at our option, we (or our Affiliate) may purchase all Private Label Products that are new, unused and undamaged at your cost. You must ship them to us at our cost using our chosen shipment method;

(d)     beginning on the De-Identification Date (defined below) you may not directly or indirectly at any time or in any manner (except with respect to other PAINT Nail Bar® Salons you own and operate) identify yourself or any business as a current or former PAINT Nail Bar® Salon, or as one of our current or former franchisees, or use any of the Marks, the Systems, System Standards, or any colorable imitation thereof, including, without limitation, on any stationery, forms, advertising materials, or billing statements; and

(e)     if we do not exercise the right to purchase Salon assets, you will at your own expense: (i) immediately following the De-Identification Date, post a temporary notice or sign at the Salon's entrance announcing that the Salon will no longer operate as a PAINT Nail Bar® Salon and otherwise stop identifying the Salon as a PAINT Nail Bar® Salon; (ii) within 3 days after the De-identification Date, remove and deliver to us (or, at our option, destroy) all exterior and interior signs, Marketing Materials, forms, and other materials containing any of the Marks or otherwise identifying or relating to a PAINT Nail Bar® Salon; and (iii) within 3 days after the De-Identification Date, make such alterations as we reasonably specify to distinguish the Salon and its assets clearly from their former appearance and from other PAINT Nail Bar® Salons so as to prevent a likelihood of confusion by the public and otherwise take the steps that we specify to de-identify the Salon, including, without limitation, permanently removing all Marks and trade dress from the Salon's interior, exterior, and Operating Assets.

If you fail to comply with any of the requirements of the Section within 7 days after the De-Identification Date, then, without limiting our other rights and remedies under this Agreement or applicable law, we or our designee may enter the Salon and adjacent areas, without prior notice or liability, to remove the items and/or make the alterations required by this Section at your sole cost and expense. The "**De-Identification Date**" means: (i) if we exercise our right to purchase Salon assets, the closing date of our (or our designee's) purchase of the Salon's assets, or (ii) if we do not exercise the right to purchase Salon assets, the date upon which that right expires or the date upon which we provide you written notice of our decision not to exercise, or to withdraw our previous exercise, of that right, whichever occurs first.

13.3     <u>Confidential Information</u>. Upon termination or expiration of this Agreement, you and your Owners will immediately cease to use any of our Confidential Information in any business or otherwise and return to us all copies of the Manuals and any other confidential materials that we have loaned to you.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

13.4     Covenant Not to Compete.  Upon termination of this Agreement for any reason or expiration of this Agreement, you agree that, for 2 years beginning on the effective date of termination or expiration(subject to extension as provided below), neither you nor any of your Owners, will

(a)     have any direct or indirect, controlling or non-controlling interest as an owner whether of record, beneficial or otherwise in any Competitive Business which is located or operating at the Site or within a 5-mile radius of the Site, or any other PAINT Nail Bar® Salon; provided that this restriction will not be applicable  to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent less than 3% of the number of shares of that class of securities issued and outstanding, or

(b)     perform services as a director, officer, manager, employee, consultant, representative or agent for a Competitive Business which is located or operating at the Site or within a 5-mile radius of the Site.

The time period during which these restrictions apply will be automatically extended, with respect to all persons that this Section covers, for each day during which any person covered by this Section is not complying fully with this Section.  You acknowledge that you and your Owners possess skills and abilities of a general nature and have other opportunities for exploiting these skills.  Consequently, our enforcing the covenants made in this Section will not deprive you or your Owners of personal goodwill or the ability to earn a living.

13.5     Our Right to Purchase Salon Assets.

13.5.1   Exercise of Option.  Upon termination of this Agreement for any reason or expiration of this Agreement, we have the option, exercisable by giving you written notice within 15 days after the date of termination or expiration, to purchase those assets associated with the operation of the Salon (including, without limitation, Operating Assets, and accounts receivable) that we designate. We have the unrestricted right to assign this option to purchase.  We must receive, and you (and each Guarantor) must provide, all customary representations, warranties and indemnities given by the seller of the assets of a business, including, without limitation, representations and warranties regarding ownership and condition of and title to assets, liens and encumbrances on assets, validity of contracts and the liabilities affecting the assets, contingent or otherwise, and indemnities for all actions, events and conditions that existed or occurred in connection with the Salon or your business prior to the closing of our purchase.

If you or one of your affiliates owns the Site, we may elect to include a fee simple interest in that site as part of the assets purchased or, at our option, lease that Site from you or such affiliate for an initial 10-year term with 1 renewal term of 10 years (at our option) on commercially reasonable terms.  If you lease the Site from an unaffiliated lessor, you agree (at our option) to assign the lease to us or to enter into a sublease for the remainder of the lease term on the same terms (including renewal options) as the lease.

13.5.2   Purchase Price.  The purchase price for any assets we choose to acquire will be their fair market value.  However, the purchase price will not include any value for the rights granted by this Agreement, goodwill attributable to the Marks, the Paint Nail Bar® brand image, Systems and other intellectual property, or participation in the network of PAINT Nail Bar® Salon network.  For purposes of determining the fair market value of all equipment (including the Computer System) used in operating the Salon, the equipment's useful life will be determined to be no more than 3 years.

QB\40341653.31

13.5.3 <u>Appraisal</u>. If we and you cannot agree on fair market value, fair market value will be determined by 3 independent appraisers, each of whom in doing so will be bound by the criteria specified in subparagraph (b). We will appoint one appraiser, you will appoint one appraiser, and these two appraisers will appoint the third appraiser. You and we agree to select our respective appraisers within 15 days after we deliver our notice of exercise to you (if you and we have not agreed on fair market value before then), and the two appraisers so chosen are obligated to appoint the third appraiser within 15 days after the last of them is appointed. You and we will bear the costs of our own appraisers and share equally the fees and expenses of the third appraiser. Within 30 days after we deliver our notice of exercise to you, each party will submit its respective calculation of fair market value to the appraisers in such detail as the appraisers request and according to the criteria specified in subparagraph (b). Within 15 days after receiving both calculations, the appraisers will determine, by a majority vote, and notify you and us which of the calculations is the most correct. The appraisers must choose either your or our calculation, and may not develop their own fair market value calculation. The appraisers' choice will be the purchase price.

13.5.4 <u>Closing</u>. We (or our assignee) will pay the purchase price at the closing, which will take place not later than 30 days after the purchase price is determined, although we (or our assignee) may decide after the purchase price is determined not to complete the purchase. We may set off against the purchase price, and reduce the purchase price by, any and all amounts you owe us or our affiliates. At the closing, you agree to deliver instruments transferring to us (or our assignee) (i) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and transfer taxes paid by you, and (ii) all of the Salon's licenses and permits which may be assigned or transferred. If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the sale will be closed through an escrow. You further agree to sign general releases, in a form satisfactory to us, of any and all claims against us and our affiliates, and our and their respective owners, officers, directors, employees, agents, successors and assigns. If we exercise our rights under this Section, then for 2 years beginning on the closing date, you and your Owners (and members of your and their immediate families) will be bound by the non-competition covenant contained in this Agreement.

13.5.5 <u>Continuing Obligations</u>. All of our and your (and your Owners' and affiliates') obligations which expressly or by their nature survive the termination or expiration of this Agreement will continue in full force and effect subsequent to and notwithstanding its termination or expiration until such obligations are satisfied in full or by their nature expire.

## 14. **RELATIONSHIP OF THE PARTIES; INDEMNIFICATION.**

14.1 <u>Independent Contractors</u>. This Agreement does not create a fiduciary relationship between you and us. We and you are and will be independent contractors, and nothing in this Agreement is intended to create an agency, joint venture, partnership, or employment relationship. Neither party has any right to create any obligation on behalf of the other except as expressly provided in this Agreement. Because you are an independent contractor, your labor relations with your employees are strictly your own concern. You must comply with all applicable laws and regulations, whether related to employment, to operating the Salon or otherwise. We do not have the right or power to supervise or discipline any of your employees, to determine the hiring, firing, compensation, or terms or conditions of employment of any of your employees, or otherwise to control the labor relations between you and your employees.

14.2 <u>Taxes</u>. You and your Owners are solely responsible for all taxes, however denominated or levied upon you or the Salon, in connection with the business you will conduct under this Agreement (except any taxes we are required by law to collect from you with respect to purchases from us).

14.3 <u>Your Indemnification and Defense of Paint Nail Bar Indemnified Parties</u>.

14.3.1 To the fullest extent permitted by law, you agree to indemnify and hold harmless us, our affiliates, and our and their respective owners, directors, officers, employees, agents, successors, and assignees (the "**Paint Nail Bar Indemnified Parties**") against, and to reimburse any one or more of the Paint Nail Bar Indemnified Parties for, all Losses directly or indirectly arising out of the Salon's operation, the business you conduct under this Agreement or any other agreement between the parties and/or their affiliates that relates to the operation of the Salon, a Transfer in violation of this Agreement or your other breach of this Agreement, including those Losses alleged to be caused by a Paint Nail Bar Indemnified Party's gross negligence or willful misconduct.

14.3.2 You agree to defend (at your expense) the Paint Nail Bar Indemnified Parties against any and all Proceedings directly or indirectly arising out of, resulting from, or in connection with any matter described above, including those alleging a Paint Nail Bar Indemnified Party's gross negligence or willful misconduct, subject to this Agreement. Each Paint Nail Bar Indemnified Party may at your expense defend and otherwise respond to and address any Proceeding described in this Section and agree to settlements or take any other remedial, corrective, or other actions, without limiting your obligations to indemnify the Paint Nail Bar Indemnified Parties.

14.3.3 Your obligations in this Section will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination. A Paint Nail Bar Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its Losses, in order to maintain and recover fully a claim against you under this Section. You agree that a failure to pursue a recovery or mitigate a Loss will not reduce or alter the amounts that a Paint Nail Bar Indemnified Party may recover from you under this Section.

14.4 <u>Our Indemnification of Franchise Owner Indemnified Parties</u>. We agree to indemnify and hold harmless the Franchise Owner Indemnified Parties against, and to reimburse one or more of the Franchise Owner Indemnified Parties for, all Losses (including, without limitation, defense costs and other Losses incurred in defending any Proceeding described above, if applicable) directly or indirectly arising out of, resulting from, or in connection with a final decision by a court of competent jurisdiction not subject to further appeal that we, our affiliate, or any of our or their respective employees directly engaged in willful misconduct or gross negligence or intentionally caused the property damage or bodily injury that is the subject of the claim, so long as the claim is not asserted on the basis of theories of vicarious liability (including, without limitation, agency, apparent agency, or employment) or our failure to compel you to comply with this Agreement, which are claims for which the Franchise Owner Indemnified Parties are not entitled to indemnification under this Section.

This indemnity and hold harmless will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination. A Franchise Owner Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its Losses, in order to maintain and recover fully a claim against us under this Section. We agree that a failure to pursue a recovery or mitigate a Loss will not reduce or alter the amounts that a Franchise Owner Indemnified Party may recover from us under this Section.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

14.5    Insurance.  You must obtain and thereafter maintain in full force and effect, throughout the Term, (i) Commercial General Liability insurance including endorsements adding Professional Liability in the minimum amount of $1,000,000 per occurrence and $2,000,000 in the aggregate covering premises and on-going operations as well as products and completed operations, with General Liability coverage providing for independent contractors and contractual tort liability, (ii) Automobile insurance for any owned, hired or non-owned vehicles in the minimum amount of $1,000,000 combined single limit, (iii) Statutory Worker's Compensation and Employer's Liability insurance with minimum limits of $1,000,000 per accident, disease and in the aggregate, (iv) employment practices liability insurance ("**EPLI**") coverage in the minimum amount of $500,000 per occurrence, and (v) Commercial Umbrella coverage with minimum requirements as follows:  If you operate 1-3 PAINT Nail Bar® Salons, you may obtain coverage with at least a single $1,000,000 umbrella limit covering all of those facilities; if you operate 4-6 PAINT Nail Bar® Salons, you may obtain coverage with at least a $2,000,000 limit covering all of those facilities; and if you operate 7 or more PAINT Nail Bar® Salons, you may obtain coverage with at least a $5,000,000 limit covering all of those facilities.  You must obtain this coverage above on or before the date which is the earlier of (a) 30 days prior to the earlier of the Actual Opening Date or your first use of the Marks in any manner, or (b) your execution of a Lease for the Site.  You must obtain this coverage on or before the date upon which you first hire an employee.  Such coverage (including, without limitation, any exceptions or exclusions) must satisfy our minimum requirements.

Said coverage will be on an "occurrence" basis (except for the EPLI coverage, which is on a "claims made" basis) and must provide that it cannot be canceled, terminated, reduced, or amended without the insurer's first giving us at least 30 days' advance written notice.  All policies will apply on a primary and non-contributory basis to any other insurance or self-insurance that we or out affiliates maintain.  All General Liability and Workers Compensation policies outlined above must provide for waiver of subrogation in favor of us and our affiliates.  The insurer under any required policy will at all times maintain at least an "A" rating or better as rated by Best's Insurance Reports (or any similar rating that we periodically designate).  You must cause us and all of our affiliates of whom we notify you to be named as additional insureds on any such policies and deliver evidence of required insurance coverage to us.  Upon issuance of any required insurance policy, and at least 30 days prior to any renewal or replacement of a required insurance policy, you must deliver to us a certificate of insurance evidencing that you have obtained such policy.  You must notify us of any lawsuits filed against you within 5 Business Days after you have notice of such lawsuits, whether or not you have tendered them to your insurance company for defense and/or coverage.  We may, upon 60 days prior written notice to you, require reasonable changes in the insurance coverage you are required to maintain to reflect inflation, identification of special risks, changes in law or standards of liability, higher damage awards, or other relevant changes in circumstances.

15.    **STANDARD CLAUSES.**

15.1    Severability.  Except as expressly provided to the contrary in this Agreement, each provision of this Agreement is severable, and if, for any reason, any provision or part of a provision is held to be invalid or in conflict with any applicable  present or future law or regulation in a final, unappealable ruling issued by any court, agency, or tribunal with competent jurisdiction in a proceeding to which we are a party, that ruling will not impair the operation of, or have any other effect upon, such other portions of this Agreement that remain otherwise intelligible, which will continue to be given full force and effect and bind the parties. If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable by reducing any part or all of it, you and we agree that such covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity.  If any applicable  and binding law or rule of any jurisdiction requires a greater prior notice than is required under this Agreement of the termination of this Agreement or of our refusal to enter into a Renewal Franchise Agreement, or the taking of some other action not required under this Agreement, or if, under any applicable

QB\40341653.31

and binding law or rule of any jurisdiction, any provision of this Agreement or any System Standard is invalid or unenforceable, the prior notice and/or other action required by such law or rule will be substituted for the comparable provisions of this Agreement, and we will have the right to modify such invalid or unenforceable provision or System Standard to the extent required to be valid and enforceable. You agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions or any System Standard any portion or portions which a court or arbitrator holds to be unenforceable in a final decision to which we are a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order or arbitration award. Such modifications to this Agreement will be effective only in such jurisdiction, unless we elect to give them greater applicability, and will be enforced as originally made and entered into in all other jurisdictions.

15.2    <u>Amendment</u>. Subject to our right to periodically modify System Standards and the Manual, the provisions of this Agreement may be modified only by written agreement between the parties.

15.3    <u>Waiver of Obligations</u>. We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of notice to the other or such other effective date stated in the notice of waiver. Any waiver we or you grant will be without prejudice to any other rights we or you may have, will be subject to our or your continuing review, and may be revoked by the party granting the waiver at any time and for any reason, provided, however, that any waived breach may not later be used as a ground for terminating this Agreement. Any waiver must be in writing to be enforceable. Our failure to complain or declare that you are in breach of the terms of this Agreement or our failure to give or withhold our approval as provided in this Agreement will not, except as otherwise provided in this Agreement, constitute a waiver of such breach or of such right to withhold our approval. We will not be deemed to waive or impair any of our rights under this Agreement because of our waiver of or failure to exercise any right, whether of the same, similar, or different nature, with other PAINT Nail Bar® Salons or because of the existence of other franchise or license agreements for other PAINT Nail Bar® Salons which contain provisions different from those contained in this Agreement.

15.4    <u>Costs and Attorneys' Fees</u>. If a claim for amounts owed by you to us or any of our affiliates is asserted in any legal or arbitration proceeding or if either you or we are required to enforce this Agreement in a judicial or arbitration proceeding, the party prevailing in such proceeding will be entitled to reimbursement of its costs and expenses, including reasonable accounting and attorneys' fees. Attorneys' fees will include, without limitation, reasonable legal fees charged by attorneys, paralegal fees, and costs and disbursements, whether incurred prior to, or in preparation for, or contemplation of, the filing of written demand or claim, action, hearing, or proceeding to enforce the obligations of the parties under this Agreement.

15.5    <u>No Off-Sets. Cumulative Rights</u>. You may not take any off-sets from any amounts due us or our affiliates under this Agreement or any other agreements. Our and your rights under this Agreement are cumulative, and no exercise or enforcement of any right or remedy will preclude our or your exercise or enforcement of any other right or remedy under this Agreement which we or you are entitled by law to exercise or enforce

15.6    <u>Arbitration</u>. All disputes between us and our affiliates, and our and their respective owners, officers, directors, agents, and employees, and you (and/or your Owners, Guarantors, affiliates, officers, directors, agents, and employees, if applicable) arising out of or related to this Agreement or any provision of this Agreement (including the validity and scope of the arbitration obligation under this Section, which we and you acknowledge is to be determined by an arbitrator, not a court), any other agreement between us (or our affiliate) and you, or any aspect of our and your relationship, will be determined exclusively by binding Arbitration to be conducted by 1 arbitrator under the then current commercial Arbitration rules of

the American Arbitration Association Arbitration, provided however, that each party will be able to take up to 30 interrogatories, unlimited document requests, and up to 3 depositions per side. Other discovery will be within the scope of the arbitrator's discretion. Proceedings must be held exclusively in Sarasota County, Florida. All matters relating to Arbitration will be governed by the Federal Arbitration Act (9 USC §§ 1 et seq.). Judgment upon the award may be entered in any court of competent Jurisdiction.

We and you agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. We and you further agree that, in any arbitration proceeding, each party must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us and will not have the right to declare any Mark generic or otherwise invalid. Except as otherwise described in this Agreement, we and you and your Owners waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between you and us, the party making a claim will be limited to equitable relief and to recovery of any actual damages he, she, or it sustains. We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished our right to seek the recovery of those costs.

Arbitration must be conducted on an individual, not a class-wide, basis, only we (and/or our affiliates, and our and their respective owners, officers, directors, agents, and employees) and you (and/or your Owners, Guarantors, affiliates, officers, directors, agents, and employees, if applicable) may be the parties to any arbitration proceeding described in this Section, and no such arbitration proceeding may be consolidated with any other arbitration proceeding between us and any other person, corporation, limited liability company, or partnership. Notwithstanding the foregoing or anything to the contrary in this Agreement, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section, then all parties agree that this arbitration clause will not apply to that dispute and that such dispute will be resolved in a judicial proceeding in accordance with this Section.

Notwithstanding anything to the contrary contained in this Section, we and you each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction. In that case, we and you agree to contemporaneously submit our dispute for arbitration on the merits according to this Section. The provisions of this Section will continue in full force and effect notwithstanding the termination or expiration of this Agreement and are intended to benefit and bind certain third party non-signatories.

15.7    <u>Governing Law</u>. All matters relating to arbitration will be governed by the Federal Arbitration Act (9 USC §§1 et seq. Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (15 USC §§ 1051 et seq, the United States Copyright Act, or other federal law, this Agreement, the Franchise, and all claims arising from the relationship between us and you will be governed by the laws of the State of Florida, without regard to its conflict of laws principles, except that any Florida law regulating the sale of franchises, licenses, or business opportunities, or governing the relationship of a franchisor and its franchisee or the relationship of a licensor and its licensee, or involving unfair or deceptive acts or practices, will not apply unless its jurisdictional requirements are met independently without reference to this Section.

15.8    <u>Consent to Jurisdiction</u>. Subject to our and your arbitration obligations, you and your Owners agree that all judicial actions brought by us against you or your Owners or by you or your Owners against us or

our affiliates, or our or then respective owners, officers, directors, agents, or employees, must be brought exclusively in the state and federal courts in Sarasota County, Florida. The courts specified in this Section will have exclusive Jurisdiction over all disputes, and venue will be in Sarasota County, Florida, and will be determined according to Florida law, without regard to the jurisdictional, venue, or choice of law provisions of any state or territory other than Florida. You (and each Owner) irrevocably submit to the jurisdiction of such courts and waive any objection you, he, or she may have to either jurisdiction or venue. Notwithstanding the foregoing, we may bring an action for a temporary restraining order or for temporary or preliminary injunctive relief, or to enforce an arbitration award, in any federal or state court in the state in which you reside or the Salon is located.

15.9     <u>Waiver of Punitive Damages and Jury Trial</u>.  EXCEPT WITH RESPECT TO YOUR AND OUR OBLIGATION TO INDEMNIFY THE OTHER PURSUANT TO THIS AGREEMENT FOR CLAIMS OF OTHERS SEEKING TO RECOVER PUNITIVE OR EXEMPLARY DAMAGES, AND EXCEPT FOR CLAIMS FOR UNAUTHORIZED USE OF THE MARKS OR MISAPPROPRIATION OF ANY CONFIDENTIAL INFORMATION, OR FOR LOST PROFITS BY US ARISING OUT OF YOUR TERMINATION OF THIS AGREEMENT AS SET FORTH IN THIS AGREEMENT, WE AND YOU AND  YOUR OWNERS WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN YOU AND US, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES HE, SHE, OR IT SUSTAINS.

WE AND YOU (AND YOUR OWNERS) IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER US OR YOU (OR YOUR OWNERS).

15.10    <u>Limitation of Claims</u>.  EXCEPT FOR CLAIMS ARISING FROM YOUR NON- PAYMENT OF AMOUNTS DUE UNDER THIS AGREEMENT, ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR OUR RELATIONSHIP WITH YOU WILL BE BARRED UNLESS AN ARBITRATION PROCEEDING IS COMMENCED WITHIN 1 YEAR FROM THE DATE ON WHICH THE PARTY ASSERTING SUCH CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO SUCH CLAIMS.

15.11    <u>Construction</u>.  The recitals and Exhibits to this Agreement are a part of this Agreement, which, together with any riders or addenda signed simultaneously with this Agreement, constitutes our and your entire agreement, and there are no oral or other written understandings, representations, or agreements between us and you, relating to the subject matter of this Agreement.  Notwithstanding the foregoing, nothing in this Agreement will disclaim or require you to waive reliance on any representation that we made in the most recent disclosure document (including its Exhibits and amendments) that we delivered to you or your representative.  Any policies that we adopt and implement from time to time to guide our decision-making are subject to change, are not a part of this Agreement, and are not binding on us.  Except as provided in the indemnification and arbitration Sections, nothing in this Agreement is intended, or will be deemed, to confer any rights or remedies upon any person or legal entity not a party to this Agreement. Except where this Agreement expressly obligate s us reasonably to approve any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed or effected actions that require our approval.  The headings of the Sections and Subsections are for convenience only and do not define, limit, or construe the contents of such Sections or Subsections. Any time period or deadline imposed on the parties under this Agreement will be extended or delayed as is reasonably necessary upon the occurrence of a force majeure (although all payments due under this Agreement must continue to be made).  This Agreement may be executed in multiple copies, each of which

will be deemed an original.  If two or more persons are at any time "you" under this Agreement, their obligations and liabilities to us will be joint and several.

15.12   Notices and Payments.  All approvals, requests, notices, and reports required or permitted under this Agreement will not be effective unless in writing and delivered to the party entitled to receive the notice in accordance with this Section.  All such approvals, requests, notices, and reports, as well as all payments, will be deemed delivered at the time delivered by hand, or 1 Business Day after being placed in the hands of a nationally recognized commercial courier service for next Business Day delivery, or 3 Business Days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid, and must be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified and/or, with respect to any approvals and notices that we provide to you or your Owners, at the Salon's address.  As of the Effective Date of this Agreement, notices should be addressed to the following addresses unless and until a different address has been designated by written notice to the other party.

| To us: | PAINT NAIL BAR FRANCHISE COMPANY, LLC |
| | 1432 First Street |
| | Sarasota, FL  34236 |
| | Phone:  (941) 366-8989 |
| | Fax:  (423) 456-7890 |

Notices to you and the Owners      As indicated on the Signature Page of this Agreement

15.13   Time.  Time is of the essence of this Agreement and each and every provision.

15.14   Binding Effect.  The delivery of this Agreement to you is not an offer  Therefore, this Agreement will not be binding upon us until it is first signed by you, tendered to us for our acceptance, and accepted by us through the signatures of 2 duly authorized individuals. Once accepted by us, this Agreement is binding upon and will inure to the benefit of us and you and our and your respective successors and permitted assigns.

15.15   Exercise of Our Business Judgment.  We have the right, in our sole judgment, to operate, develop and change the Systems in any manner that is not specifically prohibited by this Agreement.  Whenever we have reserved in this Agreement a right to take or withhold an action, or to grant or decline to grant you a right to take or omit an action, we may, except as otherwise specifically provided in this Agreement, make our decision or exercise our rights based on the information readily available to us and our judgment of what is in our and/or our franchise network's best interest s at the time our decision is made, regardless of whether we could have made other reasonable or even arguably preferable alternative decisions or whether our decision or the action we take promotes our financial or other individual interest.

15.16   Electronic Mail.  You acknowledge and agree that exchanging information with us by e-mail is efficient and desirable for day-to-day communications and that we and you may utilize e-mail for such communications.  You authorize the transmission of e-mail by us and our employees, vendors, and affiliates ("**Official Senders**") to you during the Term.  You further agree that (a) Official Senders are authorized to send e-mails to those of your employees as you may occasionally authorize for the purpose of communicating with us, (b) you will cause your officers, directors, and employees to give their consent to Official Senders' transmission of e-mails to them, (c) you will require such persons not to opt out or otherwise ask to no longer receive e-mails from Official Senders during the time that such person works for or is affiliated with you, and (d) you will not opt out or otherwise ask to no longer receive e-mails from Official Senders during the Term.  The consent given in this Section will not apply to the provision of

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

notices by either party under this Agreement using e-mail unless the parties otherwise agree in a written document manually signed by both parties.

**INTENDING TO BE LEGALLY BOUND**, the parties have executed and delivered this Agreement to be effective as of the Effective Date, regardless of the dates listed below.

FRANCHISOR:

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

By: _Mark Schlossberg_
Name: Mark Schlossberg
Title: CEO/founder
Date: 11/22/2021

FRANCHISEE:

Kenny Eric Eddleman        Andrea M Eddleman
Name of Franchisee

By: _Kenny Eric Eddleman_
Name: Kenny Eric Eddleman    Andrea M Eddleman
Title: Owner              Owner
Date: 11/22/2021          11/23/2021
Address for Notice Purposes:
_____
_____
_____

40

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

# EXHIBIT A

## INDEX OF TERMS

Actual Opening Date..........................................1

ADA.......................................................................4

Additional Renewal Franchise.......................27

affiliate..................................................................2

Agreement.............................................................1

Business Day.......................................................17

Client Information.............................................11

Competitive Business.......................................11

Computer System..............................................15

Confidential Information ...................................9

control ....................................................................2

controlling Ownership Interest .....................22

De-Identification Date .....................................32

Disability..............................................................25

Effective Date .......................................................1

EPLI .....................................................................35

Establishment Package.......................................4

First Renewal Franchise..................................26

Force Majeure .....................................................29

Franchise ...............................................................1

Franchise Owner Indemnified Parties...............9

Franchisee .............................................................1

Franchisor .............................................................1

Gross Revenue .....................................................5

Guarantors ...........................................................2

Immediate Family.............................................23

Immediate Family Transfer ............................22

Initial Fee...............................................................5

Initial Inventory Package...................................4

Initial Marketing Period..................................17

Initial Transfer Package...................................14

Innovations ........................................................12

Lease Signing Date ..............................................3

Lender...................................................................21

Local Marketing Spending Requirement.........17

Losses .....................................................................9

Manuals .................................................................7

Marketing Contribution ...................................17

Marketing Fund ................................................17

Marks .....................................................................1

Non-Compliance Fee ..........................................6

Official Senders.................................................40

Opening Deadline ...............................................2

Opening Marketing Program ..........................16

Operating Assets..................................................4

our............................................................................1

QB\40341653.31

Ownership Interest ...............................................2

Paint Franchisee Transfer ...............................23

Paint Nail Bar Indemnified Parties .................34

PAINT Nail Bar® Salons ..................................1

Proceedings .....................................................10

Renewal Franchise Fee ....................................26

Renewal Franchise Letter ................................27

Salon Management System .............................16

Site .....................................................................1

Site Acceptance Date .........................................3

Site Selection Area .............................................2

Social Media ...................................................13

Social Media Fee...............................................6

System Standards .............................................7

System Website .............................................. 18

Systems .............................................................. 1

Technology Fee ................................................. 6

Term................................................................... 1

Territory ............................................................ 1

Transfer ............................................................ 21

Transfer Package Material .......................... 14

us 1

we ....................................................................... 1

you ..................................................................... 1

your .................................................................... 1

**EXHIBIT B**

**BASIC TERMS**

      This Exhibit is in reference to that certain Franchise Agreement between PAINT NAIL BAR FRANCHISE COMPANY, LLC a Florida limited liability company ("**we**," "**us**," or "**our**"), and _____, a _____ ("**you**" or "**your**") effective as of _____, 201__ (the "**Franchise Agreement**").

## SITE SELECTION AREA

Your Site Selection Area is:

NA

_____

_____

_____

## SITE

Your Site's address is _____ .

### ESTABLISHMENT PACKAGE

| ITEM | COST |
|---|---|
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
| **TOTAL COST OF ESTABLISHMENT PACKAGE** | $ |

## INITIAL INVENTORY PACKAGE

| ITEM | COST |
|------|------|
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| **TOTAL COST OF INITIAL INVENTORY PACKAGE** | $ |

**FRANCHISOR:**

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

By: _Mark Schlossberg_
Name: _Mark Schlossberg_
Title: _CEO/founder_
Date: _11/22/2021_

**FRANCHISEE:**

Kenny Eric Eddleman        Andrea M Eddleman
_____
Name of Franchisee

By: _Kenny Eric Eddleman_ _____
Name: _Kenny Eric Eddleman_ _Andrea M Eddleman_
Title: _Owner_        _Owner_
Date: _11/22/2021_        _11/23/2021_

2

**EXHIBIT C TO THE DISCLOSURE DOCUMENT**

---

**AREA DEVELOPMENT ADDENDUM**

---



**AREA DEVELOPMENT ADDENDUM**

      **THIS AREA DEVELOPMENT ADDENDUM** (the "**Addendum**") is effective as of ___11/22/2021___, 20____ (the "**Effective Date**"), and amends the franchise agreement dated _____ ~~11/22/2021~~, 20____ (the "**Current Franchise Agreement**") between **PAINT NAIL BAR FRANCHISE COMPANY, LLC**, a Florida limited liability company whose principal business address is 1432 First Street, Sarasota, Florida 34236 ("**we**," "**us**," or "**our**" or "**Franchisor**"), and _____, whose principal business address is _____ (referred to in this Addendum as "**you**," "**your**" or "**Developer**").

**BACKGROUND INFORMATION**

      You are simultaneously entering into the Current Franchise Agreement with us to own and operate a PAINT Nail Bar® Salon at an approved location. You and we are singing this Addendum because you would like the right to develop and operate multiple PAINT Nail Bar® Salons within a certain geographic area over a certain period of time, and we are willing to grant you those rights if you comply with the terms and conditions of this Addendum.

**OPERATIVE TERMS**

      1.    **Precedence and Defined Terms**. This Addendum is an integral part of, and is incorporated into, the Current Franchise Agreement. Nevertheless, this Addendum supersedes any inconsistent or conflicting provisions of the Current Franchise Agreement. Capitalized terms used but not defined in this Addendum have the meanings given in the Current Franchise Agreement.

      2.    **Term of Addendum**. This Addendum commences on the Effective Date and expires on the earlier of (such period being the "**Term**"): (i) the last day of the Development Schedule (defined below); or (ii) the opening of the last PAINT Nail Bar® Salon specified in the Development Schedule. This Addendum may be terminated before it expires in accordance with its terms. Upon expiration or termination of this Addendum, you will no longer have any further rights to acquire franchises to operate PAINT Nail Bar® Salons under this Addendum; but you may continue to develop, own and operate all PAINT Nail Bar® Salons then subject to fully executed franchise agreements (including the Current Franchise Agreement, the "**Franchise Agreements**") with us in accordance with their terms.

      3.    **Development Rights**. If you are in full compliance with all of the provisions of this Addendum and all of the Franchise Agreements, then during the Term, we will grant to you the right to develop, own and operate ____ new PAINT Nail Bar® Salons (including the Salon to be developed under the Current Franchise Agreement) to be located within the following Development Area which is defined as the entire territory encompassed by: _____

_____ in the State of _____ (the "**Development Area**").

4.     **Development Obligations**.  During the term of this Addendum, to maintain your rights under this Addendum, you must:

(a)     at all times faithfully, honestly and diligently perform your obligations and continuously exert your best efforts to promote and enhance the development of Salons within the Development Area.

(b)     open and maintain in operation a total of _____  PAINT Nail Bar® Salons through the Term and within each of the time periods (the "**Development Periods**") mandated by the schedule below (the "**Development Schedule**").

(c)     open Salons by the end of each Development Period below; and

(d)     maintain the cumulative number of Salons in operation as of the end of each Development Period below:

| Development Period | Salon No. | Opening Deadline Measured from Effective Date | Cumulative Number in Operation |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

You may only relocate a Salon in accordance with the terms and conditions provided in the franchise agreement for that Salon.  To maintain your rights under this Addendum, no more than one Salon may be temporarily closed for relocation at any given time.

5.     **Development Fee**.  You agree to pay us a development fee of $_____  (the "**Development Fee**"), which is equal to $45,000 for the first PAINT Nail Bar® Salon to be opened pursuant to the Current Franchise Agreement, plus:  (a) $35,000 for the second Salon, and (b) $30,000 each for the remaining Salons to be developed under the Development Schedule.  After payment of the Development Fee in full, the Initial Franchise Fee for each Salon is reduced to -0-.  The total initial payment is illustrated as follows:

| No. of Salons | Current Initial Franchise Fee | Development Fee | Total Initial Fees Due |
|---|---|---|---|
| 2 | $45,000 | $35,000 | $80,000 |
| 3 | $45,000 | $35,000 + $30,000 | $110,000 |
| 4 | $45,000 | $35,000 + (2 x $30,000) | $140000 |
| 5 | $45,000 | $35,000 + (3 x $30,0000)0 | $170,000 |

The Development Fee constitutes payment only for the rights we grant you under this Addendum.  The Development Fee must be paid in full on the Effective Date.  The Development Fee is fully earned by us and non-refundable.

6.     **Effect of Failure**.  Strict compliance with the Development Schedule is of the essence.  If you do not timely meet or maintain the Development Schedule, you will be in default.  Any such default constitutes a material breach of this Addendum and we may terminate this Addendum.  Termination of the Addendum: (a) will cancel your exclusivity so that we may grant additional franchises or ourselves operate Salons in the Development Area, but (b) will not terminate the Franchise Agreements which will remain in effect.

7. **Franchise Agreement**. You must enter into our then-current form of franchise agreement for each PAINT Nail Bar® Salon, and your guarantors must personally guaranty your obligations under them pursuant to our then-current forms of Principal Owners Guaranty. You must sign each franchise agreement no later than the earlier of the date you sign a lease agreement or construction contract for the associated Salon. However, all Franchise Agreements will be modified to provide that the initial franchise fee for each PAINT Nail Bar® Salon under the Development Schedule will be waived.

8. **Grant of Franchises**. You agree to give us all information and materials we request to assess each proposed Salon site and your or your Controlled Affiliate's financial and operational ability to develop and operate each proposed Salon. "Controlled Affiliate" means any initial business entity of which you or one or more of your majority owners owns at least 51% of the total authorized ownership interests, as long as you or such owner(s) have the right to control the business entity's management and policies. We will accept or reject a site you propose for a Salon within 15 days after we receive from you a complete site report and any other materials we request. If we do not respond within the 15 day period then the site will be deemed rejected. We will not unreasonably withhold approval of any site you propose that meets our then-current criteria for demographic characteristics, traffic patterns, parking, character of neighborhood, competition from and proximity to other businesses and other PAINT Nail Bar® Salons, the nature of other businesses in proximity to the site and other commercial characteristics and the size, appearance and other physical characteristics of the proposed site. We have the absolute right to disapprove any site that does not meet these criteria and other criteria that we may develop from time to time. Neither you nor any Controlled Affiliate may sign any lease or sublease for a site without our prior written acceptance of such site and without first signing and complying with a franchise agreement applicable to such site. If we approve a proposed site, we must also approve your or your Controlled Affiliate's financial and operational ability to develop and operate the proposed Salon before we will enter into a franchise agreement for the proposed Salon with you or your Controlled Affiliate. After you or your Controlled Affiliate sign a franchise agreement, its terms and conditions will control the development and operation of that Salon, with the exception that it must be opened within the time limits specified in the Development Schedule.

9. **Franchise Status**. This Addendum does not create a franchise relationship between you and us. Any franchise relationship between you and us is created solely by signing a Franchise Agreement.

10. **Transfer**. Your rights under this Addendum are neither assignable nor transferable.

11. **Remaining Terms Unaffected**. The remaining terms of the Current Franchise Agreement are unaffected by this Addendum and remain binding on the parties.

Intending to be bound, you and we sign and deliver this Addendum in one or more counterparts on the Effective Date.

**US:**                                              **YOU:**

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**      _____

                                                 Name of Developer

By: _Mark Schlossberg_____        By: _Kenny Eric Eddleman_____
Name: ____Mark Schlossberg_____        Name: _Kenny Eric Eddleman__Andrea M Eddleman_
Title: _____CEO/founder_____        Title: ____Owner_____Owner_____
Date: _____11/22/2021_____        Date: __11/22/2021_____11/23/2021_____

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT D TO THE DISCLOSURE DOCUMENT**

---

**FINANCIAL STATEMENTS**

---

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**Paint Nail Bar Franchise Company, LLC**
**Report on Audit of Financial Statements**
**December 31, 2020, 2019 and 2018**
**And For The Years Then Ended**

**Prepared by: HD Davis CPAs, LLC**
**Certified Public Accountants**
**125 Churchill Hubbard Rd.**
**Youngstown, Ohio 44505**
**(330) 759-8522**

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

<u>FINANCIAL STATEMENTS</u>

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

December 31, 2020, 2019 and 2018

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

<u>C O N T E N T S</u>

<u>P A G E</u>

Independent Auditor's Report ------------------------------------------------------------------ 1 - 2

Balance Sheets --------------------------------------------------------------------------------- 3

Statements of Operations and Members' Deficit ------------------------------------------- 4

Statements of Cash Flows -------------------------------------------------------------------- 5

Notes to Financial Statements ---------------------------------------------------------------- 6 - 8

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D



HD Davis CPAs

www.hddaviscpas.pro

info@hddaviscpas.pro

September 29, 2021

To the Members
PAINT Nail Bar Franchise Company, LLC
Sarasota, Florida

## Independent Auditor's Report

We have audited the accompanying financial statements of PAINT Nail Bar Franchise Company, LLC (the Company), which comprise the balance sheets as of December 31, 2020, 2019 and 2018, and the related statements of operations and members' deficit and cash flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of PAINT Nail Bar Franchise Company, LLC as of December 31, 2020, 2019 and 2018, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

**Report on 2018 Financial Statements**

The financials statements of PAINT Nail Bar Franchise Company, LLC for the year ended December 31, 2018 was audited by another auditor, who expressed a unmodified opinion on those statements on July 1, 2019.

*HD Davis CPAs*

Certified Public Accountants

<u>BALANCE SHEETS</u>

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

December 31, 2020, 2019 and 2018

|  | **2020** | 2019 | 2018 |
|---|---|---|---|
| **A S S E T S** | | | |
| <u>CURRENT ASSETS</u> | | | |
| Cash | $ **63,250** | $ 46,042 | $ 4,580 |
| Franchisee receivables | **54,669** | 31,963 | 17,710 |
| Financed franchise fee receivable | **25,000** | 0 | 25,000 |
| Due from related party - NOTE B | **147,387** | 143,387 | 122,534 |
| Other receivable | **2,000** | 2,000 | 25,000 |
| TOTAL CURRENT ASSETS | $ **292,306** | $ 223,392 | $ 194,824 |
| | | | |
| **LIABILITIES AND MEMBERS' DEFICIT** | | | |
| <u>CURRENT LIABILITIES</u> | | | |
| Accounts payable | $ **33,955** | $ 21,231 | $ 35,231 |
| Deferred revenue | **585,261** | 665,379 | 377,760 |
| TOTAL CURRENT LIABILITIES | **619,216** | 686,610 | 412,991 |
| | | | |
| <u>MEMBERS' DEFICIT - NOTE B</u> | **(326,910)** | (463,218) | (218,167) |
| | $ **292,306** | $ 223,392 | $ 194,824 |

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

<u>STATEMENTS OF OPERATIONS AND MEMBERS' DEFICIT</u>

## PAINT NAIL BAR FRANCHISE COMPANY, LLC

Years ended December 31, 2020, 2019 and 2018

|  | | **2020** | 2019 | 2018 |
|---|---|---|---|---|
| <u>REVENUE</u> | | | | |
| Franchise | | $ **304,383** | $ 69,653 | $ 23,954 |
| Royalties | | **326,938** | 204,283 | 49,361 |
| | TOTAL REVENUE | **631,321** | 273,936 | 73,315 |
| | | | | |
| <u>OPERATING EXPENSES</u> | | | | |
| Bank charges | | **546** | 157 | 537 |
| Computer and software | | **2,644** | 3,116 | 2,718 |
| Donations | | **1,940** | 865 | 0 |
| Dues and subscriptions | | **7,433** | 3,879 | 28 |
| Insurance | | **8,477** | 9,248 | 101 |
| Marketing | | **13,672** | 39,534 | 27,376 |
| Meals and entertainment | | **22,171** | 25,359 | 6,969 |
| Office expenses | | **6,406** | 10,610 | 2,493 |
| Postage and delivery | | **429** | 448 | 331 |
| Professional fees | | **52,424** | 77,761 | 64,975 |
| Rent | | **3,670** | 6,817 | 0 |
| Repairs and maintenance | | **7,311** | 9,413 | 0 |
| Supplies | | **24,946** | 25,269 | 7,492 |
| Taxes and licenses | | **889** | 1,803 | 1,071 |
| Training | | **2,290** | 3,736 | 760 |
| Travel | | **54,013** | 65,351 | 27,067 |
| Utilities | | **2,813** | 4,924 | 0 |
| | TOTAL OPERATING EXPENSE | **212,074** | 288,290 | 141,918 |
| <u>OTHER INCOME</u> | | | | |
| Interest income | | **0** | 264 | 0 |
| | TOTAL OTHER INCOME | **0** | 264 | 0 |
| | NET INCOME (LOSS) | **419,247** | (14,090) | (68,603) |
| <u>MEMBERS' DEFICIT</u> | | | | |
| Beginning of year | | **(463,218)** | (218,167) | (114,465) |
| Distributions | | **(282,939)** | (230,961) | (35,099) |
| End of year | | $ **(326,910)** | $ (463,218) | $ (218,167) |

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

<u>STATEMENTS OF CASH FLOWS</u>

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

Years ended December 31, 2020, 2019 and 2018

|  | **2020** | 2019 | 2018 |
|---|---|---|---|
| <u>CASH FLOWS FROM OPERATING ACTIVITIES</u> |  |  |  |
| Net income (loss) | **$ 419,247** | $ (14,090) | $ (68,603) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: |  |  |  |
| Increase in franchisee receivables | **(22,706)** | (14,253) | (17,710) |
| (Increase) decrease in other receivables | **0** | 23,000 | (25,000) |
| Increase (decrease) in accounts payable | **12,724** | (14,000) | 35,231 |
| Increase in deferred revenue | **(80,118)** | 287,619 | 252,760 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | **329,147** | 268,276 | 176,678 |
|  |  |  |  |
| <u>CASH FLOWS FROM FINANCING ACTIVITIES</u> |  |  |  |
| Decrease (increase) in financed franchise fee receivable | **(25,000)** | 25,000 | (25,000) |
| Increase in due to/from related party | **(4,000)** | (20,853) | (163,106) |
| Distributions | **(282,939)** | (230,961) | (35,099) |
| NET CASH USED IN FINANCING ACTIVITIES | **(311,939)** | (226,814) | (223,205) |
| NET CHANGE IN CASH | **17,208** | 41,462 | (46,527) |
|  |  |  |  |
| <u>CASH</u> |  |  |  |
| Beginning of year | **46,042** | 4,580 | 51,107 |
| End of year | **$ 63,250** | $ 46,042 | $ 4,580 |

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

<u>NOTES TO FINANCIAL STATEMENTS</u>

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

December 31, 2020, 2019 and 2018

## NOTE A – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Nature of Business:
PAINT Nail Bar Franchise Company, LLC (the Company) is a Florida Limited Liability Company formed on August 13, 2015, located in Southwest Florida. The Company offers franchises for the establishment and operation of nail salons and is in the business of selling franchise licenses, or the right to franchise the Company's business model, as well as providing various support services to franchisees in the nail care industry.

Method of Accounting:
The Company utilizes the accrual basis of accounting in conformity with U.S. generally accepted accounting principles.

Cash and Cash Equivalents:
The Company considers highly liquid debt instruments purchased with an original maturity date of three months or less to be cash equivalents.

Franchising:
The Company generates revenues from franchising through individual franchise agreements. Franchise revenues are recognized in accordance with Financial Accounting Standards Board (FASB) ASC 952, *Franchisors*, which requires deferral until substantial performance of franchisor obligations is complete, which is normally upon opening of the store. When a franchise is sold, the Company agrees to provide certain services to the franchisee including training, opening assistance and ongoing training.

The franchise agreements require the franchisee to pay an initial, non-refundable fee upon the signing of the agreement and continuing monthly royalty fees are the greater of $1,500 or a certain percentage of gross sales, currently ranging from 5.0% to 6.0%. The initial term of the franchise agreement is ten years with renewal options of ten years subject to certain conditions. In some cases, the Company may enter into a multi-unit development agreement with a franchisee, which allows a single franchisee to open more than one store in a specified geographical area.

Royalty revenue from store sales is recognized as earned by the Company on a monthly basis. Monthly contributions to the Marketing Fund by franchisees are recorded as a liability until the funds are disbursed on advertising expense, as defined in the franchise agreements.

Marketing Fund:
An advertising fee of the greater of $1,000 or 1.0% of gross sales is collected from all franchisees for general marketing, advertising and publicity administered by the Marketing Fund on behalf of the PAINT Nail Bar franchise system. As of November 2018, the advertising fee was not assessed to any existing or new franchisees.

Technology Fee:
A technology fee ranging from $300 to $650 per month is collected from all franchisees for social media website development and franchisee intranet development that provides training, marketing and benchmarking metrics.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

<u>NOTES TO FINANCIAL STATEMENTS</u>

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

December 31, 2020, 2019 and 2018

## NOTE A – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

Late Fees:
An administrative fee of $100 per occurrence is charged for any delinquent payment by a franchisee. Interest of the lesser of 18% per year or highest contract rate of interest allowed by law is payable by the franchisee on all overdue amounts.

Use of Estimates:
The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Income Taxes:
The Company, with the consent of its members, elected under the Internal Revenue Code to be taxed as a partnership. In lieu of corporate income taxes, the partners of a partnership are taxed on their proportionate share of the Company's taxable income or loss. Therefore, no provision for income taxes has been included in the financial statements.

## NOTE B – CONTROLLING INTEREST AND RELATED PARTY TRANSACTIONS

Controlling Interest:
All of the outstanding membership units of the Company are owned 50/50 by two individuals.

Related Party Transactions:
PAINT Nail Bar, LLC an entity wholly-owned by the Company's members, makes payments on behalf of the Company for costs and expenses incurred in the ordinary course of business. Amounts owed by the Company under this arrangement totaled $-0- at December 31, 2020, 2019 and 2018, respectively.

Additionally, the Company pays expenses on behalf of PAINT Nail Bar, LLC which are shown as amounts due from related party on the associated balance sheet. The advances were non-interest bearing, due on demand, and are expected to be paid during 2022. These amounts totaled $147,387, $143,387 and $122,534, at December 31, 2020, 2019 and 2018, respectively.

## NOTE C – COMMITMENTS AND CONTINGENCIES

At December 31, 2020, 2019 and 2018, the Company had 2, 2 and 14 franchise agreements, respectively, for new stores that are being developed and have not yet opened.

## NOTE D – SUBSEQUENT EVENTS

Management evaluated all activity of the Company through September 29, 2021, the date the financial statements were available to be issued, and concluded that no subsequent events have occurred that would require recognition or disclosure in the financial statements or notes, except as described below.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

<u>NOTES TO FINANCIAL STATEMENTS</u>

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

December 31, 2020, 2019 and 2018

## NOTE D – SUBSEQUENT EVENTS

The current global coronavirus pandemic may significantly affect the profitability, financial condition, and results of operation of the Company for the year ending December 31, 2021.

As of September 29, 2021 , two additional franchises that were sold by the Company in 2020 have opened.

## NOTE E – LIQUIDITY AND AVAILABILITY

The Company's financial assets available within one year of the balance sheets as of December 31, 2020 for general expenditures are as follows:

| | |
|---|---|
| Cash and cash equivalents | $  63,250 |
| Accounts receivable | 81,669 |
| | $ 144,919 |

As part of the Company's liquidity management, it has a policy to structure its financial assets to be available as its expenses and other obligations come due.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**THE FOLLOWING FINANCIAL STATEMENTS ARE PREPARED WITHOUT AN AUDIT. PROSPECTIVE FRANCHISEES SHOULD BE ADVISED THAT NO CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED THESE FIGURES OR EXPRESSED AN OPINION WITH REGARD TO THE CONTENT OR FORM.**

# Paint Nail Bar Franchise Company

## Balance Sheet

As of August 31, 2021

|  | TOTAL |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Bank Accounts | |
| Due (To)/From Paint | 181,983.12 |
| SouthState | 291,767.15 |
| **Total Bank Accounts** | **$473,750.27** |
| Accounts Receivable | |
| Accounts Receivable | 23,454.13 |
| **Total Accounts Receivable** | **$23,454.13** |
| Other Current Assets | |
| Franchise Fee Held In Escrow | 30,000.00 |
| Inventory Asset | 38,303.44 |
| **Total Other Current Assets** | **$68,303.44** |
| **Total Current Assets** | **$565,507.84** |
| Other Assets | |
| Financed Franchise Fee Receivable | 8,333.28 |
| Security Deposit | 2,000.00 |
| **Total Other Assets** | **$10,333.28** |
| **TOTAL ASSETS** | **$575,841.12** |
| **LIABILITIES AND EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| Accounts Payable (A/P) | 33,955.13 |
| **Total Accounts Payable** | **$33,955.13** |
| Other Current Liabilities | |
| Deferred Franchise Income | 876,611.99 |
| Due to PRIMERS by Paint | 35,736.00 |
| **Total Other Current Liabilities** | **$912,347.99** |
| **Total Current Liabilities** | **$946,303.12** |
| **Total Liabilities** | **$946,303.12** |
| Equity | |
| Partner Distribution  Mark and Michelle | -366,983.37 |
| Retained Earnings | -326,911.80 |
| Net Income | 323,433.17 |
| **Total Equity** | **$ -370,462.00** |
| **TOTAL LIABILITIES AND EQUITY** | **$575,841.12** |

# Paint Nail Bar Franchise Company

## Profit and Loss

### January - August, 2021

| | TOTAL |
|---|---|
| Income | |
| Franchise Fee Income | 62,374.36 |
| Royalties | 417,663.96 |
| Sales | 47,841.47 |
| Technology Fee | 80,600.00 |
| **Total Income** | **$608,479.79** |
| GROSS PROFIT | **$608,479.79** |
| Expenses | |
| Bank Charges | 386.99 |
| Computer and Software | 4,265.95 |
| Consultant | 30,195.06 |
| Dues & Subscriptions | 3,350.92 |
| Entertainment | 7,441.60 |
| Insurance | 1,490.94 |
| Legal & Professional Fees | 44,281.00 |
| Marketing | 50,859.97 |
| Meals | 18,692.49 |
| Office Expenses | 8,420.52 |
| Postage and Delivery | 1,877.82 |
| Rent or Lease | 20,950.06 |
| Repair & Maintenance | 2,321.20 |
| Stationery & Printing | 1,129.08 |
| Supplies | 26,369.95 |
| Taxes & Licenses | 138.75 |
| Training | 1,200.00 |
| Travel | 39,928.25 |
| Utilities | 3,994.18 |
| **Total Expenses** | **$267,294.73** |
| NET OPERATING INCOME | **$341,185.06** |
| Other Expenses | |
| Miscellaneous | 17,751.89 |
| **Total Other Expenses** | **$17,751.89** |
| NET OTHER INCOME | **$ -17,751.89** |
| NET INCOME | **$323,433.17** |

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT E TO THE DISCLOSURE DOCUMENT**

---

**FORM OF GENERAL RELEASE**

---

# WAIVER AND RELEASE OF CLAIMS

THIS WAIVER AND RELEASE OF CLAIMS (the "**Release**") is made as of _____, 20___ by _____, a(n) _____ ("**Franchisee**"), and each individual holding an ownership interest in Franchisee (collectively with Franchisee, "**Releasor**") in favor of PAINT NAIL BAR FRANCHISE COMPANY, LLC, a Florida limited liability company ("**Franchisor**," and together with Releasor, the "**Parties**").

**WHEREAS,** Franchisor and Franchisee have entered into a Franchise Agreement (the "**Agreement**") pursuant to which Franchisee was granted the right to own and operate a PAINT Nail Bar® Salon;

**WHEREAS,** Franchisee has notified Franchisor of its desire to transfer the Agreement and all rights related thereto, or an ownership interest in Franchisee, to a transferee, **[enter into a successor franchise agreement]** and Franchisor has consented to such transfer **[agreed to enter into a successor franchise agreement]**; and

**WHEREAS,** as a condition to Franchisor's consent to the transfer **[Franchisee's ability to enter into a successor franchise agreement]**, Releasor has agreed to execute this Release upon the terms and conditions stated below.

**NOW, THEREFORE,** in consideration of Franchisor's consent to the transfer **[Franchisor entering into a successor franchise agreement]**, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and intending to be legally bound, Releasor hereby agrees as follows:

1.     <u>Representations and Warranties</u>.  Releasor represents and warrants that it is duly authorized to enter into this Release and to perform the terms and obligations herein contained, and has not assigned, transferred or conveyed, either voluntarily or by operation of law, any of its rights or claims against Franchisor or any of the rights, claims or obligations being terminated and released hereunder. Releasor represents and warrants that he/she is duly authorized to enter into and execute this Release on behalf of Franchisee. Releasor further represents and warrants that all individuals that currently hold a direct or indirect ownership interest in Franchisee are signatories to this Release.

2.     <u>Release</u>.  Releasor and its subsidiaries, affiliates, parents, divisions, successors and assigns and all persons or firms claiming by, through, under, or on behalf of any or all of them, hereby release, acquit and forever discharge Franchisor, any and all of its affiliates, parents, subsidiaries or related companies, divisions and partnerships, and its and their past and present officers, directors, agents, partners, shareholders, employees, representatives, successors and assigns, and attorneys, and the spouses of such individuals (collectively, the "**Released Parties**"), from any and all claims, liabilities, damages, expenses, actions or causes of action which Releasor may now have or has ever had, whether known or unknown, past or present, absolute or contingent, suspected or unsuspected, of any nature whatsoever, including without limiting the generality of the foregoing, all claims, liabilities, damages, expenses, actions or causes of action directly or indirectly arising out of or relating to the execution and performance of the Agreement and the offer and sale of the franchise related thereto, except for any claims arising from representations made in the Franchise Disclosure Document furnished to Franchisee prior to entering into the Agreement..

**IN WITNESS WHEREOF** Releasor has executed this Release as of the date first written above.

**FRANCHISEE:**                                                    **RELEASORS:**

_____ , a

_____

By: _____                    Name: _____
Name: _____                  Date: _____
Its: _____

                                                                            _____
                                                                            Name: _____
                                                                            Date: _____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____, 20___ . , by _____, who is personally known to me or has produced _____ as identification.

                                                                            _____
                                                                            Signature of Notary
                                                                            My Commission Expires: _____

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT F TO THE DISCLOSURE DOCUMENT**

---

**STATE SPECIFIC ADDENDA AND RIDERS**

---

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

# ADDENDUM
## TO FRANCHISE DISCLOSURE DOCUMENT FOR
## PAINT NAIL BAR FRANCHISE COMPANY, LLC
## STATE OF CALIFORNIA

The following paragraphs are added to the Disclosure Document:

OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION. ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION at www.dfpi.ca.gov.

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

The following paragraph is added to Item 5 of the disclosure document:

Initial franchise fees are deferred until the Franchisor has performed all initial obligations owed the Franchisee and the Franchisee has commenced doing business. This financial assurance requirement is imposed by the California Department of Financial Protection And Innovation based on our financial condition.

The following paragraphs are added at the end of Item 17 of the Disclosure Document pursuant to regulations promulgated under the California Franchise Investment Law:

**California Law Regarding Termination and Nonrenewal**. California Business and Professions Code Sections 20000 through 20043 provide rights to franchisees concerning termination or nonrenewal of a franchise. If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

**Termination Upon Bankruptcy**. The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 et. seq.).

**Post-Termination Noncompetition Covenants**. The Franchise Agreement contains a covenant not to compete which extends beyond the termination of the respective agreement. These provisions may not be enforceable under California law.

**Applicable Law**. The Franchise Agreement requires application of the laws of the State of Florida with certain exceptions. These provisions may not be enforceable under California law.

**Liquidated Damages**. The Franchise Agreement contains a liquidated damages clause. Under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

# RIDER TO
## PAINT NAIL BAR FRANCHISE COMPANY, LLC
## FRANCHISE AGREEMENT
## <u>FOR USE IN CALIFORNIA</u>

This Rider is entered into this _____, 20___ (the "**Effective Date**"), between **PAINT NAIL BAR FRANCHISE COMPANY, LLC**, a Florida limited liability company ("**we**," "**us**," "**our**" or "**Franchisor**"), and _____, a _____ ("**you**," "**your**" or "**Franchisee**"), and amends the Franchise Agreement between the parties dated as of the Effective Date (the "**Agreement**").

1.     <u>**Precedence and Defined Terms**</u>. This Rider is an integral part of, and is incorporated into, the Agreement. Nevertheless, this Rider supersedes any inconsistent or conflicting provisions of the Agreement. Terms not otherwise defined in this Rider have the meanings as defined in the Agreement. This rider is being signed because (a) the offer or sale of the franchise for the PAINT Nail Bar® Salon Business that you will operate under the Franchise Agreement was made in the State of California <u>and</u> the PAINT Nail Bar® Salon Business will be located in California, and/or (b) you are a resident of California.

2.     <u>**Initial Fees**</u>. The payment of initial franchise fees and any payments due us for the Establishment Package are deferred until the Franchisor has performed all initial obligations owed the Franchisee and the Franchisee has commenced doing business. This financial assurance requirement is imposed by the California Department of Financial Protection And Innovation based on our financial condition.

Intending to be bound, the parties sign and deliver this Rider in 2 counterparts effective on the Agreement Date, regardless of the actual date of signature.

**FRANCHISOR:**

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

By: _Mark Schlossberg_____
Name: _____Mark Schlossberg_____
Title: _____CEO/founder_____
Date: _____11/22/2021_____

**FRANCHISEE:**

_____
Name of Franchisee

By: _kenny Eric Eddleman_____
Name: ____Kenny Eric Eddleman_____
Title: _____Owner_____
Date: _____11/22/2021_____

**ADDENDUM TO THE**
**PAINT NAIL BAR FRANCHISE COMPANY, LLC**
**MARYLAND DISCLOSURE DOCUMENT**

1.  Item 5 is amended by adding the following language:

    All initial fees and payments shall be deferred until such time as the franchisor completes its initial obligations under the franchise agreement.

2.  Item 17 is amended by adding the following language after the table:

    (a)  Any General Release required as a condition of renewal, sale and/or assignment or transfer does not apply to any liability under the Maryland Registration and Disclosure Law.

    (b)  You may sue in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law. Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

    (c)  The provision in the franchise agreement which provides for termination upon bankruptcy of the franchisee may not be enforceable under Federal Bankruptcy Law (11 U.S.C. Section 1010 et seq.)

    (d)  The franchise agreement provides that disputes are resolved through arbitration. A Maryland franchise regulation state that it is an unfair or deceptive practice to require a franchisee to waive its right to file a lawsuit in Maryland claiming a violation of the Maryland Franchise Law. In light of the Federal Arbitration Act, there is some dispute as to whether this forum selection requirement is legally enforceable.

1

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**RIDER TO**
**PAINT NAIL BAR FRANCHISE COMPANY, LLC**
**FRANCHISE AGREEMENT**
**FOR USE IN MARYLAND**

This Rider is entered into this _____, 20___ (the "**Effective Date**"), between **PAINT NAIL BAR FRANCHISE COMPANY, LLC,** a Florida limited liability company ("**we**," "**us**," "**our**" or "**Franchisor**"), and _____, a _____("**you**," "**your**" or "**Franchisee**"), and amends the Franchise Agreement between the parties dated as of the Effective Date (the "**Agreement**").

      1.    **Precedence and Defined Terms**. This Rider is an integral part of, and is incorporated into, the Agreement. Nevertheless, this Rider supersedes any inconsistent or conflicting provisions of the Agreement. Terms not otherwise defined in this Rider have the meanings as defined in the Agreement.

      2.    **Initial Fees**. The following is added to Section 3 of the Agreement: All initial fees and payments will be deferred until such time as the franchisor completes its initial obligations under the franchise agreement.

      3.    **No Release, Estoppel or Waiver of State Law**. All representations requiring prospective franchisees to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

      4.    **Jurisdiction**. Any litigation arising on claims under Maryland Law may be brought by the Franchisee in Maryland.

      5.    **Limitation on Claims**. Nothing in this Agreement will reduce the 3-year statute of limitations afforded a franchisee for bringing a claim arising under Maryland Law. All claims arising under the Maryland Law must be brought within 3 years after the grant of the franchise.

      6.    **Arbitration**. The Agreement provides that disputes are resolved through arbitration. A Maryland franchise regulation state that it is an unfair or deceptive practice to require a franchisee to waive its right to file a lawsuit in Maryland claiming a violation of the Maryland Franchise Law. In light of the Federal Arbitration Act, there is some dispute as to whether this forum selection requirement is legally enforceable.

      7.    **General Release**. Any General Release required as a condition of renewal, sale and/or assignment or transfer does not apply to any liability under the Maryland Registration and Disclosure Law.

      Intending to be bound, the parties sign and deliver this Rider in 2 counterparts effective on the Agreement Date, regardless of the actual date of signature.

**FRANCHISOR:**                                 **FRANCHISEE:**

**PAINT NAIL BAR FRANCHISE COMPANY,**    _____
**LLC**                                      Name of Franchisee

By:_____    By:_____
Name:_____    Name:_____
Title:_____    Title:_____
Date:_____    Date:_____

1

QB\40549416.55

**RIDER TO**
**PAINT NAIL BAR FRANCHISE COMPANY, LLC**
**FRANCHISE COMPLIANCE CERTIFICATION**
**<u>FOR USE IN MARYLAND</u>**

The following is added to the Franchise Compliance Certification:

All representations requiring prospective franchisees to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a release, estoppel or wavier of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

FRANCHISEE APPLICANT:

_____

Dated: _____, 20____

**ADDENDUM**
**TO FRANCHISE DISCLOSURE DOCUMENT FOR**
**PAINT NAIL BAR FRANCHISE COMPANY, LLC**
**FOR USE IN MINNESOTA**

1.     Items 5 and 7 are amended to add the following:

The State of Minnesota has imposed a deferral condition on us.  Therefore, no fees are payable by you to us until all of our pre-opening obligations are completed and your Salon has opened for business.

2.     Item 17, summary column for (f) is amended to add the following:

With respect to franchises governed by Minnesota law, we will comply with Minn. Stat. Sec. 80C.14, subds. 3, 4 and 5 which require, except in certain specified cases, that you be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the franchise agreement; and that consent to the transfer of the franchise will not be unreasonably withheld.

3.     Item 17, summary column for (m) is amended to add the following:

Any release signed as a condition of transfer will not apply to any claims you may have under the Minnesota Franchise Act.

4.     Item 17, summary columns for (v) and (w) are amended to add the following:

Minn. Stat. Sec. 80C.21 and Minn. Rule 2860.4400J prohibit us from requiring litigation to be conducted outside Minnesota.  In addition, nothing in this Disclosure Document or agreement can abrogate or reduce any of your rights as provided for in Minnesota Statues, Chapter 80C, or your rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.

**RIDER TO**
**PAINT NAIL BAR FRANCHISE COMPANY, LLC**
**FRANCHISE AGREEMENT**
**<u>FOR USE IN MINNESOTA</u>**

This Rider is entered into this _____, 20___ (the "**Effective Date**"), between **PAINT NAIL BAR FRANCHISE COMPANY, LLC**, a Florida limited liability company ("**we**," "**us**," "**our**" or "**Franchisor**" ), and _____, a _____ ("**you**," "**your**" or "**Franchisee**"), and amends the Franchise Agreement between the parties dated as of the Effective Date (the "**Agreement**").

1.      **<u>Precedence and Defined Terms</u>**. This Rider is an integral part of, and is incorporated into, the Agreement. Nevertheless, this Rider supersedes any inconsistent or conflicting provisions of the Agreement. Terms not otherwise defined in this Rider have the meanings as defined in the Agreement. This rider is being signed because (a) the offer or sale of the franchise for the PAINT Nail Bar® Salon Business that you will operate under the Franchise Agreement was made in the State of Minnesota <u>and</u> the PAINT Nail Bar® Salon Business will be located in Minnesota, and/or (b) you are a resident of Minnesota.

2.      **<u>Initial Fees</u>**. The State of Minnesota has imposed a deferral condition on us. Therefore, no fees are payable by you to us until all of our pre-opening obligations are completed and your Salon has opened for business.

2.      **<u>Transfer</u>**. Section 9 of the Agreement is amended to add the following:

            Our consent to the transfer of the franchise will not be unreasonably withheld.

3.      **<u>Expiration of this Agreement</u>**. Section 11 of the Agreement is amended to add the following:

            With respect to franchises governed by Minnesota Law, we will comply with Minn. Stat. Sec. 80c.14, subds. 3, 4, and 5, which require, except in certain specified cases, that you be given 180 days' notice of non-renewal of the Franchise Agreement.

4.      **<u>Termination</u>**. Section 12 of the Agreement is amended to add the following:

            With respect to franchises governed by Minnesota Law, we will comply with Minn. Stat. Sec. 80c.14, subds. 3, 4, and 5, which require, except in certain specified cases, that you be given 90 days' notice of termination (with 60 days to cure).

5.      **<u>Consent to Jurisdiction</u>**. The following is added to Section 15.8:

            Minn. Stat. Sec. 80C.21 and Minn. Rules 2860.4400J prohibit us from requiring litigation to be conducted outside Minnesota. In addition, nothing in the Disclosure Document or franchise agreement can abrogate or reduce any of your rights as provided for in Minnesota Statutes, Chapter 80C, or your rights to any procedure, forum or remedies provided for by the laws of the jurisdiction.

6.      **<u>Waiver of Punitive Damages and Jury Trial</u>**. Section 15.9 is deleted in its entirety.

7.      **<u>Limitation of Claims</u>**. Section 15.10 is amended to add the following:

No action may be commenced for claims coming under Minnesota Law more than 3 years after the cause of action accrues.

9. **Injunctive Relief**. The Franchisee does not consent to the Franchisor obtaining injunctive relief for any matters coming under Minnesota Law; but the Franchisor may seek such injunctive relief.

10. **General Release**. Pursuant to Minn. Rule 2860.4400D the general release required as a condition of renewal, sale and/or assignment/transfer shall not apply to any liability under the Minnesota Franchise Act.

Intending to be bound, the parties sign and deliver this Rider in 2 counterparts effective on the Agreement Date, regardless of the actual date of signature.

**FRANCHISOR:**

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**FRANCHISEE:**

_____
Name of Franchisee

By:_____
Name:_____
Title:_____
Date:_____

**ADDENDUM TO THE**
**PAINT NAIL BAR FRANCHISE COMPANY, LLC**
**VIRGINIA DISCLOSURE DOCUMENT**

Item 5 is amended by adding the following language:

> The Virginia State Corporation Commission's Division of Securities and Retail Franchising requires us to defer payment of the initial franchise fee and other initial payments owed by franchisees to the franchisor until the franchisor has completed its pre-opening obligations under the Franchise Agreement.

Item 17(h) is amended to add the following language:

Under Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause. If any grounds for default or termination stated in the franchise agreement does not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

**RIDER TO**
**PAINT NAIL BAR FRANCHISE COMPANY, LLC**
**FRANCHISE AGREEMENT**
<u>**FOR USE IN VIRGINIA**</u>

This Rider is entered into this _____, 20_____ (the "**Effective Date**"), between **PAINT NAIL BAR FRANCHISE COMPANY, LLC,** a Florida limited liability company, with its principal business address at 1432 First Street, Sarasota, Florida 34236 ("**we**," "**us**" or "**our**"), and _____ _____, a _____ whose principal business address is _____ _____ ("**you**" or "**your**") and amends the Franchise Agreement between the parties dated as of the Effective Date, (the "**Agreement**").

1.     <u>**Precedence and Defined Terms**</u>.  This Rider is an integral part of, and is incorporated into, the Agreement.  Nevertheless, this Rider supersedes any inconsistent or conflicting provisions of the Agreement.  Terms not otherwise defined in this Rider have the meanings as defined in the Agreement.

2.     <u>**Initial Fees**</u>.  The following is added to Section 3.1 of the Agreement:  The Virginia State Corporation Commission's Division of Securities and Retail Franchising requires us to defer payment of the initial franchise fee and other initial payments owed by franchisees until we have completed our pre-opening obligations under the Franchise Agreement.

Intending to be bound, you and we sign and deliver this Rider in 2 counterparts effective on the Agreement Date, regardless of the actual date of signature.

"**US**"                                                    "**YOU**"

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

By:_____
Name:_____                    Name:_____
Title:_____                    Date:_____
Date:_____

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

# RIDER TO
## PAINT NAIL BAR FRANCHISE COMPANY, LLC
## AREA DEVELOPMENT ADDENDUM
## <u>FOR USE IN VIRGINIA</u>

This Rider is entered into this _____, 20____ (the "**Effective Date**"), between **PAINT NAIL BAR FRANCHISE COMPANY, LLC,** a Florida limited liability company, with its principal business address at 1432 First Street, Sarasota, Florida 34236 ("**we**," "us" or "**our**"), and _____ _____, a _____ whose principal business address is _____ _____ ("**you**," "**your**" or "**Developer**") and amends the Area Development Addendum between the parties dated as of the Effective Date, (the "**Addendum**").

     1.    <u>**Precedence and Defined Terms**</u>.  This Rider is an integral part of, and is incorporated into, the Addendum.  Nevertheless, this Rider supersedes any inconsistent or conflicting provisions of the Agreement.  Terms not otherwise defined in this Rider have the meanings as defined in the Addendum.

     2.    <u>**Initial Fees**</u>.  The following is added to Section 3.1 of the Agreement:  The Virginia State Corporation Commission's Division of Securities and Retail Franchising requires us to defer payment of the development owed by franchisees until the franchisor has completed our pre-opening obligations under the Area Development Addendum.

     Intending to be bound, you and we sign and deliver this Rider in 2 counterparts effective on the Addendum Date, regardless of the actual date of signature.

**"US"**                                                            **"YOU"**

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**


By:_____              _____
Name:_____              Name:_____
Title:_____              Date:_____
Date:_____

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT G TO THE DISCLOSURE DOCUMENT**

---

**TABLE OF CONTENTS OF MANUALS**

---

Table of Contents

| OPERATING MANUAL | | |
|---|---|---|
| **Manual Section** | **Beginning Page** | **Number of Pages** |
| **SECTION A: INTRODUCTION** | | |
| WELCOME LETTER FROM THE PAINT NAIL BAR TEAM | 1 | 2 |
| HISTORY OF PAINT NAIL BAR | 3 | 2 |
| MISSION AND VISION | 5 | 1 |
| 4 PILLARS OF PAINT | 5 | 1 |
| CODE OF ETHICS | 6 | 1 |
| FRANCHISE RELATIONSHIP | 7 | 1 |
| SERVICES PROVIDED TO THE PAINT NAIL BAR FRANCHISEE | 8 | 1 |
| Site Acceptance | 8 | 1 |
| Design Specifications and Equipment Lists | 8 | 1 |
| Initial Training | 8 | 1 |
| Initial On-Site Training Assistance and Support | 10 | 2 |
| Ongoing Training and Support | 10 | 1 |
| Approved Suppliers | 10 | 1 |
| Administration of Advertising Fund, Advertising Materials and Sales Aids | 11 | 1 |
| Franchisee Councils | 11 | 1 |
| Ongoing Research and Development | 11 | 1 |
| Corporate Website | 11 | 1 |
| Confidential Operations Manual | 12 | 1 |
| Annual Conferences | 12 | 1 |
| RESPONSIBILITIES OF THE PAINT NAIL BAR FRANCHISEE | 13 | 1 |
| Responsibilities to Your Clients | 13 | 1 |
| Responsibilities to Your Staff | 14 | 1 |
| Responsibilities to Your Fellow Franchisees | 14 | 1 |
| Responsibilities to the Franchise | 15 | 1 |
| You Represent the Paint Brand | 15 | 2 |
| VISITS FROM THE CORPORATE OFFICE | 17 | 1 |
| PAYING OTHER FEES | 18 | 1 |
| Additional Opening and Ongoing Assistance | 18 | 1 |
| Additional Training | 18 | 1 |
| Refresher Training | 19 | 1 |
| Annual Convention and Business Meetings | 19 | 1 |
| Transfer | 20 | 1 |
| Renewal Fee | 20 | 1 |
| Advertising Fund | 20 | 1 |
| Local Advertising & Advertising Cooperative | 20 | 1 |
| Grand Opening | 20 | 1 |
| Audit | 20 | 1 |
| Late Fee | 20 | 1 |
| Interest | 21 | 1 |
| Supplier Inspection/Testing | 22 | 1 |
| Indemnification | 22 | 1 |
| Refurbishing and Modernization | 22 | 1 |
| Website and Email Hosting and Maintenance | 22 | 1 |
| Software Licensing & Technology | 22 | 1 |
| Accounting | 22 | 1 |

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

| OPERATING MANUAL | | |
|---|---|---|
| **Manual Section** | **Beginning Page** | **Number of Pages** |
| Audit | 22 | 1 |
| **SECTION B: PRE-OPENING PROCEDURES** | | |
| PRE-OPENING CHECKLIST | 1 | 4 |
| ESTABLISHMENT OF BUSINESS FORM | 5 | 1 |
| SITE SELECTION | 6 | 1 |
| Market Analysis | 7 | 1 |
| Salon Criteria | 8 | 1 |
| Office Requirements | 8 | 1 |
| Working with a Commercial Broker | 8 | 3 |
| Site Acceptance | 11 | 1 |
| Leasing Issues | 12 | 1 |
| Lease Considerations | 12 | 1 |
| Letter of Intent | 12 | 3 |
| Required Lease Inclusions | 15 | 1 |
| Having your Lease Approved by your Attorney | 16 | 1 |
| Lease Approval | 16 | 1 |
| BUILDING OUT YOUR SALON | 17 | 1 |
| Design Specifications | 17 | 2 |
| Design Meeting with Franchisor | 19 | 1 |
| Design Specifications | 20 | 1 |
| Working with an Architect | 20 | 1 |
| Selecting a Contractor | 20 | 4 |
| Contracting with Required Services | 24 | 3 |
| Obtaining Licenses and Permits | 27 | 4 |
| REQUIRED EQUIPMENT | 31 | 1 |
| INITIAL INVENTORY | 32 | 1 |
| SETTING UP AND FINE TUNING YOUR SALON | 33 | 8 |
| LOGO AND SIGNAGE SPECIFICATIONS | 41 | 1 |
| Logo Specifications | 42 | 2 |
| Business Cards and Letterhead | 44 | 1 |
| Signage Specifications | 44 | 3 |
| Building Signage | 45 | 1 |
| Exterior Signage | 45 | 1 |
| Window Signage | 45 | 1 |
| Sidewalk Signage | 45 | 1 |
| Interior Signage | 45 | 11 |
| SETTING UP YOUR LOCATION PAGE | 56 | 1 |
| SETTING UP BANK ACCOUNTS | 57 | 3 |
| PROCURING REQUIRED INSURANCE POLICIES | 60 | 3 |
| MEETING YOUR TAX OBLIGATIONS | 63 | 1 |
| Employer Identification Number | 63 | 1 |
| Federal Taxes | 63 | 1 |
| State Taxes | 64 | 1 |
| Property Taxes | 64 | 1 |
| FRANCHISE ONBOARDING AND INITIAL TRAINING | 65 | 1 |
| Initial Scheduling | 66 | 1 |
| CONDUCTING A GRAND OPENING | 67 | 3 |
| Planning | 70 | 1 |

QB\40549416.55

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

| OPERATING MANUAL | | |
|---|---|---|
| **Manual Section** | **Beginning Page** | **Number of Pages** |
| **SECTION C: HUMAN RESOURCES** | | |
| EEOC GUIDELINES IN HIRING EMPLOYEES | 1 | 1 |
| Employers Covered by EEOC-Enforced Laws | 1 | 1 |
| How Employees Are Counted | 2 | 1 |
| Record Keeping Requirements | 2 | 1 |
| Reporting Requirements | 3 | 1 |
| Charge Processing Procedures | 3 | 1 |
| Mediation | 4 | 1 |
| Remedies | 4 | 1 |
| Regulatory Enforcement Fairness Act | 4 | 1 |
| Technical Assistance | 5 | 1 |
| Informal Guidance | 5 | 1 |
| Publications | 5 | 1 |
| Laws Regarding Harassment | 6 | 1 |
| Sexual Harassment | 6 | 1 |
| Racial and Ethnic Harassment | 6 | 1 |
| Pregnancy Discrimination | 7 | 1 |
| Religious Accommodation | 7 | 1 |
| Immigration Reform/Control Act | 8 | 2 |
| Wage and Labor Laws | 10 | 1 |
| Fair Labor Standards Act | 10 | 1 |
| What the FLSA Requires | 10 | 2 |
| Tips | 12 | 1 |
| Overtime | 13 | 1 |
| What the FLSA Does Not Require | 13 | 1 |
| FLSA Minimum Wage Poster | 14 | 1 |
| Other Mandatory Labor Law Posters | 14 | 1 |
| Workers' Compensation | 14 | 2 |
| Working with Independent Contractors | 16 | 1 |
| Employees vs. Independent Contractors | 16 | 3 |
| PROFILE OF THE IDEAL PAINT NAIL BAR EMPLOYEE | 19 | 3 |
| Job Descriptions | 22 | 7 |
| Recruiting Employees | 29 | 1 |
| Initial Hiring Needs | 30 | 2 |
| Getting the Word Out | 32 | 2 |
| Screening | 34 | 3 |
| THE INTERVIEW PROCESS | 37 | 9 |
| Application | 46 | 2 |
| Conducting Interviews | 48 | 1 |
| Sample Interview Questions | 49 | 3 |
| Completing the Interview Report | 52 | 1 |
| Reference Checks | 53 | 1 |
| Required Licenses / Certifications | 54 | 1 |
| Practical | 54 | 1 |
| 2nd  Interview | 54 | 2 |
| Post Interview & Job Offer | 56 | 1 |
| HIRING ON A TRIAL BASIS | 57 | 2 |
| ORIENTATION OF NEW EMPLOYEES | 59 | 1 |

QB\40549416.55

| OPERATING MANUAL | | |
|---|---|---|
| **Manual Section** | **Beginning Page** | **Number of Pages** |
| Confidentiality | 60 | 1 |
| New Employee Paperwork | 61 | 4 |
| Issuing Uniforms | 65 | 1 |
| Policies and Benefits | 66 | 1 |
| Overview of Operation | 66 | 1 |
| TRAINING | 67 | 1 |
| Training Tips | 67 | 1 |
| Initial Training | 68 | 3 |
| Speed | 71 | 2 |
| Positive Reinforcement | 73 | 1 |
| Ongoing Training | 74 | 3 |
| PERSONNEL POLICIES | 77 | 8 |
| UNIFORM AND DRESS CODE | 85 | 3 |
| TIME-TRACKING AND PAYROLL PROCEDURES | 88 | 2 |
| COMPENSATION STRUCTURE | 90 | 1 |
| MANAGING PERSONNEL | 91 | 1 |
| Management Guidelines | 92 | 1 |
| Importance of Communications | 93 | 2 |
| Hosting Staff Meetings | 95 | 4 |
| Motivating Staff | 99 | 1 |
| Staff Scheduling | 99 | 3 |
| CONDUCTING PERFORMANCE EVALUATIONS | 102 | 3 |
| Preparation | 105 | 1 |
| Procedure | 106 | 2 |
| Review Meeting | 108 | 3 |
| PROGRESSIVE DISCIPLINE | 111 | 4 |
| TERMINATION/SEPARATION | 115 | 2 |
| Termination | 117 | 2 |
| Resignation | 119 | 1 |
| **SECTION D: DAILY OPERATING PROCEDURES** | | |
| SUGGESTED HOURS OF OPERATION | 1 | 2 |
| Daily Procedures | 3 | 1 |
| Opening Procedures | 3 | 2 |
| Ongoing Daily Duties | 5 | 3 |
| Closing Procedures | 7 | 3 |
| Back Of House Daily Tasks | 9 | 4 |
| Closing Paperwork | 13 | 3 |
| WEEKLY, MONTHLY AND ANNUAL TASKS | 16 | 1 |
| UNDERSTANDING PAINT NAIL BAR PRODUCTS AND  SERVICE OFFERINGS | 17 | 1 |
| Product Knowledge | 18 | 2 |
| Services Menu | 20 | 1 |
| Nail Art | 20 | 1 |
| Why Client Choose Paint | 21 | 1 |
| Paint Nail Bar Retail Products | 21 | 1 |
| Paint Nail Bar Back Bar Products | 21 | 1 |
| CUSTOMER SERVICE PROCEDURES | 22 | 1 |
| Service Objectives | 22 | 4 |

| OPERATING MANUAL | | |
|---|---|---|
| **Manual Section** | **Beginning Page** | **Number of Pages** |
| Communicating with Clients | 26 | 2 |
| Monitor your Behavior | 28 | 1 |
| Additional Customer Service Tips | 29 | 2 |
| Customer Service Philosophy | 31 | 1 |
| How to Achieve Great Customer Service | 32 | 1 |
| Building a Loyal Clientele | 33 | 1 |
| Conquering Client Complaints | 34 | 1 |
| Dealing with Difficult Clients | 35 | 1 |
| Handling Complaints | 35 | 3 |
| Handling Refund Requests | 38 | 2 |
| Responding to Negative Yelp Reviews | 40 | 2 |
| BOOKER.COM | 42 | 1 |
| SALON CONSULTANT PROCEDURES | 43 | 4 |
| Proper Handling of Incoming Calls | 47 | 1 |
| Greeting | 47 | 1 |
| Walk-In Clients | 48 | 1 |
| First Time Clients | 48 | 1 |
| Entering Client Information in Booker.com | 49 | 1 |
| Scheduling Appointments | 50 | 2 |
| Cancellations and No Shows | 52 | 1 |
| Confirming Appointments | 53 | 1 |
| Preparing Work Tickets | 53 | 1 |
| Checking In Clients | 53 | 1 |
| Checking Clients Out | 53 | 1 |
| Accepting Payment | 54 | 3 |
| Issuing and Accepting Gift Cert | 57 | 1 |
| Special Orders | 58 | 1 |
| Packaging Purchases | 58 | 1 |
| Client Follow Up | 59 | 1 |
| PERFORMING SERVICE | 59 | 1 |
| Preparing for Clients | 59 | 1 |
| Client Consultation | 59 | 2 |
| Performing Service | 61 | 2 |
| Retail Procedures | 63 | 2 |
| End of Appointment | 65 | 1 |
| Asking For Referrals | 65 | 1 |
| POST APPOINTMENT PROCEDURES | 66 | 3 |
| Disinfecting Your Manicure Station | 69 | 1 |
| Disinfecting Your Pedicure Station | 69 | 1 |
| Disinfecting Tools and Supplies | 69 | 1 |
| Disinfecting the Wax & Lash Room | 69 | 1 |
| Resetting Manicure & Pedi Station | 70 | 1 |
| Resetting the Wax & Lash Room | 70 | 5 |
| MERCHANDISING GUIDELINES | 75 | 1 |
| Tagging and Pricing Merchandise | 75 | 1 |
| Merchandise Display | 75 | 1 |
| PARTY AND EVENT PROCEDURES | 76 | 1 |
| In Store Parties | 77 | 2 |

| OPERATING MANUAL | | |
|---|---|---|
| **Manual Section** | **Beginning Page** | **Number of Pages** |
| Off Site Events | 79 | 3 |
| SAFETY & SECURITY | 82 | 1 |
| Responsibility | 82 | 2 |
| Orientation | 84 | 1 |
| Workplace Hazards | 85 | 1 |
| Accident & Incident Reporting and Investigation | 86 | 1 |
| Workers Compensation | 89 | 1 |
| Federal Employment Safety Laws/ OSHA | 89 | 6 |
| Material Safety Data Sheets | 95 | 1 |
| Robbery | 95 | 1 |
| Burglary | 96 | 1 |
| Fire Safety | 96 | 1 |
| Recommended Security Policies | 96 | 3 |
| HEALTH AND SAFETY | 99 | 1 |
| State Laws and Regulations | 100 | 1 |
| Principles of Infection Control | 100 | 1 |
| Cleaning | 100 | 1 |
| Disinfecting | 100 | 1 |
| Universal Precautions | 100 | 1 |
| Blood Spill | 101 | 1 |
| Eyewash Kit | 101 | 1 |
| Disinfect or Dispose | 102 | 1 |
| Handwashing | 102 | 1 |
| Laundering Towels and Blankets | 102 | 1 |
| **SECTION E: SALON MANAGEMENT PROCEDURES** | | |
| BUSINESS PLANNING AND FINANCIAL MANAGEMENT | 1 | 1 |
| Developing an Annual Business Plan and Budget | 2 | 1 |
| Salon Management Goals | 2 | 1 |
| Required and Recommended Reports | 3 | 2 |
| Using Reports to Analyze your Business | 5 | 1 |
| Record Keeping Requirements | 6 | 1 |
| Compliance with Payment Card Infrastructure (PCI) Standards | 7 | 1 |
| Data Security | 8 | 1 |
| PRICING PHILOSOPHY | 9 | 1 |
| ACCOUNTING, BILL PAYMENT AND PAYROLL | 10 | 1 |
| FRANCHISE REPORTING REQUIREMENTS | 11 | 1 |
| Royalty Payment | 11 | 1 |
| Making Your Advertising Contribution | 11 | 1 |
| Required Local Marketing Expenditures | 11 | 1 |
| Required Gross Revenue Report | 11 | 1 |
| Electronic Funds Transfer | 12 | 1 |
| Financial Statements | 13 | 2 |
| INVENTORY MANAGEMENT | 15 | 1 |
| Ordering | 15 | 2 |
| Using Approved Suppliers | 17 | 1 |
| Receiving Procedures | 18 | 1 |
| Tagging Retail Inventory | 18 | 1 |
| Conducting Physical Inventory | 19 | 1 |

| OPERATING MANUAL | | |
|---|---|---|
| **Manual Section** | **Beginning Page** | **Number of Pages** |
| MANAGING THE PAINT NAIL BAR EXPERIENCE | 1 | 1 |
| Hospitality | 1 | 1 |
| High Standards | 2 | 1 |
| Maintaining a Positive Environment | 2 | 1 |
| Keeping an Immaculate Salon | 3 | 1 |
| **SECTION F: MARKETING** | | |
| MARKETING BASICS | 1 | 1 |
| POSITIONING LINES | 2 | 1 |
| Positioning Lines | 2 | 1 |
| Tag Lines | 2 | 2 |
| GUIDELINES FOR USING NAIL BAR MARKS | 4 | 2 |
| MARKETING PLAN | 6 | 1 |
| Marketing Calendar | 6 | 2 |
| PROMOTING PAINT NAIL BAR IN YOUR AREA | 8 | 1 |
| Exterior Promotional | 8 | 1 |
| Flyers and Brochures | 9 | 2 |
| Print Advertising | 11 | 2 |
| Free Radio | 13 | 1 |
| Promotion and Upgrade Offers | 14 | 2 |
| Social Media | 16 | 2 |
| Google and other Business Listings | 18 | 1 |
| Paint Nail Bar Website | 18 | 1 |
| Email Marketing | 19 | 1 |
| USING REFERRALS TO BUILD BUSINESS | 20 | 1 |
| Business Partners | 20 | 1 |
| Word of Mouth | 20 | 3 |
| REQUIRED ADVERTISING EXPENDITURES | 23 | 1 |
| Local Advertising Requirements` | 23 | 1 |
| Advertising Fund | 23 | 1 |
| Regional Cooperative Advertising | 24 | 1 |
| Grand Opening Advertising | 25 | 1 |
| PUBLIC RELATIONS | 26 | 1 |
| Writing A press Release | 26 | 1 |
| Additional PR tips | 26 | 2 |
| Putting together a Press Kit | 28 | 1 |
| Media List | 28 | 2 |
| COMMUNITY INVOLVEMENT | 30 | 3 |
| EVENT MARKETING | 33 | 1 |
| OBTAINING ADVERTISING APPROVAL | 34 | 1 |

*Each Section begins on Page 1*
**TOTAL PAGES**                                                                                                     *369*
APPENDICES:
        APPROVED SUPPLIER
        FORMS AND SAMPLES
        BOOKER.COM PROCEDURES
        SAMPLE REPORTS AND FINANCIAL STATEMENTS
        SERVICE PROTOCOLS
        VIDEOS

**EXHIBIT H TO THE DISCLOSURE DOCUMENT**

**FORM OF PRINCIPAL
OWNER'S GUARANTY**

# PRINCIPAL OWNER'S GUARANTY

This Guaranty must be signed by the principal owners (referred to as "**you**" for purposes of this Guaranty only) of _____ _____ (the "**Business Entity**") under the Franchise Agreement dated _____, 20___ and any Promissory Note for the Initial Franchise Fee, or otherwise (collectively, the "**Agreement**") with **PAINT NAIL BAR FRANCHISE COMPANY, LLC** ("**us**," or "**our**" or "**we**").

1.   **Scope of Guaranty**.  In consideration of and as an inducement to our signing and delivering the Agreement, each of you signing this Guaranty personally and unconditionally:  (a) guarantee to us and our successors and assigns that the Business Entity will punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and (b) agree to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement.

2.   **Waivers**.  Each of you waive: (a) acceptance and notice of acceptance by us of your obligations under this Guaranty; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations guaranteed by you; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations guaranteed by you; (d) any right you may have to require that an action be brought against the Business Entity or any other person as a condition of your liability; (e) all rights to payments and claims for reimbursement or subrogation which you may have against the Business Entity arising as a result of your execution of and performance under this Guaranty; and (f) all other notices and legal or equitable defenses to which you may be entitled in your capacity as guarantors.

3.   **Consents and Agreements**.  Each of you consent and agree that:  (a) your direct and immediate liability under this Guaranty are joint and several; (b) you must render any payment or performance required under the Agreement upon demand if the Business Entity fails or refuses punctually to do so; (c) your liability will not be contingent or conditioned upon our pursuit of any remedies against the Business Entity or any other person; (d) your liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which we may from time to time grant to Business Entity or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims and no such indulgence will in any way modify or amend this Guaranty; and (e) this Guaranty will continue and is irrevocable during the term of the Agreement and, if required by the Agreement, after its termination or expiration.

4.   **Enforcement Costs**.  If we are required to enforce this Guaranty in any judicial or arbitration proceeding or any appeals, you must reimburse us for our enforcement costs.  Enforcement costs include reasonable accountants', attorneys', attorney's assistants', arbitrators' and expert witness fees, costs of investigation and proof of facts, court costs, arbitration filing fees, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for, or in contemplation of the filing of any written demand, claim, action, hearing or proceeding to enforce this Guaranty.

5.   **Effectiveness**.  Your obligations under this Guaranty are effective on the Agreement Date, regardless of the actual date of signature.  Terms not otherwise defined in this Guaranty have the meanings as defined in the Agreement.  This Guaranty is governed by Florida law and we may enforce our rights regarding it in the courts of Sarasota, Florida.  Each of you irrevocably submits to the jurisdiction and venue of such courts.

Each of you now sign and deliver this Guaranty effective as of the date of the Agreement regardless of the actual date of signature.

**PERCENTAGE OF OWNERSHIP**
**INTEREST IN BUSINESS ENTITY**

**GUARANTORS**

| | |
|---|---|
| 49 | Print Name: _Kenny Eric Eddleman_ <br> Date: ~~11/22/2021~~ |
| 51% | Print Name: _Andrea M Eddleman_ <br> Date: _11/23/2021_ |
| | Print Name: _____ <br> Date: _____ |

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT I TO THE DISCLOSURE DOCUMENT**

---

**FORM OF PRINCIPAL
OWNER'S STATEMENT**

---

## PRINCIPAL OWNER'S STATEMENT
## PRINCIPAL OWNER'S STATEMENT

This form must be completed by the Franchisee Entity ("**Franchisee**") if Franchisee has multiple owners or if Franchisee is owned by another/other business organization (such as a corporation, partnership or limited liability company). Franchisor is relying on the truth and accuracy of this form in awarding the Franchise Agreement to Franchisee.

1.    **Form of Owner**. Franchisee is a (check one):

| | | |
|---|---|---|
| (a) | General Partnership | ☐ |
| (b) | Corporation | ☐ |
| (c) | Limited Partnership | ☐ |
| (d) | Limited Liability Company | ☐ |
| (e) | Other | ☐ |
| | Specify: _____ | |

2.    **Business Entity**. Franchisee was incorporated or formed on _____, _____ *(date)*, under the laws of the State of _____. Franchisee has not conducted business under any name other than this corporation, limited liability company or partnership name and _____ *(Entity Name)* . The following is a list of all persons who have management rights and powers (e.g., officers, managers, partners, etc.) relative to Franchisee and their positions are listed below:

| Name of Person | Position(s) Held |
|---|---|
| Kenny Eric Eddleman | Owner |
| Andrea M Eddleman | Owner |
| | |
| | |

3.    **Owners**. The following list includes the full name and mailing address of each person who is one my owners and fully describes the nature of each owner's interest. Attach additional sheets if necessary.

| Owner's Name and Address | Description of Interest | % of Ownership |
|---|---|---|
| Kenny Eric Eddleman | Owner | 49 |
| Andrea M Eddleman | Owner | 51 |
| | | |
| | | |
| | | |

1

3.  **Governing Documents**.  Attached are copies of the documents and contracts governing the ownership, management and other significant aspects of the business organization of Franchisee (e.g., articles of incorporation or organization, partnership or shareholder agreements, etc.).

This Owner's Statement is current and complete as of _____, 20__.

### FRANCHISEE:

By: _____*Mark Schlossberg*_____
Name: _____Mark Schlossberg_____
Title: _____CEO/founder_____
Date: _____11/22/2021_____

### OWNERS:

**Individuals:**

_____*Kenny Eric Eddleman*_____
*(Signature)*

_____Kenny Eric Eddleman_____
*(Print Name)*
Date: _____11/22/2021_____

_____*Anne*_____
*(Signature)*

_____Andrea M Eddleman_____
*(Print Name)*
Date: _____11/23/2021_____

_____
*(Signature)*

_____
*(Print Name)*
Date: _____

_____
*(Signature)*

_____
*(Print Name)*
Date: _____

**Corporation, Limited Liabilty Company or Partnership:**

_____ObiEnterprise LLC_____
*(Name of Entity)*

By: _____
Name: _____
Title: _____
Date: _____

_____
*(Name of Entity)*

By: _____
Name: _____
Title: _____
Date: _____

_____
*(Name of Entity)*

By: _____
Name: _____
Title: _____
Date: _____

_____
*(Name of Entity)*

By: _____
Name: _____
Title: _____
Date: _____

2

**EXHIBIT J TO THE DISCLOSURE DOCUMENT**

---

**FORM OF CONDITIONAL ASSIGNMENT OF
TELEPHONE NUMBERS AND LISTINGS
INTERNET ADDRESSES**

---

## CONDITIONAL ASSIGNMENT OF
## TELEPHONE NUMBERS AND LISTINGS AND INTERNET ADDRESSES

**THIS CONDITIONAL ASSIGNMENT OF TELEPHONE NUMBERS AND LISTINGS AND INTERNET ADDRESSES** (this "**Assignment**") is effective as of _____, 20__, between **PAINT NAIL BAR FRANCHISE COMPANY, LLC**, a Florida limited liaibility company with its principal place of business at 1432 First Street, Sarasota, Florida 34236 ("**we**," "**us**" or "**our**") and _____ _____, whose current place of business is _____ ("**you**" or "**your**"). You and we are sometimes referred to collectively as the "**parties**" or individually as a "**party.**"

## BACKGROUND INFORMATION:

We have simultaneously entered into the certain Franchise Agreement (the "**Franchise Agreement**") dated as of _____, 20___ with you, pursuant to which you plan to own and operate a PAINT Nail Bar® Salon (the "**Salon**" or "**Salons**"). The Salons use certain proprietary knowledge, procedures, formats, systems, forms, printed materials, applications, methods, specifications, standards and techniques authorized or developed by us (collectively the "**System**"). We identify PAINT Nail Bar® Salons and various components of the System by certain trademarks, trade names, service marks, trade dress and other commercial symbols (collectively the "**Marks**"). In order to protect our interest in the System and the Marks, we will have the right to control the telephone numbers and listings and internet addresses of the Salon if the Franchise Agreement is terminated.

## OPERATIVE TERMS:

You and we agree as follows:

1.     **Background Information**: The background information is true and correct. This Assignment will be interpreted by reference to the background information. Terms not otherwise defined in this Assignment will have the meanings as defined in the Franchise Agreement.

2.     **Conditional Assignment**: FOR VALUE RECEIVED, Franchisee assigns to Franchisor: (a) those certain telephone numbers and regular, classified or other telephone directory listings (collectively, the "**Telephone Numbers and Listings**"); and (b) those certain Internet website addresses ("**URLs**") associated with Franchisor's trade and service marks and used from time to time in connection with the operation of the PAINT Nail Bar® Salon at the address provided above. This Assignment is for collateral purposes only and, except as specified in this Assignment, Franchisor has no liability or obligation of any kind whatsoever arising from or in connection with this Assignment, unless Franchisor notifies the telephone company and/or the listing agencies with which Franchisee has placed telephone directory listings (all such entities are collectively referred to herein as "**Telephone Company**") and/or Franchisee's Internet service provider ("**ISP**") to effectuate the Assignment pursuant to its terms.

Upon termination or expiration of the Franchise Agreement (without extension) for any reason, Franchisor has the right and is empowered to effectuate the assignment of the Telephone Numbers and Listings and the URLs, and, in such event, Franchisee shall have no further right, title or interest in the Telephone Numbers and Listings and the URLs, and shall remain liable to the Telephone Company and the ISP for all past due fees owing to the Telephone Company and the ISP on or before the effective date of the assignment.

1

3.    **Power of Attorney**: Franchisee agrees and acknowledges that as between Franchisor and Franchisee, upon termination or expiration of the Franchise Agreement, Franchisor shall have the sole right to and interest in the Telephone Numbers and Listings and the URLs, and Franchisee irrevocably appoints Franchisor as Franchisee's true and lawful attorney-in-fact, which appointment is coupled with an interest, to direct the Telephone Company and the ISP to assign same to Franchisor, and execute such documents and take such actions as may be necessary to effectuate the assignment. Upon such event, Franchisee shall immediately notify the Telephone Company and the ISP to assign the Telephone Numbers and Listings and the URLs to Franchisor. If Franchisee fails to promptly direct the Telephone Company and the ISP to assign the Telephone Numbers and Listings and the URLs to Franchisor, Franchisor shall direct the Telephone Company and the ISP to effectuate the assignment contemplated hereunder to Franchisor. The parties agree that the Telephone Company and the ISP may accept Franchisor's written direction, the Franchise Agreement or this Assignment as conclusive proof of Franchisor's exclusive rights in and to the Telephone Numbers and Listings and the URLs upon such termination or expiration and that such assignment shall be made automatically and effective immediately upon Telephone Company's and ISP's receipt of such notice from Franchisor or Franchisee. The parties further agree that if the Telephone Company or the ISP requires that the parties execute the Telephone Company's or the ISP's assignment forms or other documentation at the time of termination or expiration of the Franchise Agreement, Franchisor's execution of such forms or documentation on behalf of Franchisee shall effectuate Franchisee's consent and agreement to the assignment. The parties agree that at any time after the date hereof they will perform such acts and execute and deliver such documents as may be necessary to assist in or accomplish the assignment described herein upon termination or expiration of the Franchise Agreement.

4.    **Indemnification**: You will indemnify and hold us and our affiliates, stockholders, directors, officers and representatives (collectively, the "**Indemnified Parties**") harmless from and against any and all losses, liabilities, claims, proceedings, demands, damages, judgments, injuries, attorneys' fees, costs and expenses that any of the Indemnified Parties incur as a result of any claim brought against any of the Indemnified Parties or any action which any of the Indemnified Parties are named as a party or which any of the Indemnified Parties may suffer, sustain or incur by reason of, or arising out of, your breach of any of the terms of any agreement or contract or the nonpayment of any debt you have with the Telephone Company and/or ISP.

5.    **Binding Effect**: This Assignment is binding upon and inures to the benefit of the parties and their respective successors-in-interest, heirs, and successors and assigns.

6.    **Assignment to Control**: This Assignment will govern and control over any conflicting provision in any agreement or contract which you may have with the Telephone Company and/or ISP.

7.    **Attorney's Fees, Etc.**: In any action or dispute, at law or in equity, that may arise under or otherwise relate to this Assignment or the enforcement thereof, the prevailing party will be entitled to reimbursement of its attorneys' fees, costs and expenses from the non-prevailing party. The term "**attorneys' fees**" means any and all charges levied by an attorney for his or her services including time charges and other reasonable fees including paralegal fees and legal assistant fees and includes fees earned in settlement, at trial, appeal or in bankruptcy proceedings and/or in arbitration proceedings.

8.    **Severability**: If any of the provisions of this Assignment or any section or subsection of this Assignment are held invalid for any reason, the remainder of this Assignment or any such section or subsection will not be affected, and will remain in full force and effect in accordance with its terms.

9.   **Governing Law and Forum**:  This Assignment is governed by Florida law.  The parties will not institute any action against any of the other parties to this Assignment except in the state or federal courts of general jurisdiction in Sarasota, Florida, and they irrevocably submit to the jurisdiction of such courts and waive any objection they may have to either the jurisdiction or venue of such court.

<table>
<tr><td><strong>ASSIGNOR:</strong></td><td><strong>ASSIGNEE:</strong></td></tr>
</table>

**PAINT NAIL BAR FRANCHISE COMPANY, LLC**

ASSIGNOR:

By: *Kenny Eric Eddleman*
Print Name: Kenny Eric Eddleman
Title: Owner
Date: 11/22/2021

By: *Andrea M Eddleman*
Print Name: Andrea M Eddleman
Date: 11/23/2021

By:
Print Name:
Date:

ASSIGNEE — PAINT NAIL BAR FRANCHISE COMPANY, LLC

By: *Mark Schlossberg*
Print Name: Mark Schlossberg
Title: CEO/founder
Date: 11/22/2021

**EXHIBIT K TO THE DISCLOSURE DOCUMENT**

**FORM OF CONFIDENTIALITY, NONSOLICITATION AND NONCOMPETITION AGREEMENT**

# CONFIDENTIALITY, NONSOLICITATION AND NONCOMPETITION AGREEMENT

**THIS CONFIDENTIALITY, NONSOLICITATION AND NONCOMPETITION AGREEMENT** (this "**Agreement**") is effective as of _____, 20____, between _____ _____(the "**Franchisee**," "**we**," "**us**" or **our**") and _____ _____ ("**you**" or "**your**").

## BACKGROUND INFORMATION:

We have entered into a Franchise Agreement (the "**Franchise Agreement**") with **PAINT NAIL BAR FRANCHISING, LLC** (the "**Franchisor**") to operate a PAINT Nail Bar® Salon franchise (the "**Salon**" or "**Salons**"). The Salon is operated pursuant to formats, specifications, standards, methods and procedures prescribed or approved by the Franchisor (the "**System**"). We and the Franchisor possess certain confidential information, consisting of specifications, plans and other characteristics of products and services provided, the Computer System, Intranet database and information, and business operating techniques, criteria methods in obtaining licensing and meeting regulatory requirements, designing and constructing Salons, the selection, testing and training of personnel and other employees, and the formats, specifications, standards, methods, procedures, information, and knowledge of and experience in the operating and franchising of PAINT Nail Bar® Salons, which we either own or license (the "**Confidential Information**").

You understand that the System and Confidential Information are the Franchisor's proprietary trade secrets and confidential. You acknowledge that we and the Franchisor have and will provide you with specialized and extensive training regarding operation of the Salon and have invested considerable time, funds and resources to do so. We have an obligation under the Franchise Agreement to maintain such Confidential Information as secret and confidential. You represent to us and the Franchisor that you have other skills that you can utilize if, for any reason, your relationship with us ends.

## OPERATIVE TERMS:

Accordingly, you and we agree as follows:

1.     **Confidentiality**. You will: (i) not use the Confidential Information in any other business or capacity; (ii) maintain the absolute confidentiality of the Confidential Information during and after the term of your ownership in, or employment by us; (iii) not make unauthorized copies of any portion of the Confidential Information disclosed in written or electronic form; and (iv) comply with all procedures we prescribe from time to time to prevent unauthorized use or disclosure of the Confidential Information.

2.     **In-Term Competitive Restrictions**. During the time that you are one of our owners or employees, unless we otherwise permit in writing or except in accordance with another franchise agreement with us, you agree that you will not, directly or indirectly (e.g., through a spouse, child or other immediate family member):

(a)     have any direct or indirect interest as a disclosed or beneficial owner, or in any other capacity a nail salon or one or more similar facilities or businesses that offer the same or similar products and services customarily offered by PAINT Nail Bar® Salons, or an entity that grants franchises or licenses for any of these types of businesses, other than the Salon and other PAINT Nail Bar® Salons (a "**Competitive Business**"), (i) anywhere; (ii) within the Territory; (iii) within any geographic territory that we have assigned to any one of our other PAINT Nail Bar® Salons, employees, or Franchisees, or in which we directly operate, market or sell; (iv) via the Internet or other form of e-commerce, wherever located; or (v) within 5 miles of any geographic area that we have awarded to any other PAINT Nail Bar® Salons;

(b)    perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business, wherever located;

(c)    recruit or hire any employee of ours, of the Franchisor, of our or its affiliates, or of any of the Franchisor's franchisees, without obtaining the prior written permission of that person's employer; or

(d)    divert or attempt to divert any business or customer of the Salon to any Competitive Business.

Nothing in this Section prohibits you from having a direct or indirect interest as a disclosed or beneficial owner in a publicly held Competitive Business, as long as such securities represent less than 5% of the number of shares of that class of securities which are issued and outstanding.

3.    **Post-Term Competitive Restrictions**.  For a period of 2 years following the date that you cease to be one of our owners or an employee, you agree that you will not, directly or indirectly (e.g., through a spouse, child or other immediate family member):

(a)    have any direct or indirect interest as an owner whether of record, beneficially or otherwise perform or engage in services as a director, officer, manager, employee, consultant, representative, or agent for, a Competitive Business (this restriction shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent less than 3% of the number of shares of that class of securities issued and outstanding);

(b)    directly recruit or solicit for hire any of our employees or the employees of any PAINT Nail Bar® Salon without obtaining our or the employer's prior written permission (general advertising or solicitation directed to the public in general is not restricted;

(c)    direct any prospective or existing business or economic opportunities away from us, our Affiliate, the Salon or any other PAINT Nail Bar® Salon to a Competitive Business; or

(d)    perform any act prejudicial or injurious to the goodwill associated with the Marks.

If you refuse to voluntarily comply with the foregoing obligations, the 2-year period will be extended by the period of noncompliance.  Nothing in this Section prohibits you from having a direct or indirect interest as a disclosed or beneficial owner in a publicly held Competitive Business, as long as such securities represent less than 5% of the number of shares of that class of securities which are issued and outstanding.

4.    **Severability and Substitution**.  To the extent that any portion of this Agreement is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, length of time or remedy, but may be made enforceable by reduction, adjustment or modification of any or all thereof, you and we agree that this Agreement will be enforced to the fullest extent permissible under the laws or public policies of the jurisdiction in which enforcement is sought, and such reduced or modified provision will be enforced to the fullest extent.

5.    **Acquisition**.   You agree that the confidentiality, competitive, and employment undertakings and restrictions survive any change in our ownership, any merger or consolidation, any sale of our assets, and any assignment or transfer of this Agreement.

6.    **Extension of Time Period**.  The time period during which you are to refrain from any of the activities listed in this Agreement will be automatically extended by any length of time during which

you or any of your affiliates, successors or assigns are in breach of any provision of this Agreement. This Agreement will continue through the duration of the extended time periods.

7. **Suspension of Compensation**. We will not be required to pay any other compensation to you during any period of time in which you are in breach of this Agreement. Upon such breach, you forfeit payment of such amounts without limitation on any other remedies available to us for redress.

8. **No Defense or Setoff**. You must not assert, by way of defense or setoff, any alleged breach or damage caused by you if we must enforce this Agreement against you.

9. **Injunctive Relief**. You and we agree that the breach of this Agreement will result in irreparable harm to us and the Franchisor, and that no monetary award can fully compensate us if you violate it. Thus, if you breach this Agreement, you agree that we will be entitled to an injunction restraining you from any further breach. Such injunctive relief may be obtained without bond, but upon due notice, in addition to such other and further remedies or relief as may be available to us at equity or law.

10. **Miscellaneous**.

(a) **Complete Agreement**: This Agreement contains the complete agreement between the parties concerning this subject matter. This Agreement supersedes any prior or contemporaneous agreement, representation or understanding, oral or written, between them. The continued relationship between the parties described in this Agreement constitutes full and sufficient consideration for the binding commitment of the parties to this Agreement.

(b) **Waiver and Amendment**: A waiver or amendment of this Agreement, or any provision of it, will be valid and effective only if it is in writing and signed by all parties or the party waiving such provision. No waiver of any term of this Agreement will operate as a waiver of any other term of this Agreement or of that same term at any other time.

(c) **Rights Cumulative**: No right or remedy available to any party is exclusive of any other remedy. Each and every remedy will be cumulative to any other remedy given under this Agreement, or otherwise legally existing upon the occurrence of a breach of this Agreement.

(d) **Certain Definitions**: As used throughout this Agreement, the following terms have the following meanings:

(i) The term "**person**" means any corporation, professional corporation or association, partnership (limited or general), joint venture, trust, association or other business entity or enterprise or any natural person;

(ii) The term "**affiliate**" means, with respect to any person, any other person that directly, indirectly, or through one or more intermediaries, controls, is controlled by or is under common control with, such person, and includes any subsidiaries or other business entities that are beneficially owned by such person or its affiliates;

(iii) The term "**attorney's fees**" means any and all charges levied by an attorney for his services, including time charges, expenses and other reasonable fees including paralegal fees and legal assistant fees, and includes fees earned in settlement, at trial, on appeal or in bankruptcy proceedings.

(e) **Governing Law**: This Agreement is governed by the laws of the State of Florida. The prevailing party in any litigation involving this Agreement must be reimbursed its attorney's fees from the non-prevailing party.

(f) **Third-Party Beneficiary**: The parties understand and acknowledge that the Franchisor is a third-party beneficiary of the terms of this Agreement and, at its option, may enforce the provisions of this Agreement with you. Your obligations under this Agreement will continue for the benefit of our and the Franchisor's successors and assigns.

(g) **Background Information**: The background information is true and correct and is incorporated into this Agreement. This Agreement will be interpreted with reference to the background information.

Intending to be bound, the parties sign below:

**"US":**                                                         **"YOU":**

_____

                                                                  Signature:_____
Signature:_____*Kenny Eric Eddleman*_____   Print Name:_____
Print Name:___Kenny Eric Eddleman___*Andrea M Eddleman*   Title_____
Title_____Owner_____    Date:_____
Date:_____11/22/2021_____

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT L TO THE DISCLOSURE DOCUMENT**

---

**LEASE ADDENDUM**

---

# LEASE ADDENDUM

## LEASE PROVISIONS FOR PAINT NAIL BAR® SALONS:

The following provisions must be inserted into your lease for your Salon that you will operate under the "Paint Nail Bar®" brand (the "**Lease**"). You may add this language via a rider or addendum to your Lease, as long as the rider or addendum document is signed by both Tenant and the Landlord. Please send us a copy of the signed Lease, along with any riders or addenda.

## REQUIRED LANGUAGE:

A.      Landlord hereby consents to Tenant's displaying the "Paint Nail Bar®" Marks and signs at the Salon according to the system standards of Paint Nail Bar Franchise Company, LLC ("Franchisor") set forth in the Franchise Agreement between Tenant and Franchisor (the "Franchise Agreement"), as Franchisor periodically modifies them, to the extent those standards comply with applicable law. A copy of the Franchisor's signage standards are attached to this Addendum as Exhibit "A."

B.      Landlord shall send to Franchisor copies of all default notices, and all notices of Landlord's intent to terminate the Lease (or any rights of Tenant thereunder) or evict Tenant from the leased premises, simultaneously with sending such notices to Tenant. Such copies shall be sent to:

PAINT NAIL BAR FRANCHISE COMPANY, LLC
1432 First Street
Sarasota, FL  34236
Phone:  (941) 366-8989
Fax:  (423) 456-7890

C.      Landlord shall provide Franchisor at least 30 days' prior written notice before Landlord terminates the Lease (or any rights of Tenant thereunder) or evicts Tenant from the leased premises. During such 30-day period, Franchisor shall have the right, but not the obligation, to cure any defaults of Tenant under the Lease. If Franchisor cures such defaults, then such notice from Landlord shall be void and of no force or effect.

D.      Upon the occurrence of any of the following:

(1)      a default by Tenant under the Lease, the Franchise Agreement, or any document or instrument securing or relating to the Franchise Agreement, or

(2)      the termination of the Franchise Agreement before its term expires by Franchisor or Tenant for any reason other than a default by Franchisor,

Franchisor shall have the right (but no obligation), exercisable upon delivery of written notice to Tenant and Landlord, to compel an assignment of the Lease, and all of Tenant's rights thereunder, to Franchisor or to an assignee of Franchisor's choice, at Franchisor's option. If Franchisor (or its assignee) exercises the rights under this paragraph, Tenant shall have no further right, title or interest under the Lease or to the leased premises, but shall remain solely liable to Landlord for all rents, charges and other obligations under the Lease prior to the date upon which Franchisor (or its assignee) assumes possession of the leased premises.

E.     Landlord shall cooperate with Franchisor or any designee thereof (at Paint's option) in the removal from the leased premises of any trademarks, service marks, and proprietary systems and information related to the "Paint Nail Bar®" brand upon the termination or expiration of the Franchise Agreement.

F.     Landlord shall give Franchisor access to Landlord's information of Tenant's records relating to Tenant's performance of its obligations under the Lease, including but not limited to Tenant's Lease payment records.

G.     Franchisor is an intended third party beneficiary under the provisions set forth above with independent rights to enforce them and neither Landlord nor Tenant may alter or limit any of those provisions without Franchisor's prior written approval.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT A TO**

**<u>LEASE ADDENDUM</u>**

**PAINT NAIL BAR® SALON
SIGNAGE STANDARDS**

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT M TO THE DISCLOSURE DOCUMENT**

---

**LENDER CONSENT**

---

**LENDER CONSENT**

DATE
**[INSERT ADDRESS BLOCK]**

Re      Loan to _____

Dear _____:

You have advised us that _____ ("**Franchisee**") has applied for a loan an aggregate principal amount not to exceed \$_____ (the "**Loan**") pursuant to a loan agreement (together with any promissory notes, security agreements, guarantees, forms of UCC-1 Financing Statements, and any other related agreements, documents and instruments, as amended, supplemented or otherwise modified, collectively, the "**Loan Agreement**," a copy of which is attached hereto as Attachment A) between Franchisee and _____ (the "**Lender**").  We understand that the Loan will be secured in part by a lien (the "**Lien**") on some of Franchisee's business assets including, but not limited to, all furniture and fixtures, machinery and equipment, inventory, raw material, work in process, and permits now owned or hereinafter acquired by Franchisee and the products and proceeds thereof (subject to the provisions of this Lender Consent, collectively, the "**Collateral**"), relating to the Franchisee's Salon located at _____ and commonly known as Paint Nail Bar (the "**Salon**").

PAINT NAIL BAR FRANCHISE COMPANY, LLC ("**Company**") has entered into the Franchise Agreement attached to this Lender Consent as <u>Attachment B</u> (as amended, supplemented or otherwise modified, collectively, the "**Franchise Agreement**") pursuant to which Franchisee will operate the Salon under the "Paint Nail Bar®" name and other Marks.  All capitalized terms not defined herein shall have the meanings set forth in the Franchise Agreement.

Subject to the terms of this Lender's Consent, Company consents to the existence of Lender's Lien on the Collateral.  However, notwithstanding the foregoing or anything to the contrary in the Loan Agreement, the Lien does not apply to, and the Collateral shall not include, any direct or indirect, beneficial or legal right or title to, or interest in, (i) the ownership interests in Franchisee, (ii) the Franchise Agreement or any rights of Franchisee thereunder, or (iii) any Company Property (defined below) "**Company Property**" includes all right and title to and interest in and to the following assets, which the parties acknowledge and agree are the sole and exclusive property of Company or its affiliates.

(a)     the Marks, all other trademarks, service marks, trade names, logos and other commercial symbols that are associated with or used by the Salon from time to time during the term of the Franchise Agreement, and all related goodwill,

(b)     the System Website,

(c)     the Manuals and System Standards and all plans, designs and specifications relating to a Salon,

(d)     the Innovations, and

(e)     the Systems, the Confidential Information and all written or electronic materials provided during any training program or otherwise containing any Confidential Information.

Additionally, Company, Lender and Franchisee agree as follows:

(1)     Company and Lender mutually agree to use reasonable efforts to furnish each other, contemporaneously with transmittal to Franchisee, copies of all written notices of default under the Franchise Agreement or the Loan Agreement, as applicable, and Franchisee consents to the providing of

such notices. Each of Company and Lender reserve, in their absolute discretion, the right to determine whether to issue a written notice of default Company's or Lender's failure to provide the other with a copy of any such written notice of default will not affect Company's or Lender's ability to enforce its rights against Franchisee under the Franchise Agreement or the Loan Agreement, as applicable.

(2)     Lender shall have the right, but no obligation, in Franchisee's name and on its behalf, to cure any failure of Franchisee to pay amounts owed to Company or its Affiliate under the Franchise Agreement, provided Lender cures any such failure on or before the date which is five (5) days after Company's delivery to Lender of notice of such failure. Any amounts that Lender pays under this Section, and any costs and expenses (including, without limitation, attorneys' fees) that Lender incurs in connection therewith, shall be added to the Loan.

(3)     Company shall have the right, but no obligation, in Franchisee's name and on its behalf, to cure any failure of Franchisee under the Loan Agreement, provided Company cures any such failure on or before (a) the last day of the cure period afforded to Franchisee under the Loan Agreement to cure such failure, if any, or (b) 5 days after Lender's delivery to Company of notice of such failure, whichever is later Franchisee shall promptly reimburse Company for all amounts that Company pays under this Section and any costs and expenses (including, without limitation, attorneys' fees) that Company incurs in connection therewith.

(4)     In addition to and without limiting Company's rights under this Agreement, upon either Franchisee's default under the Loan Agreement and failure to cure such default within the cure period afforded to Franchisee under the Loan Agreement, if any, or the termination of the Franchise Agreement before its term expires (except in accordance with the Franchise Agreement), Company shall have the right, but not the obligation, upon delivery of written notice to Lender:

(a)     to assume Franchisee's obligations under the Loan Agreement, including, without limitation, its obligation to repay the then remaining Loan. If Company exercises its rights under this Section, Lender shall provide Company a reasonable time following its exercise of such rights to cure any then outstanding defaults of Franchisee under the Loan Agreement. To the extent required under the Loan Agreement, Lender hereby consents to any assumption of Franchisee's obligations under the Loan Agreement pursuant to this Section, and Company will execute all necessary documentation to evidence its assumption of all of Franchisee's obligations under the Loan Agreement.

(b)     purchase Lender's interest in the Loan and the Loan Agreement on terms acceptable to Company and Lender. If Company exercises its rights under this Section, Lender and Company will execute all necessary documentation to transfer to Company all of Lender's right, title and interest in and to the Loan and the Loan Agreement, including, without limitation, Lender's rights in all Collateral securing the Loan and all of Lender's rights and remedies to proceed against Franchisee with respect to payments made by Company to fulfill Franchisee's obligations under the Loan.

Company may, at its option, assign any or all of its rights and obligations under this Section to a designee, and that designee shall have all of Company's rights and obligations described herein.

(5)     By its signature below, Franchisee acknowledges that this Lender Consent was provided to Lender at Franchisee's request and in consideration thereof, Franchisee hereby releases Lender and Company, as well as each of their respective Affiliates, officers, directors, employees, agents, representatives, successors and assigns, of and from any and all actions, causes of action, suits, claims, demands, contingencies, debts, accounts and judgments whatsoever, at law or in equity, whether known or unknown, assuming from the exercise by Lender or Company of any of the rights granted hereunder and the recognition and compliance with such exercise by the other parties hereto.

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

Notwithstanding anything to the contrary in this Lender Consent or the Loan Agreement, nothing in this Lender Consent constitutes Company's consent to Lender's acquiring any possessory or other rights in the Collateral or otherwise assuming possession of the Salon (for example, through foreclosure or conveyance in lieu of foreclosure) (a "**Foreclosure**"). Any Foreclosure constitutes a Transfer requiring Company's prior written consent pursuant to the Franchise Agreement. If Lender desires to operate the Salon under the Marks following the Foreclosure, then, before the Foreclosure, either (a) Lender and/or Franchisee shall comply with the appropriate provisions of the Franchise Agreement pertaining to Transfers, or (b) Lender shall comply with Company's then current procedures and requirements concerning the grant of new franchises. Nothing in this Lender Consent is a warranty or guaranty, express or implied, that Company will consent to the Transfer or grant a new franchise to Lender (or its designee).

If, at any time after a Foreclosure, Lender decides to sell its interest in the Salon or ownership interest in Franchisee, Lender shall notify Company in a writing that describes the interest proposed to be sold and the terms of the proposed sale. Company shall have a right of first refusal, exercisable at any time within 30 days after Company's receipt of Lender's notice, to acquire such interest on the same terms and conditions as those agreed to between Lender and the prospective buyer.

Nothing in this Lender Consent shall limit Company's ability to enforce any of its rights or remedies under the Franchise Agreement (whether before or after a default thereunder) or applicable law.

Lender agrees and consents that any or all of Company's rights and obligations under this Lender Consent may be assigned to any Affiliate of Company or to any successor or assign of Company under the Franchise Agreement, and that following such assignment, Company will have no liability, contingent or otherwise, hereunder. Company agrees and consents that any or all of Lenders' rights and obligations under this Lender Consent may be assigned to any Affiliate of Lender and that following such assignment, Lender will have no liability, contingent or otherwise, hereunder. This Lender Consent is binding upon the parties hereto and the irrespective permitted successors and assigns and inures to the benefit of the parties hereto and their respective permitted successors and assigns.

All notices, request or demands hereunder shall be in writing and deemed delivered at the time delivered by hand, or 1 business day after being placed in the hands of a nationally recognized commercial counter service for next business day delivery, or 3 business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid, and must be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified and/or, with respect to any notices to Franchisee, at the Salon's address.

THIS LENDER CONSENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE LAWS OF THE STATE OF FLORIDA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

This Lender Consent may be executed in any number of counterparts, each of which when executed and delivered, will be deemed an original, but all counterparts together will constitute but one and the same instrument.

Very truly yours,

PAINT NAIL BAR FRANCHISE COMPANY, LLC

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

AGREED TO AND ACCEPTED this _____ day of _____, 201__.

(Lender)

By _____
Name _____
Title _____

AGREED TO AND ACCEPTED this _____ day of _____, 201__.

(Franchisee)

By _____
Name _____
Title _____

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT N**

---

**FRANCHISE COMPLIANCE CERTIFICATE**

---

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**FRANCHISE COMPLIANCE CERTIFICATE**

As you know PAINT NAIL BAR FRANCHISE COMPANY, LLC ("**we**" or "**us**" or "**our**"), and you are preparing to enter into a Franchise Agreement for the operation of a PAINT Nail Bar® Salon franchise. The purpose of this Questionnaire is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, to be certain that you have been properly represented in this transaction, and to be certain that you understand the limitations on claims you may make by reason of the purchase and operation of your franchise. **You cannot sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document but you must sign and date it the same day you sign the Franchise Agreement and pay your franchise fee.** Please review each of the following questions carefully and provide honest responses to each question. If you answer "No" to any of the questions below, please explain your answer on the back of this sheet.

Yes__ No__ 1. Have you received and personally reviewed the Franchise Agreement and each attachment or schedule attached to it?

Yes__ No__ 2. Did you receive the Franchise Agreement and each ancillary agreement, containing all material terms, at least 7 calendar days before signing any binding agreement with us or an affiliate? (This does not include any mutually agreed upon changes to any agreement.)

Yes__ No__ 3. Have you received and personally reviewed the Franchise Disclosure Document we provided?

Yes__ No__ 4. Did you receive the Franchise Disclosure Document at least 14 calendar days before signing the Franchise Agreement, this Questionnaire, or any related agreement, or before paying any funds to us or an affiliate related to the franchise sale?

Yes__ No__ 5. Did you sign a receipt for the Franchise Disclosure Document indicating the date you received it?

Yes__ No__ 6. Do you understand all the information contained in the Franchise Disclosure Document and Franchise Agreement?

Yes__ No__ 7. Have you reviewed the Franchise Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor?

Yes__ No__ 8. Have you discussed the benefits and risks of developing and operating a PAINT Nail Bar® Salon franchise with an existing PAINT Nail Bar® Salon franchisee?

Yes__ No__ 9. Do you understand the risks of developing and operating a PAINT Nail Bar® Salon franchise?

Yes__ No__ 10. Do you understand the success or failure of your franchise will depend in large part upon your skills, abilities and efforts and those of the persons you employ as well as many factors beyond your control such as competition, interest rates, the economy, inflation, labor and supply costs and other relevant factors?

Yes__ No__ 11. Do you understand all disputes or claims you may have arising out of or relating to the Franchise Agreement must be mediated in Florida, if not resolved informally?

Yes__ No__ 12. Do you understand that you must satisfactorily complete the initial training course before we will allow your franchised Salon to open or consent to a transfer?

Yes__ No__ 13. Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a PAINT Nail Bar® Salon franchise that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

Yes__ No__ 14. Do you agree that no employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement, concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

1

Yes__ No__    15.    Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue a PAINT Nail Bar® Salon franchise will generate, that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

Yes__ No__    16.    Do you understand that the Franchise Agreement and attachments to the Franchise Agreement contain the entire agreement between us and you concerning the franchise for the PAINT Nail Bar® Salon meaning any prior oral or written statements not set out in the Franchise Agreement or the attachments to the Franchise Agreement will not be binding?

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.

| | |
|---|---|
| _Kenny Eric Eddleman_ | _Andrea M Eddleman signature_ |
| Franchise Applicant | Franchise Applicant |
| Kenny Eric Eddleman | Andrea M Eddleman |
| Name (please print) | Name (please print) |
| 11/22/2021 | 11/23/2021 |
| Dated _____ | Dated _____ |
| | |
| Franchise Applicant | Franchise Applicant |
| | |
| Name (please print) | Name (please print) |
| | |
| Dated _____ | Dated _____ |

EXPLANATION OF ANY NEGATIVE RESPONSES [REFER TO QUESTION NUMBER]:

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT O TO THE DISCLOSURE DOCUMENT**

---

**STATE EFFECTIVE DATES**

---

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

# State Effective Dates

The following states have franchise laws that require the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This document is effective and may be used in the following states, where the document is filed, registered or exempt from registration, as of the Effective Date stated below:

| State | Effective Date |
|---|---|
| California | Effective _____, 2021 |
| Hawaii | None |
| Illinois | None |
| Indiana | None |
| Maryland | Effective_____, 2021 |
| Michigan | Effective December 23, 2020 |
| Minnesota | None |
| New York | None |
| North Dakota | None |
| Rhode Island | None |
| South Dakota | None |
| Virginia | Effective_____, 2021 |
| Washington | None |
| Wisconsin | None |

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

QB\40549416.55

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

**EXHIBIT P TO THE DISCLOSURE DOCUMENT**

---

**RECEIPTS**

---

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

# **RECEIPT**

This disclosure document summarizes certain provisions of the franchise agreement, area development agreement and other information in plain language.  Read this disclosure document and all agreements carefully.

If PAINT NAIL BAR FRANCHISE COMPANY, LLC offers you a franchise, we must provide this disclosure document to you 14 calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.  New York requires that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of any binding franchise or other agreement, or payment of any consideration that relates to the franchise relationship.  Michigan requires that we give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement, or payment of any consideration, whichever occurs first.

If PAINT NAIL BAR FRANCHISE COMPANY, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and any applicable state agency Exhibit A to this disclosure document.

The franchisor is PAINT NAIL BAR FRANCHISE COMPANY, LLC, located at 1432 First Street, Sarasota, Florida 34236. Its telephone number is (301) 807-2971.

We authorize the respective state agencies identified on Exhibit "A" to receive service of process for us if we are registered in the particular state.

Issuance Date:  September 29, 2021.

The name, principal business address, and telephone number of the franchise seller(s) offering the franchise is/are:

| Name | Principal Business Address | Telephone Number |
|---|---|---|
| ☐  Mark Schlossberg<br>☐  Michele Schlossberg | 1432 First Street<br>Sarasota, FL  34236 | (301) 807-2971 |

I have received a disclosure document dated :  September 29, 2021 (the state effective dates are listed on the pages preceding the table of contents).  The disclosure document included the following Exhibits:

| | | | |
|---|---|---|---|
| Exhibit "A" | List of State Agencies/Agents for Service of Process | Exhibit "J" | Form of Conditional Assignment of Telephone Numbers and Listings and Internet Addresses |
| Exhibit "B" | Franchise Agreement | | |
| Exhibit "C" | Area Development Addendum | Exhibit "K" | Confidentiality, Nonsolicitation and Noncompetition Agreement |
| Exhibit "D" | Financial Statements | | |
| Exhibit "E" | Form of Release | Exhibit "L" | Lease Addendum |
| Exhibit "F" | State Specific Addenda and Riders | Exhibit "M" | Lender  Consent |
| Exhibit "G" | Table of Contents of Manuals | Exhibit "N" | Franchise Compliance Certificate |
| Exhibit "H" | Principal Owner's Guaranty | Exhibit "O" | State Effective Dates |
| Exhibit "I" | Principal Owner's Statement | Exhibit "P" | Receipts |

_____
Print Name

_____          _____
Date                                                    (Signature) Prospective Franchise Owner

_____

**(Keep this page for your records)**

QB\40549416.55

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

DocuSign Envelope ID: 38CF8D76-6322-40F6-AF8E-547C15D6637D

## **RECEIPT**

This disclosure document summarizes certain provisions of the franchise agreement, area development agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If PAINT NAIL BAR FRANCHISE COMPANY, LLC offers you a franchise, we must provide this disclosure document to you 14 calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. New York requires that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of any binding franchise or other agreement, or payment of any consideration that relates to the franchise relationship. Michigan requires that we give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement, or payment of any consideration, whichever occurs first.

If PAINT NAIL BAR FRANCHISE COMPANY, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and any applicable state agency Exhibit A to this disclosure document.

The franchisor is PAINT NAIL BAR FRANCHISE COMPANY, LLC, located at 1432 First Street, Sarasota, Florida 34236. Its telephone number is (301) 807-2971.

We authorize the respective state agencies identified on Exhibit "A" to receive service of process for us if we are registered in the particular state.

Issuance Date: : September 29, 2021.

The name, principal business address, and telephone number of the franchise seller(s) offering the franchise is/are:

| Name | Principal Business Address | Telephone Number |
|---|---|---|
| ☐ Mark Schlossberg<br>☐ Michele Schlossberg | 1432 First Street<br>Sarasota, FL 34236 | (301) 807-2971 |

I have received a disclosure document dated : September 29, 2021 (the state effective dates are listed on the pages preceding the table of contents). The disclosure document included the following Exhibits:

| | | | |
|---|---|---|---|
| Exhibit "A" | List of State Agencies/Agents for Service of Process | Exhibit "J" | Form of Conditional Assignment of Telephone Numbers and Listings and Internet Addresses |
| Exhibit "B" | Franchise Agreement | | |
| Exhibit "C" | Area Development Addendum | Exhibit "K" | Confidentiality, Nonsolicitation and Noncompetition Agreement |
| Exhibit "D" | Financial Statements | | |
| Exhibit "E" | Form of Release | Exhibit "L" | Lease Addendum |
| Exhibit "F" | State Specific Addenda and Riders | Exhibit "M" | Lender Consent |
| Exhibit "G" | Table of Contents of Manuals | Exhibit "N" | Franchise Compliance Certificate |
| Exhibit "H" | Principal Owner's Guaranty | Exhibit "O" | State Effective Dates |
| Exhibit "I" | Principal Owner's Statement | Exhibit "P" | Receipts |

_____

Print Name

_____

_____

Date

(Signature) Prospective Franchise Owner

_____

**(Sign and Return this Page to Us):**
**PAINT NAIL BAR FRANCHISE COMPANY, LLC**
**1432 First Street**
**Sarasota, Florida 34236**
**Attn: Mark Schlossberg**